IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Charles Christopher Williams, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | **DEATH PENALTY CASE** |
| v. | ) | C.A. No. 6:16-cv-1655-JMC-KFM |
| | ) | |
| Bryan P. Sterling, Commissioner, | ) | |
| South Carolina Department of Corrections, | ) | |
| Joseph McFadden, Warden, Lieber | ) | |
| Correctional Institution, | ) | |
| Respondents. | ) | |

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY**

1.  Charles Christopher Williams was convicted and sentenced to death in the Greenville County Court of General Sessions in South Carolina.  Case Nos. 03-GS-23-6677; 04-GS-23-1745; 04-23-1746.

2.  Petitioner was convicted on February 15, 2005, and sentenced on February 19, 2005.

3.  Petitioner was sentenced to death.

4.  Petitioner was convicted of more than one crime.

5.  Petitioner was convicted of murder, kidnapping, and using a firearm during the commission of a violent crime.  He was sentenced to death for murder.

6.  Petitioner pled not guilty and was tried by a jury.

7.  Petitioner did not testify at trial.

8.  Petitioner appealed his convictions and sentence.

9.  (a)-(e) Petitioner appealed to the Supreme Court of South Carolina. The court affirmed the conviction and sentence on February 8, 2010.  *State v Williams,* 690 S.E.2d 62 (S.C. 2010).

    (f)    Petitioner raised the following grounds in his direct appeal, Dkt. No. 19-1:

           (1)    The court erred by refusing to sentence appellant to life imprisonment when the jury revealed it was split nine to three in favor of death after hours of deliberation since the alternative of an Allen charge was impractical and was going to be coercive against the minority opposing death under these unusual circumstances, and S.C. Code §16-3-20 provided for a life sentence where the jury cannot agree on a sentence after "reasonable deliberation."

(2)  The court erred, in the alternative, by refusing to give appellant's proposed Allen charge when the jury revealed it was split 9-3 in favor of the death penalty where the judge's instruction concluded with language telling the jury the court hoped they would arrive at a verdict. This instruction was coercive towards the minority whereas appellant's instruction told the jurors not to do violence to their individual judgments to reach a verdict, and concluded by correctly stating that "no juror should surrender their honest conviction for the mere purpose of returning a unanimous verdict."

(3)  The court erred by refusing to declare a mistrial after Dr. Pamela Crawford testified she consulted with various solicitors and this solicitor again returned to the topic of Dr. Crawford's "assessment" of the case after the judge ruled it was an improper topic for testimony. The solicitor impermissibly had Dr. Crawford vouch for and bolster the solicitor's decision to seek the death penalty while at the same time making the defense appear to be hiding relevant evidence from the jury. The damage could not be cured and a mistrial should have been declared that once the jury disclosed its numerical division it was incumbent upon the trial judge to declare a mistrial.

(g)  Petitioner did not seek further review by a higher state court because no such higher state court exists.

(h)  Petitioner filed a petition for writ of certiorari in the United States Supreme Court, Case No. 10-5029. The petition was denied on October 4, 2010. *Williams v. South Carolina*, 562 U.S. 899 (2010).

10.  Petitioner sought relief through an application for post-conviction relief in the state courts of South Carolina.

11.  (a)  Petitioner filed an application for post-conviction relief in the Greenville County Court of Common Pleas, Case No. 2010-CP-23-9792, on November 30, 2010, Dkt. No. 19-11, an addendum to the application was filed on September 30, 2011, Dkt. No. 19-13, and a second addendum was filed

(1)  Trial counsel was ineffective, in derogation of the Sixth Amendment to the United States Constitution, for waiving various objections to the confession given by petitioner to Dr. Pamela Crawford, where Dr. Crawford told petitioner she would help him get treatment as a psychiatrist where she was in reality a law enforcement officer intent on obtaining a damaging confession.

(2)  Trial counsel was ineffective, in derogation of the Sixth Amendment to the United States Constitution, for waiving the objection to Dr. Crawford being allowed to testify before the jury, by agreeing Dr. Crawford could testify but not as an expert, since the trial judge's proposed ruling on the matter was erroneous and it led to great confusion for the jury as Dr. Crawford began what was expert testimony.

(3)  Trial counsel was ineffective, in derogation of the Sixth Amendment to the

United States Constitution, for failing to effectively move for a mistrial based on Dr. Crawford's cumulative testimony, and by failing to effectively object to the trial judge's curative instruction that the South Carolina Supreme Court found solved any need for a mistrial.

(4)    Trial counsel was ineffective, in derogation of the Sixth Amendment to the United States Constitution, for failing to present available evidence in mitigation regarding the extreme difficulties between petitioner's mother and father and available mitigating evidence about petitioner's extremely troubled childhood, teenage, and young adult years.

(5)    Trial counsel was ineffective, in derogation of the Sixth Amendment to the United States Constitution, for arguing the trial judge had to declare a mistrial and sentence petitioner to life imprisonment where the jury revealed its division since defense counsel should have argued the trial judge's distinction between a jury revealing its division upon request from the trial judge, and a jury reporting its division on its own, introduced an arbitrary factor into the case as it related to the trial judge's discretion to give an Allen charge rather than declare a mistrial and sentence petitioner to life imprisonment.

(6)    Trial counsel was ineffective, in derogation of the Sixth Amendment to the United States Constitution, for failing to argue that certain portions of petitioner's journal should have been excluded under Rule 403, SCRE due to their tendency to confuse the jury, and because their probative value was substantially outweighed by their unduly prejudicial effect.

(7)    Trial counsel was ineffective for not preserving, or appellate counsel was ineffective for not briefing, in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and/or South Carolina Code 16-3-25, and/or the corresponding sections of the South Carolina Constitution, that the death penalty was not appropriate and that the death penalty is used in an arbitrary manner.

(8)    Trial counsel was ineffective in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as the corresponding sections of the South Carolina Constitution, for failing to object to statements in the Solicitor's closing argument, including, but not limited to, statements discussing life in prison, statements about the death penalty being extremely limited, injecting his own personal beliefs in the argument, repeatedly referencing the community and the result of the verdict in the community, and allowing improper argument in both the opening statement and the closing argument.

(9)    Trial counsel was ineffective for not preserving, or appellate counsel was ineffective for not briefing, in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as the corresponding sections of the South Carolina Constitution, that the judge's instructions to the jury that their decision was a recommendation violated South Carolina Jurisprudence, as well as the Constitution of South Carolina and the United States.

(10)    Trial counsel was ineffective in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as the corresponding sections of the South Carolina Constitution, for failing to conduct adequate voir dire, and/or to exclude certain jurors, and/or to preserve

the request to change venue.

(11)  Trial counsel was ineffective for not preserving, or appellate counsel was ineffective for not briefing the argument in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as the corresponding sections of the South Carolina Constitution, that the defendant should have the right to plead guilty and still receive a jury trial for sentencing.

(12)  Trial counsel was ineffective for not preserving, or appellate counsel was ineffective for not briefing, in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as the corresponding sections of the South Carolina Constitution, that the aggravating circumstances should be in the indictment.

(13)  Trial counsel was ineffective in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as the corresponding sections of the South Carolina Constitution, for failing to invoke the defendant's right as a foreign national and in investigating the identity of his grandfather.

(14)  Trial counsel was ineffective in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as the corresponding sections of the South Carolina Constitution, and South Carolina Code Ann. 23-3-400 et seq, for failing to ask the judge to make a finding that the defendant did not have to register as a sex offender.

(15)  Trial counsel was ineffective for failing to investigate and further develop prenatal exposure of alcohol to the defendant and the resulting complications arising out of said exposure. This would include a diagnosis of fetal alcohol syndrome or some other type of Alcohol Related Neurodevelopmental Disorder and testimony and evidence that said exposure was not only powerful mitigation that a jury could have considered to give the defendant life, but it also may have been used to prove the defendant, because of mental disease or defect, lacked sufficient capacity to conform his conduct to the requirements of the law.

An evidentiary hearing was held between January 28 and February 6, 2013. The application for postconviction relief was denied on July 24, 2013.

(b)/(c)  Petitioner has not filed any other application for post-conviction relief.

(d)    (1)    Petitioner appealed the denial of his application for post-conviction relief to the South Carolina Supreme Court on the following grounds:

         a.    The PCR judge committed error by failing to address the overwhelming evidence and the clear admissions from trial attorneys that they not only failed to consider fetal alcohol syndrome, but that they would have liked to have had such evidence before the jury. He further committed error by using inappropriate standards and analysis to determine whether said error was prejudicial.

         b.    The PCR court erred in failing to find the solicitor repeatedly injected arbitrary considerations before the jury, including comparing his

decision to seek the death penalty to the jury's decision to impose death, repeatedly injecting his personal opinions before the jury, and by repeatedly minimizing the jury's sense of responsibility, including telling them, "you're not killing anyone."

c. The South Carolina death penalty statute is unconstitutional under *Furman versus Georgia*, and more importantly, an adequate proportionality analysis has never been performed in this case, and the death penalty is excessive in this case.

d. Trial counsel was ineffective in failing to recognize the fact that petitioner is a German citizen and entitled to certain rights as such and entitled to aid from the German government in assisting in his defense. Failure to utilize such aid was prejudicial to petitioner's case.

e. The petitioner had a right to plea guilty to the murder charge and still have a right to trial by jury.

f. The petitioner's constitutional rights were violated by the failure of the aggravating circumstances to be included in the indictment.

(2) The petition for writ of certiorari was initially granted but then denied as improvidently granted on April 13, 2016.

12. The grounds for relief are set forth below.

## GROUNDS FOR FEDERAL HABEAS RELIEF

**I. Petitioner's Rights to a Fair Trial and to Due Process of Law Under the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States Were Violated by the Trial Court's *Allen* Charge to the Jury.[1]**

**A. Supporting Facts**

1. The jury began penalty phase deliberations at 3:50 p.m. on Friday, February 18, 2005. At 7 p.m., the jury returned to open court. The trial judge then told the jurors, "It's been a long twelve days, and it's been a long day today. I know everyone is tired. What I am going to do is stop deliberations, turn you over to the bailiffs, get supper and be back in the morning at 9:30. We will continue deliberations at that time." Dkt. No. 20-6 at 428.

2. The next morning, Saturday, February 19, 2005, after convening at 9:30 the jury sent the judge a note – apparently shortly before 11:55 a.m. – which stated: "Judge Nicholson, jury is at 9 for death imposition, 3 for life imprisonment. Please refer to instruction about what procedure to follow to resolve." The note was signed by the foreperson of the jury. *Id.* at 429-432;

---

[1] Grounds 12(a) & 12(b) in the initial Petition for Writ of Habeas Corpus. Dkt. No. 46.

*See* Court's Exhibit 14.  Dkt. No. 20-8 at 34.  The court then noted that the defense had a motion "based upon the note from the jury" and, in the alternative, a request for an *Allen* charge if the judge denied the motion.  Dkt. No. 20-6 at 429.

      3.     Defense counsel then argued that, under these circumstances, the law required the court to sentence Petitioner to life imprisonment.  Defense counsel noted that he had seen the jury's note and understood the break down between "life and death jurors at this point."  Defense counsel argued that the jury's disclosure required the imposition of a sentence of life imprisonment without parole:

> They should not be brought in and asked any questions or commented to.  They have told you what their count is by the disclosure of that note to you.  So, we do so move that the sentence be imposed, life imprisonment without parole, at this time without further deliberations.

*Id.* at 429-430.

      4.     The court then asked the solicitor for her comments.  *Id.*

      5.     The solicitor admitted, "We can't undo what the jury has done in the sense of the note they've sent out."  Nevertheless, the solicitor opposed the imposition of a life sentence without parole.  *Id.* at 430.

      6.     The court then denied the motion to sentence Petitioner to life imprisonment.  The court stated: "I think the procedure is to give an *Allen* charge and let them continue deliberation."  *Id.* at 430-431.

      7.     After the court refused to declare a mistrial and sentence Petitioner to life imprisonment, Petitioner asked the court, in the alternative, to give the following instruction:

> By law I cannot tell you where to go from here, I suggest that you continue deliberations in an attempt to reach a verdict.  I can tell you that each of you have a duty to consult with one another and to deliberate with a view to reaching an agreement that does not do violence to any one of your individual judgments.  Each of you as jurors must decide the case for yourself after impartial consideration of the evidence with your fellow jurors.  During the course of your continued deliberations each of you should not hesitate to re-examine your own views and change your opinion if convinced that your opinion is erroneous.  Each juror who finds himself or herself to be in the minority should consider their views in light of the opinions of the jurors of the majority.  Those in the majority must consider their views in light of the minority.  **No juror should surrender their honest conviction for the mere purpose of returning a unanimous verdict**.

Court's Exhibit 13. Dkt. No. 20-8 at 38 (emphasis added).

8.    The court denied the request to give an *Allen* charge in this form.  Defense counsel took exception to the court's ruling.  Dkt. No. 6 at 430-432.  The court then instructed the jury as follows:

> Mr. Foreman, ladies and gentlemen of the jury, you've stated you've been unable to reach a verdict in this case.  When a matter is in dispute, it isn't always easy for even two people to agree.  So, when 12 people must agree, it becomes even more difficult.  In some cases absolute certainty cannot be reached or expected. You should consult with one another, express your own views, and listen to the opinions of your fellow jurors.  Tell each other how you feel and why you feel that way.  Discuss your differences with open minds.  Therefore, to some degree it can be said jury service is a matter of give and take.
>
> Every one of you has the right to your opinion, the verdict you agree to must be your own verdict, a result of your own convictions.  You should not give up your firmly held beliefs merely to be in agreement with your fellow jurors.  The minority should consider the majority's opinion and the majority should consider the minority's opinion.  You should carefully consider and respect the opinions of each other and evaluate your position for reasonableness, correctness, and partiality.  You must lay aside all outside matters and reexamine the question before you base [*sic*] the law and the evidence in this case.
>
> I therefore, ask you to return to your deliberations with the hope that you can arrive at [a] verdict.

*Id.* at 432-433.

9.    Following this instruction the defense again took exception "to the extent that your instruction differs from the proposed instruction that we've had marked as Court's Exhibit 13." Defense counsel argued the judge's instruction should emphatically inform the minority jurors that they did not have to "simply go along to get along type language.  We believe the language that we proposed specifically identifies to the jurors that they have the right and essentially an obligation to deal with their own views in this case and not to agree simply to agree."   *Id.* at 434-435.

10.    Defense counsel also cited *State v. Hughes,* 521 S.E.2d 500 (S.C. 1999) for the proposition that an *Allen* charge must be even-handed in telling the majority and minority to give consideration to each other views.  Dkt. No. 20-6 at 434-435.

11.    Under the circumstances of the case, the *Allen* charge given by the court was improper and coercive and violated Petitioner's rights to a fair trial and to due process of law under the Fifth Amendment, Eighth, and Fourteenth Amendments of the Constitution of the United States.

12.    Undue coercion resulted from, among other things, the fact that the three holdout jurors knew that the numerical division in favor of death had been revealed to the court. For these purposes, it is irrelevant whether that revelation came in response to an inquiry by the Court or whether, as here, the jury itself volunteered the information. In either case, the minority jurors are coerced by an *Allen* charge because they are aware that the judge knows the numerical division of the jury and the *Allen* charge appears to single them out as preventing a verdict after a long trial.

13.    In this case, that coercive effect was amplified by the fact that the trial had extended over twelve days. Moreover, deliberations had already consumed more than 5 ½ hours over a two-day period. Indeed, the jury was being forced to deliberate on the weekend, and it was after 2 ½ hours of such deliberation on a Saturday when the jury delivered its note announcing its split.

14.    The closing language of the Court's instruction further enhanced its improperly coercive effect. In particular, the instruction concluded with the judge telling the jurors to return to deliberations with the hope that they could arrive at a verdict rather than with an admonition that no juror should surrender his or her honest convictions to reach a unanimous verdict, as the defense had specifically requested. Dkt. No. 20-6 at 433.

**B.    Exhaustion**

Petitioner exhausted his state remedies on Ground One.

### C.     Direct Appeal

Petitioner raised Ground One on direct appeal, Dkt. No. 19-1 at 8-15, and the South

Carolina Supreme Court adjudicated the claim on the merits, Dkt. No. 19-4 at 5-12.

### D.     Post-Conviction Proceedings

Petitioner did not raise this issue through a post-conviction motion or a motion for

habeas corpus in a state trial court because the issue was exhausted on direct appeal and, therefore,

was not a cognizable claim for post-conviction review in South Carolina state court.  *See Drayton v.*

*Evatt*, 430 S.E.2d 517 (S.C. 1993).

### E.     Other Remedies

Petitioner has not used any other procedures to exhaust his state remedies on Ground

One.

**II.     Petitioner's Rights to a Fair Trial and to Due Process of Law Under the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States Were Violated by the Trial Court's Denial of the Defense Motion for a Mistrial on the Grounds that Testimony Elicited by the State from Pamela Crawford, M.D., a Forensic Psychiatrist, both Improperly Vouched for and Bolstered the State's Decision to Seek the Death Penalty and Created the False Impression that the Defense Was Hiding Relevant Evidence from the Jury.[2]**

### A.     Supporting Facts

1.     The State called Pamela Crawford, M.D., a forensic psychiatrist, as a witness

to testify about an interview that she conducted with Petitioner shortly after his arrest.  Dr. Crawford

testified that she was employed by the South Carolina Department of Mental Health ("DMH") and

that, pursuant to a memorandum of understanding between DMH and the South Carolina Law

Enforcement Division ("SLED"), she served as a consulting forensic psychiatrist for SLED.  Dkt.

No. 20-6 at 169.

2.     Dr. Crawford further testified as follows:

Q     Explain to the jury prior to September the 3rd of 2003, what the
      working relationship you had either with my office or other solicitors.

A     This was all through my work with Department of Mental Health,
      through the memorandum of agreement with SLED.  I would do a
      variety of things.  Some of the things I would do, for example, go on

---

[2] Ground 12(c) in the initial Petition for Writ of Habeas Corpus.  Dkt. No. 46.

> SWAT calls and assist with negotiations. But as far as your office and the solicitor's office is concerned, I would be called by a solicitor if, for example, there was some kind of alleged crime of significant magnitude. And they would call me and ask me to come and provide assistance.

> Q    All right. What type of assistance in particular did I request from you in this particular case on September the 3rd?

> A    In this particular case, and again I'm called by various solicitors throughout the state, and **I'm only called when it's a case of a very severe nature. And typically it's when the death penalty may be considered. And I'm asked to assess –**

*Id.* at 169-170 (emphasis added).

3.    Defense counsel immediately objected to this testimony. *Id.* at 170. The Court sustained the objection, *id.* at 173, and gave a curative instruction as follows:

> Mr. Foreman, ladies and gentlemen of the jury, please disregard anything that she said that she may be asked to assess concerning the death penalty. Disregard that. That's not appropriate. We're not going there.

*Id.* at 174.

4.    Notwithstanding the Court's direction, the State immediately injected the improper issue of Dr. Crawford's assessment of the validity of the death penalty before the jury again:

> Was the purpose of you interviewing the defendant to provide that information to me in consideration of whether or not –

*Id.* at 177.

5.    Defense counsel objected, *id.* and, in light of the additional and now irremedial prejudice from the State's repeated references to the fact that it had consulted with Dr. Crawford on its decision to seek the death penalty and the prejudice from the appearance that the defense was trying to keep relevant information from the jury, moved for a mistrial. *Id.* at 179-181.

6.    The Court denied the motion for a mistrial. *Id.* at 181.

7.    The State's repeated references to the fact that Dr. Crawford, a forensic psychiatrist, had assessed Petitioner and assisted the solicitor in his determination of whether to seek the death penalty prejudiced Petitioner and deprived him a fair trial at the penalty phase. In particular, these references to Dr. Crawford's role improperly vouched for the State's decision to seek death. *See United States v. Young*, 470 U.S. 1, 18-19 (1985) ("prosecutor's opinion carries with it the

imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence"); *Weaver v. Bowersox*, 438 F.3d 832, 841 (8th Cir. 2006) ("prosecutor should not emphasize his or her position of authority in making death penalty determinations because it may encourage the jury to defer to the prosecutor's judgment"); *United States v. Samad*, 754 F.2d 1091, 1100 (4th Cir. 1984).

8.    The solicitor's inexplicable decision to return to this line of questioning even after the court had sustained an objection compounded the prejudice.  Although the court cut off the solicitor's renewed attempt at introducing this improper consideration, that cut off (which necessarily occurred in the presence of the jury) reinforced the improper and highly prejudicial impression that the solicitor had access to, and based his decision to seek the death penalty on, evidence that the defense was keeping from the jury.

**B.    Exhaustion**

Petitioner exhausted his state remedies on Ground Two.

**C.    Direct Appeal**

Petitioner raised Ground Two on direct appeal, Dkt. No. 19-1 at 20-25, and the South Carolina Supreme Court adjudicated the claim on its merits, Dkt. No. 19-4 at 12-14.

**D.    Post-Conviction Proceedings**

Petitioner did not raise the issue through a post-conviction motion or a motion for habeas corpus in a state trial court because the issue was exhausted on direct appeal and, therefore, was not a cognizable claim for post-conviction review in South Carolina state court.  *See Drayton v. Evatt*, 430 S.E.2d 517 (S.C. 1993).

**E.    Other Remedies**

Petitioner has not used any other procedures to exhaust his state remedies on Ground Two.

**III.**    **Petitioner's Right to the Effective Assistance of Counsel Under the Sixth and Fourteenth Amendments to the Constitution of the United States Was Violated by Trial Counsel's Failure to Object to Improper Comments by the Solicitor in His Closing Arguments in the Penalty Phase.** [3]

**A.**    **Supporting Facts**

1.    The Solicitor made a series of improper and prejudicial statements during his closing arguments in the penalty phase.  These improper comments include: (i) references to the Solicitor's personal belief about the appropriateness of the death penalty, Dkt. No. 20-6 at 389 ll. 1 – 3 & ll. 16 – 18, *id.* at 390, ll. 1 – 6); (ii) references to limitations on the Solicitor's ability to seek the death penalty, and to legislative considerations that were false and misleading and relied on matters outside the record, *id.* at 385 ll. 13 - 20, *id.* at 390 ll. 1 – 6; (iii) comments that minimized the jury's sense of responsibility, *id.* at 385 ll. 13 - 20, *id.* at 386 l. 10, *id.* at 389 ll. 1 – 3, *id.* at 389 ll. 16 – 18, *id.* at 390 ll. 1 – 6; (iv) references to prison conditions that were false and misleading and that improperly suggested to the jury that a death sentence was necessary in order to ensure that Petitioner suffered, *id.* at 396 l. 17 – 397 l. 13); (v) arguments that Petitioner should not receive mercy because he showed no mercy to the victim, *id.* at 388 ll. 4 – 24); and (vi) entreaties to the jury "to speak for the community" and to make its decision "ring like a bell . . . so this community will know that we will not tolerate conduct of this type without the maximum punishment," *id.* at 398 l. 19 – 399 l. 11.

2.    It was improper for the Solicitor:

    a.    To refer to his personal opinions during closing argument.  *United States v. Young*, 470 U.S. 1, 18-19 (1985); *Weaver v. Bowersox*, 438 F.3d 832, 841 (8th Cir. 2006); *State v. Woomer*, 284 S.E.2d 357 (S.C. 1981); *State v. Northcutt*, 641 S.E.2d 873 (S.C. 2007).

    b.    To refer to limitations on his ability to seek the death penalty and to legislative considerations that were false and misleading and relied on matters outside the record.  *Romano v. Oklahoma*, 512 U.S. 1 (1994); *Vasquez v. State*, 698 S.E. 2d 561 (S.C. 2010); *State v. Smart*, 299 S.E.2d 686 (S.C. 1982).

    c.    To make comments that minimized the jury's sense of responsibility.  *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Woomer*, *supra*; *Sigmon v. State*, 742 S.E.2d 394, 399 (S.C. 2013).

    d.    To refer to prison conditions that were false and misleading and to suggest that a death sentence was necessary in order to ensure that

_____

[3] Ground 12(k) in the initial Petition for Writ of Habeas Corpus.  Dkt. No. 46.

Petitioner suffered. *State v. Bowman*, 623 S.E.2d 378, 387 (S.C. 2005),
*State v. Burkhart*, 640 S.E.2d 450, 453 (S.C. 2007).

e.   To argue that Petitioner should not receive mercy because he showed
     no mercy to the victim. *Lesko v. Lehman*, 925 F.2d 1527, 1545 (3rd
     Cir. 1991) (government "exceed[s] bounds of permissible advocacy by
     imploring the jury to make its death penalty determination in the cruel
     and malevolent manner shown by the defendant…"); *Urbin v. State*,
     714 So.2d 411, 421 (Fla. 1998) ("blatantly impermissible" for
     prosecutor to argue that jury should "show [the defendant] the same
     amount of mercy, the same amount of pity that he showed [the
     victim]")

f.   To ask the jury "to speak for the community" and to make its decision
     "ring like a bell . . . so this community will know that we will not
     tolerate conduct of this type without the maximum punishment." Such
     exhortations to a jury to send a message to the community are plainly
     improper. *See United States v. Runyon*, 707 F.3d 475, 514-515 (4th
     Cir. 2013); *United States v. Caro*, 597 F.3d 608, 625 n. 17 (4th Cir.
     2010).

3.   Trial counsel did not object to any of these improper arguments.

4.   Trial counsel had no strategic reason for the failure to object to any of these
improper comments, Dkt. No. 20-9 at 312, except for trial counsel's admittedly flawed reasoning for
not objecting to the Solicitor's comments regarding prison conditions. At the PCR hearing, trial
counsel testified that he made a strategic decision to mock the Solicitor's comments regarding prison
conditions rather than to object to them. *Id.* at 306. However, that decision was objectively
unreasonable in light of how prejudicial the comments were and the fact that trial counsel could have
objected to the questions and requested a mistrial and still have mocked the Solicitor if the motion
for trial were denied.

5.   The Solicitor's improper arguments denied Petitioner a fundamentally fair
sentencing trial in violation of the due process clause of the Fourteenth Amendment. These improper
arguments also injected arbitrary and prejudicial elements into the decisions that the jury made in
this case, thereby undermining the reliability of the verdict and sentence in violation of the Eighth
and Fourteenth Amendments. *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988) (a death sentence
cannot constitutionally "be predicated on mere 'caprice' or on 'factors that are constitutionally
impermissible or totally irrelevant to the sentencing process'") (quoting *Zant v. Stephens*, 462 U.S.
862, 884-85, 887 n. 24 (1983)). *See also Gardner v. Florida*, 430 U.S. 349 (1977).

6.    Trial counsel's conduct was deficient and prejudicial and denied Petitioner the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments.  *Strickland v. Washington*, 466 U.S. 668 (1984).

**B.    Exhaustion**

Petitioner exhausted his state remedies on Ground Three.

**C.    Direct Appeal**

Petitioner did not raise Ground Three on direct appeal because claims of ineffective assistance of trial counsel in South Carolina can be raised only in post-conviction proceedings.  *See State v. Elmore*, 386 S.E.2d 769 (S.C. 1989); *State v. Kornahrens*, 350 S.E.2d 180 (S.C. 1986).

**D.    Post-Conviction Proceedings**

Petitioner raised this claim in state post-conviction proceedings and the state court adjudicated the merits of the claim.  Dkt. No. 20-12 at 187-196.  This claim was also raised in the Petition for Writ of Certiorari to the South Carolina Supreme Court challenging the denial of post-conviction relief.  Dkt. No. 19-17 at 44-61.

**E.    Other Remedies**

Petitioner has not used any other procedures to exhaust his state remedies on Ground Three.

**IV.    In the Alternative to Ground Three, If, and to the Extent that, Ground Three is Not Procedurally Exhausted, Any Failure to Exhaust State Court Remedies on that Ground is Due to Ineffective Assistance of Post-Conviction Counsel.** [4]

**A.    Supporting Facts**

As set forth above, Petitioner contends that he has exhausted his state remedies on Ground Three.

**B.    Exhaustion**

1.    In its Return and Memorandum of Law in Support of Motion for Summary Judgment, the State admitted that Ground Three is exhausted.  Dkt. No. 68 at 177.

2.    Should this Court nonetheless determine that Ground Three is not exhausted, any failure to exhaust state court remedies would constitute ineffective assistance of post-conviction

---

[4] Ground 12(cc) in the initial Petition for Writ of Habeas Corpus.  Dkt. No. 46.

counsel, *see Martinez v. Ryan*, 132 S.Ct. 1309 (2012), and, therefore, should not result in a procedural bar.

**V.     Petitioner was denied the effective assistance of trial counsel pursuant to the Sixth and Fourteenth Amendments to the United States Constitution because counsel failed to assert that Petitioner is a citizen of The Federal Republic of Germany and, as such, was entitled to assistance from the German government.[5]**

**A.     Supporting Facts**

1.     Despite counsel's awareness that Petitioner's mother was born in German, R. at 2249, counsel failed to discover that Petitioner is himself a citizen of Germany due to that fact, cite.  As a result of his German citizenship, Petitioner was entitled to consular assistance from the German government, which is opposed to capital punishment and has an obligation to assist German citizens facing the death penalty in foreign jurisdictions.  Both the United States and Germany are signatories to the Vienna Convention on Consular Affairs, an agreement that ensures Germany's access to detained citizens in the United States and permits Germany to secure legal representation and assistance for German citizens.

2.     Because of counsel's failures, Petitioner was denied the considerable consular resources that would have been provided by Germany.  Petitioner was prejudiced because the services provided by Germany would have included, among other things, assessing the quality of Petitioner's trial counsel, providing access to financial support for developing key evidence by engaging investigators and experts, monitoring the progress of the case through the trial and appellate review, and providing significant input as an amici in the court proceedings.

3.     Trial counsel's conduct was deficient and prejudicial and denied Petitioner the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments.  *Strickland v. Washington*, 466 U.S. 668 (1984).

**B.     Exhaustion**

Petitioner exhausted his state remedies on Ground Five.

**C.     Direct Appeal**

---

[5] Ground 12(p) in the initial Petition for Writ of Habeas Corpus.  Dkt. No. 46.

Petitioner did not raise Ground Five on direct appeal because claims of ineffective assistance of trial counsel in South Carolina can be raised only in post-conviction proceedings. *See State v. Elmore*, 386 S.E.2d 769 (S.C. 1989); *State v. Kornahrens*, 350 S.E.2d 180 (S.C. 1986).

### D. Post-Conviction Proceedings

Petitioner raised this claim in state post-conviction proceedings and the state court adjudicated the merits of the claim. Dkt. No. 20-12 at 202-206. This claim was also raised in the Petition for Writ of Certiorari to the South Carolina Supreme Court challenging the denial of post-conviction relief. Dkt. No. 19-17 at 77-78.

### E. Other Remedies

Petitioner has not used any other procedures to exhaust his state remedies on Ground Five.

## VI. Petitioner was Denied the Effective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments to the United States Constitution Due to Trial Counsel's Failure to Investigate, Development, and Present in Mitigation of Punishment that Petitioner Suffers From Fetal Alcohol Syndrome Due to His Mother's Abuse of Alcohol During Pregnancy.

### A. Supporting Facts

1.     Petitioner's trial counsel retained Jan Vogelsang, M.S.W., a social worker, to investigate mitigation evidence in preparation for sentencing. Dkt. No. 20-9 at 212. Through this investigation, counsel were aware of Petitioner's learning disabilities and placement in special education classes in school. *Id.* at 225. Counsel were also aware that Petitioner's mother was an alcoholic, *id.* at 231, who drank during her pregnancy with Petitioner, i*d.* at 227. *See also id.* at 228.

3.     Counsel retained James Evans, Ph.D., to conduct neuropsychological testing on Petitioner. *Id.* at 232. Dr. Evans' testing confirmed Petitioner's learning disabilities and revealed further neurological impairment. *Id.* at 233-234.

4.     Counsel also retained Robert Richards, M.D., a general psychiatrist, to examine Petitioner. Dr. Richards diagnosed bipolar disorder, but also recommended Magnetic Resonance Imaging (MRI) of Petitioner's brain. *Id.* at 237-238.

5.     During the weekend prior to the beginning of jury selection, at counsel's request, an MRI of Petitioner's brain, as well as a neurological evaluation, was conducted by David

A. Griesemer, M.D. *Id.* at 239-240. Dr. Griesemer was not provided any background information and had to rely solely on his interview and examination of the Petitioner. *See* Affidavit of Dr. Griesemer, Attached as Exhibit 3.

6.      Despite counsel's awareness of Petitioner's impairments and his mother's drinking during pregnancy with him, counsel did not consider or investigate the possibility that Petitioner suffers from Fetal Alcohol Syndrome. Dkt. No. 20-9 at 290 (Nettles); Dkt. No. 20-9 at 353 (Mauldin). If counsel had done so, they would have learned that Petitioner suffers from partial fetal alcohol syndrome (PFAS). (Dkt. No. 20-11 at 184). This evidence could have and should have been presented as it was in the PCR case by three expert witnesses who regularly deal with fetal alcohol syndrome disorders:  (1) Paul Connor, a neuropsychologist who conducted testing on the petitioner and determined he was deficient in 8 out of the 11 cognitive ability domains tested, Dkt. No. 20-10 at 53; (2) Richard Adler, a forensic psychiatrist, who diagnosed the petitioner with PFAS, Dkt. No. 20-11 at 72; and (3) Natalie Novick Brown, a forensic psychologist who reviewed petitioner's entire life history, as well as the other experts' investigations and conclusions, and determined the petitioner's PFAS impaired his ability to such an extent that he could not conform his conduct to the requirements of the law. Dkt. No. 20-11 at 367.

7.      Trial counsel's conduct was deficient and prejudicial and denied Petitioner the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments. *Strickland v. Washington*, 466 U.S. 668 (1984).

**B.      Exhaustion**

Petitioner exhausted his state remedies on Ground Six.

**C.      Direct Appeal**

Petitioner did not raise Ground Six on direct appeal because claims of ineffective assistance of trial counsel in South Carolina can be raised only in post-conviction proceedings. *See State v. Elmore*, 386 S.E.2d 769 (S.C. 1989); *State v. Kornahrens*, 350 S.E.2d 180 (S.C. 1986).

**D.      Post-Conviction Proceedings**

Petitioner raised this claim in state post-conviction proceedings and the state court adjudicated the merits of the claim. Dkt. No. 20-12 at 207-219. This claim was also raised in the

Petition for Writ of Certiorari to the South Carolina Supreme Court challenging the denial of post-conviction relief.  Dkt. No. 19-17 at 11-40.

### E.     Other Remedies

Petitioner has not used any other procedures to exhaust his state remedies on Ground Six.

**VII.     Petitioner's Right to the Effective Assistance of Counsel under the Sixth and Fourteenth Amendments of the Constitution of the United States was Violated by Trial Counsel's Failure to Assert Either (a) that the Eighth and Fourteenth Amendments to the Constitution of the United States Prohibit the Imposition of the Death Penalty on all Persons under the Age of 21 or (b) that those Amendments Prohibit the Imposition of the Death Penalty on Persons under the Age of 21 Who Have Not Fully Matured and Petitioner, Who Was Only 20 Years Old at the Time of the Offense Was Such a Person.[6]**

### A.     Supporting Facts

1.     Petitioner was 20 years old at the time of the offense.

2.     Testimony at the PCR hearing established that Petitioner was "extremely immature and child-like" and that his skill levels as determined by the Vineland test of adaptive functioning was at approximately the level of a nine-year-old child.  Dkt. No. 20-11 at 303.

3.     In *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court held that the Eighth and Fourteenth Amendments to the Constitution prohibit the imposition of the death penalty on juvenile offenders under the age of 18 at the time of their offense.  Because the petitioner in *Roper* was under 18, the Court was not presented with the question of whether the Constitution nonetheless permits capital punishment to be imposed on juveniles over age 18 but under age 21.  Nonetheless, the central considerations that compelled the Court to hold that the Constitution prohibits the execution of offenders under the age of 18 apply with similar force to juveniles who commit their offense between ages 18 and 21.  Moreover, even if those considerations would not have supported an extension of this prohibition to all persons under the age of 21 at the time of their offense, they would at a minimum have supported the extension of the prohibition to those persons under age 21 who had not fully matured; Petitioner was such a person.

---

[6] Grounds 12(dd) & 12(ee) in the initial Petition for Writ of Habeas Corpus.  Dkt. No. 46.

4.    Trial counsel's failure to argue either (i) that the imposition of the death penalty on a defendant who was under the age of 21 at the time of his offense was unconstitutional or (ii) that the imposition of the death penalty on persons under age 21 who have not fully matured, such as Petitioner, was unconstitutional was deficient performance and prejudicial and denied Petitioner the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments. *Strickland v. Washington*, 466 U.S. 668 (1984).

### B.    Exhaustion

Ground Seven is not exhausted.

### C.    Direct Appeal

Petitioner did not raise Ground Seven on direct appeal because claims of ineffective assistance of trial counsel in South Carolina can be raised only in post-conviction proceedings.  *See State v. Elmore*, 386 S.E.2d 769 (S.C. 1989); *State v. Kornahrens*, 350 S.E.2d 180 (S.C. 1986).

### D.    Post-Conviction Proceedings

Petitioner's claim is not exhausted due to inadequate assistance of post-conviction counsel.  *See Martinez v. Ryan*, 132 S.Ct. 1309, 1320 (2012).  Counsel's conduct was deficient, not based on strategy, and prejudicial.  *Strickland v. Washington*, 466 U.S. 668 (1984).

### E.    Other Remedies

Petitioner has not used any other procedures to exhaust his remedies on Ground Seven.

### VIII.    The Imposition of a Death Sentence on Petitioner Violates the Eighth and Fourteenth Amendments to the Constitution of the United States Because the Death Penalty Statute of the State of Carolina Fails to Narrow the Circumstances Under Which the Death Penalty May Be Imposed and Therefore Results in an Arbitrary and Capricious Capital Sentencing Process.

### A.    Supporting Facts

1.    Taken together, the Eighth and Fourteenth Amendments require a capital sentencing scheme to incorporate procedures that restrict the circumstances under which the death penalty may be imposed.  Those restrictions ensure that the death penalty not be imposed in an arbitrary or capricious manner.  *See Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).

2.    The capital sentencing statutes of most jurisdictions satisfy this constitutional mandate by limiting the circumstances in which the death penalty may be imposed to situations in which the jury finds the existence of one or more "aggravating circumstances."

3.    Although South Carolina's death penalty statute does require a finding of a statutory aggravating circumstance, the statute's list of qualifying aggravating circumstances is so extensive and so broad that it does not in fact restrict the category of murders to which the death penalty may be imposed.  *See* S.C. Code § 16-3-20(C).

4.    The breadth of the statutory aggravating circumstances, and their failure to narrow the class of murders for which the death penalty may be imposed, is exacerbated by the sweeping definitions given to some of those aggravators.

5.    In this case, the only aggravating circumstance found by the jury was that the murder was committed while in the commission of kidnapping.  S.C. Code § 16-3-20(C)(a)(1)(b).  However, under South Carolina law, the definition of "kidnapping" is so expansive that it encompasses the vast majority of murders:

> South Carolina does not have different levels of crimes involving deprivation of freedom.  Instead, the crime of kidnapping in South Carolina is broad in scope.  Under our statute, a person is guilty of kidnapping if he should "unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law."  S.C. Code Ann. § 16-3-910 (2010).  Furthermore, we have interpreted this statute to encompass restraint regardless of duration or whether the victim was moved.  *See State v. Tucker*, 334 S.C. 1, 13-14, 512 S.E.2d 99, 105 (1999) (noting that the offence of kidnapping "commences when one is wrongfully deprived of freedom and continues until the freedom is restored" and further finding that proof of kidnapping existed where defendant had bound victim with duct tape in her home).

*Lozada v. South Carolina Law Enforcement Div.*, 719 S.E.2d 258 (S.C. 2011).

**B.&C. Exhaustion/Direct Appeal**

Petitioner did not assert Ground Eighth as a discrete issue in his appeal to the South Carolina Supreme Court.  Nevertheless, pursuant to S.C. Code § 16-3-25(C), the South Carolina Supreme Court considered the issue of whether Petitioner's death sentence was imposed as a result of any arbitrary manner and adjudicated that issue on the merits. Dkt. No. 19-4 at 14.

### D.    Post-Conviction Proceedings

Petitioner raised this issue in his petition for post-conviction relief and in his petition for writ of certiorari to the South Carolina Supreme Court.

### E.    Other Remedies

Petitioner has not used any other procedures to exhaust his remedies on Ground Eight.

## IX.    In the Alternative to Ground Eight, If, and To The Extent That, Ground Eight is Not Procedurally Exhausted, Any Failure to Exhaust State Court Remedies on that Ground is Due to Ineffective Assistance of Appellate and/or Post-Conviction Counsel.[7]

### A.    Supporting Facts

1.    Although the South Carolina Supreme Court reviewed Petitioner's sentence and decided on the merits that it was not the result of any arbitrary factor, appellate counsel did not affirmatively assert Ground Eight in Petitioner's direct appeal to that Court.

2.    If, and to the extent that, appellate counsel's failure to assert Ground Eight results in a procedural bar, that bar should be excused because such a failure would constitute deficient performance that was prejudicial to Petitioner and deprived him of the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments.  *Strickland v. Washington*, 466 U.S. 668 (1984).

### B.&C. Exhaustion/Direct Appeal

In its Return and Memorandum of Law in Support of Motion for Summary Judgment, the State argues that any claim of ineffective assistance of appellate counsel is procedurally barred because Petitioner's post-conviction counsel did not expressly describe Petitioner's claim as such in the "Questions Presented" section of his Petition for Writ of Certiorari to the South Carolina Supreme Court.  Dkt. No. 68 at 156-58.  Petitioner submits that this claim was adequately raised, both in the body of his petition for certiorari and in his Reply to the State's Return.  Nonetheless, should this Court determine that Petitioner's drafting of the Questions Presented was insufficient to present and to preserve the claim of ineffective assistance of appellate counsel, that drafting failure would constitute inadequate assistance of post-conviction counsel, *see Martinez*, 132 S.Ct. at 1320, and, therefore, should not result in a procedural bar.

---

[7] Ground 12(j) in the initial Petition for Writ of Habeas Corpus.  Dkt. No. 46.

**X.**     **Petitioner was Denied the Effective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments to the United States Constitution Due to Trial Counsel's Failure to Object to the Improper Sentencing Testimony of Witness Tina Smith about The Impact on Her of Witnessing Petitioner Holding the Victim Hostage and Being Unable to Assist Her.**

**A.     Supporting Facts**

1.     During sentencing, the State presented victim impact evidence, which is permitted under *Payne v. Tennessee*, 501 U.S. 808 (1991). Permissible evidence under *Payne* is "evidence about the victim and about the impact of the murder on the victim's family," *id.* at 827, as well as "his friends and colleagues," *United States v. Runyon*, 707 F.3d 475, 500 (4th Cir. 2013).

2.     Here, the State called Tina Smith in sentencing. She had already testified during the trial that she had hired the victim to work at Bi-Lo and was her supervisor and friend. She was present when Petitioner entered the victim's work area at Bi-Lo and grabbed her arm. Ms. Smith ran for help. Dkt. No. 20-5 at 79. The victim was killed before help arrived.

3.     In sentencing, Ms. Smith gave the following testimony:

Q.     Miss Smith, you. were obviously present at the Bi-Lo when the defendant entered the store and you've already testified as to what happened. How has that experience affected you personally?

A.     I live in fear every day of my life. It's something I think about every single day. That's not an exaggeration. I'm always afraid. At work I look around to see if somebody's coming in with a gun. It's constant fear every day. Actually, I'm suffering from post traumatic stress. It's something I have not been able to get past.

Q     And specifically how has Mandy's death affected you?

A     It's the most traumatic thing I ever experienced. I will never forget the look on her face when he grabbed her . And I had to leave her, and I have to see her family and know I had to leave her that day. And it was fear. It's something I'll never forget. I'll remember it the rest of her [sic] life. I'm so sorry to her family that I had to leave her.

Dkt. No. 20-6 at 208.

4.     This testimony was improper because it had nothing to do with impact due to the loss of the victim, but was instead about impact from what Ms. Smith witnessed and her emotional expression of her feelings of guilt for not intervening. This testimony should have been objected to.

5.     Trial counsel's conduct was deficient and prejudicial and denied Petitioner the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments. *Strickland v.*

*Washington*, 466 U.S. 668 (1984).

### B.    Exhaustion

Ground Ten is not exhausted.

### C.    Direct Appeal

Petitioner did not raise Ground Ten on direct appeal because claims of ineffective assistance of trial counsel in South Carolina can be raised only in post-conviction proceedings.  *See State v. Elmore*, 386 S.E.2d 769 (S.C. 1989); *State v. Kornahrens*, 350 S.E.2d 180 (S.C. 1986).

### D.    Post-Conviction Proceedings

Petitioner's claim is not exhausted due to inadequate assistance of post-conviction counsel.  *See Martinez v. Ryan*, 132 S.Ct. 1309, 1320 (2012).  Counsel's conduct was deficient, not based on strategy, and prejudicial.  *Strickland v. Washington*, 466 U.S. 668 (1984).

### E.    Other Remedies

Petitioner has not used any other procedures to exhaust his remedies on Ground Ten.

**GROUNDS FOR FEDERAL HABEAS RELIEF UNDER *MARTINEZ*
(*WITH EXTRA-RECORD EVIDENCE PROVIDED*)[8]**

**XI.    TRIAL AND COLLATERAL COUNSEL WERE INEFFECTIVE BY FAILING TO INVESTIGATE, DEVELOP AND PRESENT EVIDENCE OF THE DEFENDANT'S UNIQUE CHARACTERISTICS WHICH SUBSTANTIALLY REDUCE HIS MORAL CULPABILITY FOR THE CRIME. COUNSEL'S FAILURE VIOLATES THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION, PREJUDICED THE PETITIONER'S CASE, AND UNDERMINES CONFIDENCE IN THE OUTCOME.**

**a.    A BIO-PSYCHOSOCIAL ASSESSMENT IS THE VEHICLE BY WHICH THE UNIQUE CHARACTERISTICS OF THE DEFENDANT ARE CONSOLIDATED AND PRESENTED TO THE JURY SO THAT THE JURY WILL HAVE THE ESSENTIAL EVIDENCE NECESSARY TO REACH A REASONED MORAL JUDGMENT ABOUT THE SENTENCE TO BE IMPOSED.**

i.    Some of the unique characteristics of the petitioner were presented at trial through family members, school personnel, various and sundry medical, vocational, and public records. Expert witnesses were consulted and evaluated the petitioner and some testified concerning their findings. This information was consolidated by an expert who was to create and present a bio-psychosocial assessment (assessment) to the jury. Marjorie Hammock, MSW was that witness. She fairly demonstrated her understanding of the purpose and importance of the assessment when she

---

[8] The following grounds were asserted in the initial habeas petition as Grounds 12(s) and (12(u).  To the extent not previously included, these grounds are offered as additional grounds in support of habeas relief.

testified:

> "It [bio-psychosocial assessment] deals with the biological background of a client, and we work in a multi-disciplinary arena that is, I consult with the medical community to see what their information is about the client. We refer to and receive reference from -- referrals from doctors and other health providers. We share records and use a collaborative amount of information to make a determination about how important is that biological piece to the whole picture." (Dkt. No. 20-6 at 262-263).[9]

Unfortunately, little to no biological, psychiatric or psychological information was included in the assessment. Team physicians' and psychologists' suggestions regarding the need for specific investigation were summarily disregarded by trial counsel.[10] Until the post-conviction investigation was performed trial counsel did not know that a substantial portion of the petitioner's brain, the corpus callosum, was damaged by reason of alcohol toxicity during the gestative period of the petitioner's life (fetal alcohol spectrum disorder). Neuropsychologist James Evans alerted trial counsel to the existence of brain damage and that it "appeared as if there's no corpus callosum." Dkt. No. 20-9 at 239. The evidence of mother's drinking was prevalent and known to the mitigation investigator and trial counsel yet no further inquiry was made and therefore FASD and its cognitive consequences never reached critical mass, never reached the assessment, and never reached the jury. In fact, Daisy's alcohol use during the prenatal period and possible damage to the petitioner in utero was never mentioned in the trial. In reviewing planning notes and emails among trial and collateral counsel, the fact of Daisy's drinking while pregnant with the petitioner was barely mentioned and the term FASD was never brought up. None of the cognitive impairments associated with FASD were ever considered by the sentencing jury. Without a complete bio-psychosocial assessment the jury could not reach a deliberative and informed decision concerning the petitioner's moral

_____

[9] The DSM-V still retains the classical assessment framework although the findings are reported in an integrated fashion. The bio-psychosocial model incorporated in the DSM-IV is a broad view that attributes disease outcome to the intricate, variable interaction of biological factors (genetic, biochemical, etc), psychological factors (mood, personality, behavior, etc.), and social factors (cultural, familial, socioeconomic, medical, etc.). With the new assessment system, clinicians will still take note of the same biological, mental, physical, and social considerations that were previously used in the multiaxial DSM-IV system to provide a comprehensive assessment of the patient. See "Introduction" to the DSM-V.

[10] See affidavit of Richard W. Richards, MD, Attached as Exhibit 1, and the electronic communication of mitigation investigator Vogelsang to lead counsel John Mauldin, Attached as Exhibit 9, wherein it is noted that Dr. Richards had requested that he be provided with the QEEG report and that an MRI be obtained immediately. See affidavit of Dr. David Griesemer, neurologist, Attached as Exhibit 3, wherein he laments the lack of information at the time of his original report dated January 27, 2005 just eleven days before the trial commenced.

culpability for the crime. Neither trial nor collateral counsel investigated other organic brain conditions which were clearly indicated by the record. As an example of the inadequacy of the mitigation case investigation, bipolar affective disorder was diagnosed by Dr. Richards. Bipolar disorder is a condition known to be associated with genetic aberrations and the severity can be quantified by genetic micro-array.

Likewise, the family history for mental illness and suicidality was poorly developed and only for the immediate family.  The social historian is trained to look back as far as possible and at least for three generations. The historian quite minimally described two generations on the paternal side and did no interviews, provided no data, on the maternal side beyond one generation. Erika Leis Shedd (the petitioner's German grandmother) and several of her additional children (his aunts and uncles) were located in Idaho, but no effort was made to contact any of them for history. Ms. Hammock did not mention in her testimony that Daisy's mother, the petitioner's grandmother, had immigrated to the U.S. and was living in Idaho with additional children, or that Daisy and Chris had taken an emotional bus trip to meet them when he was 9 years old. (Flynn Affidavit, Attached as Exhibit 4). Yet even that limited and inadequate history clearly pointed counsel to a genetic script that when studied, would have revealed even more profound conditions than those documented in the limited Family Mental Health History (Defendant's Trial Exhibit 5, Attached here as Habeas Exhibit 5).  The standard of care for preparing the bio-psychosocial assessment is to investigate and gather comprehensive data for at least three generations.[11] Yet even that limited and inadequate history clearly pointed counsel to a genetic script that when studied, ultimately will reveal even more profound conditions. (Exhibit 5).  See affidavit of Merlin Butler, MD, PhD, and Exhibit 6.[12]

Very little social/environmental history was included in the assessment. The more compelling social components failed to make it to the jury or to be considered by the witness in forming her opinions. As an example, the brutal violence suffered for years by the mother was anemically described as "conflict" when in fact the petitioner's mother was taken to the emergency room several

---

[11] See affidavit of Sara Flynn, MSW Exhibit 4.
[12] Biological samples have been collected and the laboratory has commenced the genetic micro-array analysis. The geneticist's written report has not yet been received. The references to the opinions and genetic assessments are, at this point, projections made during conversations between lead counsel William H. Ehlies and the expert.

times after beatings by her husband and often hid bruises and injuries with makeup and scarves to go to work. (See Vogelsang 3/19/04 interview with Daisy Huckaby, Attached as Exhibit 17). The fact that the Petitioner witnessed this brutal violence was not mentioned. Sexual abuse of the mother was included but nothing was reported regarding the profound sexual abuse of the petitioner from approximately ages 6-7 by his paternal Uncle Bryant Williams and during infancy until age 13 by his mother. (Flynn Affidavit Exhibit 4).

Additionally, very little social/environmental history was included in the assessment. The more compelling social components failed to make it to the jury or to be considered by the social historian in forming her opinions and developing her presentation. As an example, as a vulnerable child, the Petitioner witnessed the domestic violence and on at least one occasion was found hiding in a closet. Sexual abuse of the mother was included in the social history but nothing was reported regarding the profound sexual abuse of the petitioner. (Flynn Affidavit Exhibit 4). The assessment was sorely inadequate and failed to provide the jury with the essential information for it to determine the unique characteristics of the defendant and reach a reasoned moral judgment as to the appropriate sentence. The inadequacy of the assessment was known to trial counsel:

> Q: And you knew that part of the social history, essentially at the time you went to trial, had some gaps, correct?
> A: Yes, sir. Yes sir.
> Q: Yet you still presented the social history as you understood it, through Dr. Hammock?
> A: That's right.  (Lead Counsel John Mauldin, Dkt. No. 20-9 at 400)

Understanding the paucity of essential information provided in the assessment requires viewing the assessment as it should have been presented.

### A. THE BIOLOGICAL COMPONENT

### 1. FETAL ALCOHOL SYNDROME DISORDER (FASD):

Trial counsel had ample evidence of Mr. William's mother's drinking during her pregnancy with him, yet this was never investigated. FASD was well-studied and public health education about it at that time was widespread. The defense team should have recognized it, discussed it and pursued evaluation of the client for FASD. Also, the information should have appeared prominently in materials provided to experts and thus covered in their presentations. Trial counsel testified at post-

conviction that they knew of Daisy Huckaby drinking but made nothing of it (Dkt. No. 20-9 at 286-293 (Nettles); Dkt. No. 20-9 at 368-371, 388-389 (Mauldin)).

From Jan Vogelsang's notes from interview with Maureen Bangcuyo on 5/31/04, Attached as Exhibit 18:

"Daisy drank everything and smoked during her pregnancy (with Chris). Both parents drank and smoked pot."

From Jan Vogelsang's notes from interview with Dwight Williams (Petitioner's father) on 3/18/04, Attached as Exhibit 19:

"Mr. Williams began by talking about his wife's drinking problem. He states that his wife Daisy drank during her pregnancy with Chris."

From Jan Vogelsang's chronology, under year '1981':

Daisy drank excessively throughout her pregnancy with Chris. She and Dwight also smoked pot. Dwight tried to talk to her about using alcohol and pot during pregnancy but she said she was German and wine is good for the blood. (Interview with Dwight Williams, Maureen Bangcuyo)

From Jan Vogelsang's chronology, under '1982':

During her pregnancy with Chris, Daisy drank and smoked and she and Dwight had physical fights. From Vogelsang's interviews with Dwight Williams and Maureen Bangcuyo.

Daisy Williams denied use of alcohol in pregnancy to Ms. Vogelsang. However, denial of alcohol use by the mother is not uncommon due to shame, guilt and other factors, and trained masters-level social workers (like Ms. Vogelsang and Ms. Hammock) should have recognized this. Ms. Vogelsang should have advocated that trial counsel consider seriously and have evaluated the possibility of FASD. It is puzzling and tragic how and why the issue of FASD was simply not pursued. Ms. Hammock however was not provided the leadership required of trial counsel in a capital case. (See Hammock affidavit, Attached as Exhibit 7). Trial counsel's failure to be involved and provide direction to retained experts who will testify at trial is a departure from the norms for capital defenders.

At the time of the trial, public health media attention about FASD and campaigns to prevent use of alcohol by pregnant women had been circulated for many years. These campaigns targeted a multidisciplinary array of human service professionals, including social workers. Ms. Vogelsang had

not only the responsibility as a mitigation specialist to point out possible congenital issues to trial counsel, but as a social worker she is expected to advocate that action be taken on behalf of the client. There were other red flags in the records and interviews available to the mitigation specialist and social historian (if the records were shared with her). In the same Christie Pediatric Group record records, Attached as Exhibit 20, Nystagmus (an eye abnormality not uncommon in FASD) was diagnosed at 10 months and a real striking discrepancy in Chris's height and weight was noted at that time. Growth retardation is one of the six indicators of FASD.  During the post-conviction merits hearing Dr. Adler testified that Chris Williams had all three indicators to meet the diagnostic criteria for FASD.

> A. Right. And it's important to note that there is an abundance of evidence supporting this diagnosis,   probably more than any case I have ever examined.

> A. There has to be, B, facial anomalies to make this diagnostic criteria. And according to the IOM, page 76 to 77, any one of C, D or E, needs to be present. Not all three. However in this case, all three are present.

> (Dkt. No. 20-11 at 83)

### 2. GENETICS

Although trial and collateral counsel's experts repeatedly diagnosed and referred to conditions that are genetically based they never investigated developed or presented what are certain to be additional biological conditions objectively verified and quantified for severity. These factors address a person's degree of moral culpability. The factual basis, including trial testimony in support of these statements, are discussed in the section pertaining to IAC for failing to investigate develop and present comprehensive biological information. An example, Epilepsy is reported as a symptom with which the Petitioner may suffer. Epilepsy is in the family history and is a genetically based biological condition of profound significance to a person's executive functioning. The genetic studies would have pulled this condition out of darkness and into the light. (See Adler PCR Testimony, Dkt. No. 20-11 at 131-150).

### 3. TRAUMATIC BRAIN INJURY (TBI):

Chris Williams was found to have traumatic brain injury by a neuropsychologist Evans and a psychiatrist Robert W. Richards prior to his trial, and trial counsel and the mitigation investigator

knew of this diagnosis, but there was no mention of traumatic brain injury (See QEEG report, Attached as Exhibit 8) in the social historian expert's testimony. This critical piece of the Defendant's bio-psychosocial history was completely missing from Marjorie Hammock's presentation to the jury. Additionally, the mitigation investigator acted inappropriately when she discouraged/squelched psychiatrist Dr. Robert Richards' pursuit of an MRI when he suspected TBI or brain deterioration. (See affidavit of Richards Exhibit 1 and Vogelsang email to Mauldin August 26, 2004, Attached at Exhibit 9).

In August of 2004 neuropsychologist Jim Evans, PhD evaluated the Defendant and determined that he had brain injury. He scored a .3 on the impairment index indicating mild brain damage. This was said to have possibly accounted for the IQ split between verbal and performance. (Vogelsang memo, Attached as Exhibit 10). Dr. Evans reported that there was an indication of impairment in the parietal cortical area with low decreased coherence which could account for his disability in arithmetic. He also noted that "he [Petitioner] has an indention in his head in this area where he was hit with a hammer at the age of four or five." (Mitigation Specialist Jan Vogelsang, MSW, in her PCR testimony, read from her 8/25/04 notes from consultation with Evans, Exhibit 10, Dkt. No. 20-9 at 234). Dr. Evans further reported that the frontal impairment could contribute to the mild brain damage combined with a psychotic depression, noting that "he was obsessed with Mandy and extremely stressed. The rigid thinking and impulsivity affected his reaction. Mr. Williams reported that it was his sister Maureen who hit him in the head with the hammer." (Dkt. No. 20-9 at 234).

Q.    Okay. But he (Dr. Evans) does say that he's got brain damage and that it was as if there was no corpus callosum?"
A.    Yes.   (Dkt. No. 20-9 at 237)

Further, psychiatrist Dr. Robert Richards evaluated Mr. Williams around the same time in 2004.  Ms. Vogelsang consulted with Dr. Richards and failed to timely follow-up on his request.

Q.    Okay. Now, in that email you're sending to John (Mauldin) and John's response says confirmed by phone. Is it fair to say that in this email it reflects that Rob Richards, who did testify, wanted to get an MRI done immediately?
A.    Yes.
Q.    He said he would order an - - and basically he said he got real excited about some condition of brain deterioration he knows about and wanted to see the QEEG.  I think - - basically, I'm just going to read this email in the record.  In the meantime, I had a call from

Rob Richards who, in his enthusiasm, I think I remembered that was what it was like. He asked me about brain damage. I told him we had a little. He asked what and I told him a little parietal to frontal. Then he got real excited about some condition of brain deterioration he knows about and wanted to see the QEEG. I told him, whoa, down boy. And while we would be very interested in his theory, he has to wait a minute. He said he would order an MRI immediately. But I cooled his jets and he wants the birth records to get the circumference of Chris' head at birth and his school testing.  (Dkt. No. 20-9 at 238-239).

Maureen Bangcuyo is the Petitioner's biological sister and 11 years older than Chris. At the time she was interviewed by Ms. Vogelsang Maureen was a registered nurse and an accurate family historian. During that interview Maureen recounted a number of events that should have suggested cognitive/brain dysfunction.  Ms. Vogelsang should have initiated discussion and investigation as to organicity but that did not happen. (Vogelsang Interview, Attached as Exhibit 18).  The interview and its details were not included in the Social Historian's bio-psychosocial assessment presentation to the jury. The physical violence coexisted with alcohol while the Petitioner was in utero and that violence was well documented.

"When Daisy was pregnant with Chris, she and Dwight fought morning, noon and night. They boxed around and Daisy hit the floor many times. She remembers her mother screaming that Dwight was going to make her have another miscarriage. She had one miscarriage before Chris was born."  (Exhibit 18)

During the Bancuyp interview Ms. Vogelsang documented that Chris suffered from physical imbalance and coordination issues.

 "Chris fell down a lot. He needed a helmet. Once he fell into a console table and hit his head above the eye."  She also told Ms. Vogelsang in that interview:  "Chris had a strange gait, he couldn't pick his feet up."

If the mitigation investigator and social historian had explored further, they would have also learned that the defendant suffered hits to the head in years of karate and was involved in fights related to being bullied in school for being different. The constant level of violence in the home put Chris at great risk, which should have led to a comprehensive assessment of possible injuries to him in his childhood. Even when traumatic brain injury was suggested by two team experts it was never pursued as a major issue in the Petitioner's life. It is unclear as to whether Ms. Hammock had been told that brain injury was a factor, but it was never shared with the jury.

### 4. LEARNING DISABILITIES:

Documentation of Chris Williams' learning disabilities was readily available to the trial

counsel, mitigation specialist, and to the social historian. However, despite listing educational records as reviewed for the biopsychosocial assessment, learning disabilities are never mentioned in the social historian's testimony. Petitioner is described as a "special child" and a "special needs child", especially one with "also developing mental health problems." A bio-psychosocial assessment of a person who had been diagnosed by a psychologist early in his school years with learning disabilities should have explained in detail, from readily available records, what his disabilities were. If that had been done, the jury would have known, for example, that: Chris was referred for first psychological evaluation when he was repeating first grade, at age 7 years, 8 months, on 9/25/1990. According to school psychologist Janet Hawkins' evaluation, his teacher reported that he was "very distractible in the classroom and has difficulty attending to complete tasks." The psychologist noted that Chris's had a short attention span, that his visual motor skills functioning was an area of weakness, that personality screening testing indicated tendencies toward impulsivity, that he had learning disabilities in the areas of reading and listening comprehension and that he met the criteria for special education as a learning disabled student. (The School District of Greenville County, Evaluation Summary, Janet L. Hawkins, School Psychologist II, 9/25/90, Attached as Exhibit 21). He was placed in Special Education Learning Disabilities Resource Program for the entirety of his entire elementary and middle school years except for one short period when he was removed from resource program due to a move out of the district. A re-evaluation on 9/20/93 indicated that Chris was found to be learning disabled and borderline ADD. None of this detailed information was explained to the jury in the trial. A minimally adequate bio-psychosocial presentation would have fully described Chris Williams' learning limitations while as one of the multiple negative factors, such as domestic violence, alcoholism, and sexual abuse going on in his life simultaneously. (Flynn Affidavit Exhibit 4).

### 5. EPILEPSY:

Epilepsy was never mentioned in the list of illnesses of family members by the social historian, but it was well known that Uncle Bryant Williams had severe epilepsy. There was no discernible evidence of any investigation into family history of epilepsy or whether Chris showed signs of having seizures. Signals of possible seizure activity were noted in statements made by his

sister Maureen, his mother Daisy, and others that he would stare off for periods. First grade teacher Anne Wilson reported to Ms. Vogelsang that "Chris sat and stared, and you could tell the wheels were not turning".  Vogelsang Notes, Attached as Exhibit 23.  The team should have had petitioner evaluated for absence (formerly called petit mal) seizures that cause a short period of "blanking out" or staring into space. Like other kinds of seizures, they are caused by abnormal activity in a person's brain.  Indeed, in the post-conviction phase, seizure activity in the petitioner's brain was described by Richard Adler, MD, in discussing Dr. Wendy Cohen's review of both radiologic studies of Mr. Williams' brain;  (Dkt. No. 20-11 at 131), as follows:

> A:  And she said it was located directly above the isthmus of the corpus callosum and that this is also a finding that is rare. And I asked her, particularly, when you see this thing, which is rare, what's the clinical context? And she said that when she sees it, it is typically associated with cases where there is epilepsy; seizures for a clear reason, right? You've got tissue where tissue ought not be.
> Q:  Is epilepsy quit often associated with FASD?
> A:  Yes. In fact there is a six times higher rate of seizure and brain electrical activity abnormalities in FASD…

### B. THE PSYCHOLOGICAL/PSYCHIATRIC COMPONENT

#### 1. BIPOLAR DISORDER

Chris Williams was evaluated and diagnosed with Bipolar disorder by Robert Richards, MD, psychiatrist, and a witness at the jury trial.  There was a strong hereditary component to this, because his father, uncle, and sister had all been diagnosed with Bipolar Disorder. There is no way to know whether more bipolar disorder exists in the family, since Daisy Huckaby's father (Norman Bruno Brown) was never located by trial or collateral counsel, and is likely deceased. Also, we do not have information on mental illness of the Leis (German) side of the family as no attempt was made to contact them for the trial. In the bio-psychosocial presentation by Ms. Hammock, only one person was listed as having been diagnosed as bipolar (Dwight Williams) when this diagnosis had also been suspected in Chris's uncle Bryant Williams and also in Chris's sister, Maureen Bangcuyo who was a registered nurse. She described herself to Jan Vogelsang (in interview 5/31/04, Exhibit 18) as having been diagnosed with bipolar disorder.  At the jury trial, Dr. Richards was questioned about bipolar disorder:

Q  Share with this jury what your diagnosis is.
A  Chris is quite a complicated case.  I'd say that his primary diagnosis is bipolar disorder.  Type one or type two.  I'd lean toward type one, with rapid cycling features.  (Trial testimony, Robert Richards, MD, Volume 4, p.479 of 517, lines 18-22).
Q  Let's talk about rapid cycling. What is rapid cycling?
A  Rapid cycling, based on a classification system, means that you shift in  your mood more than three or four times a year.  (Trial testimony, Robert Richards, MD Dkt. No. 20-5 at 480).

When Dr. Richards was asked to describe what kinds of symptoms he relied upon when he

observed Chris Williams, in terms of bipolar disorder, he replied:

A  But then when he relaxed a bit more, he started talking very, very fast. Probably 30 minutes to an hour into the interview.  And then I got a clue.  He started having halting speech. Halting speech is a symptom of hytomania or mania.  It's as if when he got relaxed and let me see his real self, his mind was working so fast that he had to stop between sentences and collect his thoughts and then start talking again. (Trial testimony, Robert Richards, MD, Dkt. No. 20-5, at 483)

### 2. MAJOR DEPRESSIVE DISORDER

Robert Richards, MD, diagnosed the petitioner with depression but made Bipolar Disorder

his primary diagnosis.  Dr. Seymour Halleck, a forensic psychiatrist who met with Chris Williams

for four hours, diagnosed the Petitioner with Major Depressive Episode and Obsessive Compulsive

Disorder.

Q  Have you developed any diagnosis?
A  Yes.
Q  What is that, please?
A  He had two diagnoses. He had a major depressive episode and he also had an obsessive compulsive disorder.

He explained that "this is not just having the blues or having a bad day.  This is the most serious

depressive diagnosis we have in the manual. It really means you are suffering, it means you are

practically dysfunctional."  (Sentencing testimony, Seymour Halleck, MD, Dkt. No. 20-6 at 328)  "It

means you need to be on medicine. It means you are at high risk of killing yourself."  (Sentencing

testimony, Seymour Halleck, MD, Dkt. No. 20-6 at 329).

There are numerous, clear indicators of childhood depression and anxiety and factors that

made Chris Williams an extremely at-risk child throughout the background information put together

by Ms. Vogelsang for the trial. However, the compelling and vivid anecdotes that might have made

Chris Williams' horrific childhood real were not used.  One such example that might have been

shared with the jury comes from the testimony of Rebecca Owens who was the owner of the beauty

salon where Daisy worked:

> Q  Were you ever at the Williams home?
> A  I've been at the Williams' home many times.
> Q  And when you were at the Williams' home, where was Chris?
> A  Always in his room.
> (Sentencing testimony of Rebecca Owens, Dkt. No. 20-6 at 254)
>
> Q  Was he sent to his room or did he voluntarily go to his room?
> A  He was always sent to his room.
> Q  What does - - were you ever asked to help Chris with Daisy?
> A  Christopher called me on several occasions. After they had moved in with Hans is when she started to drink a little bit more heavier and started having delusions or some kind of fits or something.  And he called me one night and told me his Mom was going crazy.  And I could hear her screaming in the background.  Because she was so essential to the operation of the salon, I would go over there to get her back together, because she had to be there at work. So, on this particular occasion I got there and he (Chris) was talking to Maureen in Charleston, crying.  And she told him to "Hang up the phone, you little black bastard," and smacked him openly handed in the face.
> Q  And then what happened?
> A  She sent him to his room. He was crying and she went up to his room and told him to shut his f-ing mouth.
> Q  Approximately how old was he at the time?
> A  Maybe 11, 12.
> (Sentencing testimony of Rebecca Owens, Dkt. No. 20-6 at 255)

The mitigation specialist did not share the rich details of the chronology with the social historian. For that reason these facts, which formed the unique characteristics of the Petitioner, were never presented to the jury. Providing just this type of information is the function of the social historian as a witness. The function is to illuminate the defendant's life in understandable and poignant detail for the jury.  Hammock lists the diagnoses given to Chris' father, mother, sister and to him, but never develops this as a theme. The overwhelming sadness and hopelessness of the childhood/youth of Chris Williams and his sister is not provided to jurors. The jury never hears what it was like on a day-to-day basis for Chris Williams (who is mentally ill). He was raised by mentally ill parents, with a mentally ill sister, in the afternoons with a mentally ill grandmother and her son (his uncle) who sexually abused him while they were together.

### 3. SUICIDALITY

Suicide was a pervasive theme in the history of the Williams family. Chris Williams made at least two serious suicide attempts that are documented. His mother, father and sister all made suicide attempts that were documented in emergency room records or psychiatric hospital records.  Per

Chestnut Hill psychiatric and mental health center records on Bryant Williams (Chris' paternal uncle), he expressed "increasing suicidal and homicidal ideation." In her sentencing testimony, the petitioner's sister Maureen Bangcuyo openly shared her struggle with suicidal thoughts. Tragically, she did kill herself by hanging on October 21, 2011. She was likely the person most devoted to Chris Williams in his life, and she answered trial attorney Bill Nettles' questioning as follows:

> Q   Maureen, I'm going to ask you something kind of personal. Have you been diagnosed with mental illness?
> A   Yes, I have.   (Dkt. No. 20-6 at 355)
> Q   You ever thought about killing yourself?
> A   Every day. (Dkt. No. 20-6 at 356)

Information on suicidality in family members was present in all of the psychiatric experts' testimonies and was included in the Social Historian Ms. Hammock's presentation. See Exhibit 5. But in the case of the Social Historian, who is the person situated to bring all of this bio-psychosocial history to life for the benefit of the jury, she simply listed the suicidal ideation/attempts by person, with no examples/histories of how and when these attempts by the Petitioner's parents occurred, how old Chris was at those times and how each event impacted a child of that age. This is yet another missed opportunity to educate the jury with details necessary to understanding who he was and to measure his moral culpability given these severe limitations. This was the function of the Social Historian and it was not carried out in this case.

On June 13, 2003, just under 3 months before the crime, Chris Williams made a very serious suicide attempt. He overdosed on 40 tricyclics which is a lethal dose. There is no indication that a psychiatric consult was done in Greenville Hospital, a "suicide contract" was arranged between a hospital social worker and Chris and he was discharged.  Dr. Seymour Halleck reported, in his testimony, that "at the hospital he is really unconscious. He's not speaking. He responds only to painful stimuli. A tube is put down his stomach to clean out his stomach. His pupils do not react to light, and he stays in that state for 12 hours and very gradually comes out. So, without medical intervention, he probably would have died." (Sentencing testimony of Seymour Halleck, MD, Dkt. No. 20-6 at 333) Halleck opined that Chris Williams should have been civilly committed and confined to a hospital, but instead, Greenville Hospital System let him go.  This incident in his life should have been described as part of the Social Historian's explanation about suicidality in the

Williams family.

### 4. OBSESSIVE COMPULSIVE DISORDER

Most adults who have OCD are aware that their obsessions and compulsions are irrational, yet they feel powerless to stop them. They may spend hours every day focusing on obsessive thoughts.  Untreated OCD is frequently incapacitating, and can be detrimental to all aspects of life, especially when suffered in combination with other types of mental illness.  Forensic psychiatrist Seymour Halleck, MD and psychiatrist Robert Richards, MD, both diagnosed Chris Williams as having obsessive compulsive disorder.

> Q  Is there any other diagnosis?
> A  He also has obsessive-compulsive disorder.  (Trial testimony of Robert Richards, MD, Dkt. No. 20-5 at 481).
>
> Q  Share with us what obsessive-compulsive disorder is.
> A  Obsessive compulsive disorder you can have obsessions, compulsions,  or both. And a part of your brain that's supposed to work it right does not      work. And so I have recurrent silly, bad, violent, sexual, religious thoughts  and  I  can't make them go away. And I think about them for hours       at a time and they really make me feel badly. Then I have simply habits or    rituals that I cannot stop doing. As a matter of fact, if I try      to stop doing  it, I get very, very nervous, almost panic like nervous.  So nervous I might      get angry instead. This goes on and on and on and waxes and wanes. It       can occur up to a hundred percent of your waking hours. So, you can      see how it can be quite distressful." (Testimony of Robert Richards, MD,          Dkt. No. 20-5 at 482).

The petitioner never received any treatment for his mental illness. Even when he made a lethal suicide attempt, he apparently did not receive a psychiatric consult and was sent home without care. Dr. Halleck tells trial attorney Mr. MacDougall in his testimony:

> "I tried to get him to explore the evidence for that particular belief, and he could not really define in a very clear way that there was any substance to that belief.  So, these - - sometimes obsessions are delusional and these obsessions could have been delusional. And in many ways Chris' obsessions were so bizarre, so unfounded, and so violent, that they approached being psychotic obsessions." (Sentencing testimony of Seymour Halleck, MD, Dkt. No. 20-6 at 331-332).

Dr. Halleck brings the psychiatric picture together for the jury, as he describes Mr. Williams' mix of mental health disabilities. This information could have been and should have been repeated as part of the bio-psychosocial presentation, but it was not, in spite of the fact that Ms. Hammock reported that she had conferred with Dr. Halleck while preparing her testimony. This was yet another example of the blunted and inadequate presentation of all aspects of the petitioner's life. The jury

thus sorely lacked critical pieces of the puzzle of this young man's life.

> Q  Doctor, you've described two diagnoses, obsessive-compulsive disorder, and major depressive episodes.  Would you tell us how those two aspects of mental episodes collided in 2003?
> A  They fed on each other. I think the obsessional disorder made the depression worse and the depression made the obsessional disorder worse, and both contributed to a powerful sense of hopelessness, which I think in the end was a factor in Chris committing a violent act.
> Q  And how does this all, to tie it up, how does this all relate?
> A  I think primarily in terms of the sense of helplessness and the sense of hopelessness he was experiencing and feeling that he had to do something about it to escape from the suffering he was experiencing.  (Sentencing testimony, Seymour Halleck, MD, Dkt. No. 20-6 at 332).

### 5.  SOCIAL WITHDRAWAL, SOCIAL ANXIETY

Multiple people in Chris Williams' life described him as withdrawn as a child and/or adolescent, and as having struggles socially, with peers.  The petitioner's sister Maureen Bangcuyo testified:

> Q  As a result of what you were seeing happening, as a result of what you were seeing happening at home here, what did you do about Chris?
> A  After Dwight left the home, I became really concerned about Chris' wellbeing, his emotional wellbeing, his mental wellbeing.  I saw him become really withdrawn and, to me, even though I'm not clinically certified, but from the literature - -
> Q  What do you do for a living?
> A  I'm a nurse, registered nurse. But my specialty is not in mental health, but I deal with a lot of people and I saw my brother becoming more and more depressed, more withdrawn. You look into his eyes and he just looks so empty.  (Dkt. No. 20-6 at 354)

> "Chris said he was picked on in school, tormented and called names so he picked on others smaller. This was in the third and fourth grades. The black kids made fun of him because he didn't like rap and crack. They called him a sissy. When he was playing ball they called him he/she." (4/29/04 Interview of Jan Vogelsang with Chris Williams, Attached as Exhibit 24 at 2)

Maureen Bangcuyo explains her brother's "vacant" appearance under direct examination by attorney Bill Nettles:

> Q  Maureen, the jury's looked at Chris for the better part of a week now; I think one could say that sometimes he appears vacant?
> A  Yeah
> Q  Has he always - -
> A  I understand
> Q  - - been like that?
> A  When you grow up in an environment where you're never allowed to express how you feel - - Dwight always said children should be seen and not heard. If you were upset about something, you couldn't show it. If you were mad about something, you couldn't show it.  And you certainly couldn't show my parents you were angry with them for whatever reason. They always said they were always right and we will

always be wrong, so you're programmed that way, you know; think of 22 years of
never being allowed to express yourself. It becomes second nature. (Dkt. No. 20-6 at
364)

Although these conditions are noted by trial team physicians and consultants they were not
integrated into the mitigation presentation for their impact upon the jury.

In addition the records establish continuing adjustment disorders. The Petitioner was picked
on in school, tormented and called names so he picked on others smaller than himself. This was while
the Petitioner was in the third and fourth grades. The black kids made fun of him because he didn't
like rap and crack. They called him a sissy. When he was playing ball they called him he/she. (Exhibit
24 at 2). Although these conditions are noted by trial team physicians and consultants they were not
integrated into the mitigation presentation for their impact upon the Petition's abilities to cope with
stressors and to make reasoned decisions under pressure. It was the fact of the victim's grabbing the
gun and running that created the sudden and unexpected circumstance that was so challenging for the
Petitioner. (See Petitioner's Voluntary Statement to Law Enforcement, Sept 3, 2003, Attached as
Exhibit 11).

### C. THE SOCIAL COMPONENT

#### 1. ALCOHOLIC PARENTS.

Evidence for severe alcoholism in both the petitioner's parents was very clear and available
from interviews done by mitigation investigator and social historian in preparation for trial, but not
used in detail or descriptively in the biopsychosocial testimony.  Mr. Williams has had multiple
hospitalizations for Major depression and alcohol abuse ((Records from Harris Psychiatric Hospital,
Charter Psychiatric Hospital and Piedmont Mental Health Center).  Daisy Huckaby had multiple
Greenville Hospital Emergency room visits in which alcohol abuse was listed as a diagnosis (in
addition mental health and suicide attempts).  Her excessive daily use of alcohol and drunkenness is
described vividly by her daughter Vogelsang's interview with her daughter Maureen Bangcuyo,
Exhibit 18.

#### 2. FAMILY VIOLENCE

Daisy said she was always bruised. Dwight hit her with the hose from a kerosene heater and
left a red mark on her face from her temple over her chest. He choked her so bad she had a ring

around her neck. (Jan Vogelsang's 3/19/04 interview with Daisy Huckaby, Exhibit 17). Maureen saw Dwight punch Daisy in the face. He knocked her across the room and broke her jaw. He ruptured her ear drum. She was in and out of consciousness. (Jan Vogelsang's 5/31/04 interview with Maureen Bangcuyo, Exhibit 18).

### 3. MENTAL ILLNESS OF PARENTS AND OTHER FAMILY MEMBERS.

At the time of the trial, there was a well-documented family history of mental illness. Diagnoses and treatment episodes were listed in the social historian's presentation, but the details and severity of this and its daily impact on the petitioner and his sister were not illustrated for the jury. Dwight Williams, the petitioner's father, had psychiatric hospitalizations at Patrick Harris Psychiatric Hospital (SCDMH) for Major Depressive Episode; It was noted that he was "suicidal and homicidal on admission" and "carefully instructed about bipolar disorder; there is considerable evidence in the history that he may have a cyclothymic personality." Three periods of outpatient treatment at Piedmont Mental Health Center were documented, with listed diagnoses as "suicidal thoughts; major depression and alcohol abuse. He was also hospitalized at Charter Psychiatric Hospital for "Depression and Alcohol Abuse and multi-drug abuse; suicidal.

Daisy Williams Huckaby, the petitioner's mother, was admitted to the Greenville Hospital Emergency Room on at least three occasions for mental illness and alcohol abuse. In 1993 she was brought to the ER in police custody, having taken sleeping pills and drinking alcohol; the physician's clinical impression was "1. Overdose and 2. Depression. Blood alcohol was .15". In 1997 she was again admitted for a possible overdose, with a blood alcohol of .14 with Xanex. She was treated by family practitioner Dr. Kevin Smith for panic attacks. In 1999 she was seen by Neurology Consultants for panic attacks, depression, alcohol abuse and Wellbutrin was prescribed. In 2003 she was again admitted to the Greenville Hospital Emergency Room after being found by her husband (Rodney Huckaby) unconscious and incontinent in the garage. She had taken an overdose of tricyclics and alcohol in a suicide attempt. Diagnoses: Anxiety, poisoning by antidepressant, and alcohol abuse." See Trial Exhibit 29.

Dwight Williams' brother, Bryant Williams, is severely mentally ill, mentally retarded, and epileptic. He was noted by Ms. Vogelsang to have been in South Carolina State Hospital years ago,

and a patient at Greenville Mental Health Center. Records from Chestnut Hills Psychiatric Hospital in 1986 reported that he was "admitted due to increasing suicidal and homicidal ideation and was diagnosed with Major Affective Disorder; depression, dysthymic disorder and Passive-Aggressive Personality Disorder". He was diagnosed with "Axis III: Seizure Disorder by Peter M. Owens, MD at Chestnut Hill Psychiatric Hospital, Travelers Rest, SC in a discharge summary dated 11/21/86 and had been having seizures since age 12. Medications listed were anti-psychotics (Haldol), Clonopin for seizures and Halcion. (Treatment record from Chestnut Hill Psychiatric Hospital, Bryant Williams, 9/15/86-11/21/86). Bryant Williams sexually abused both Chris Williams and his sister Maureen when they were children staying after school in the home he shared with his mother, Mary Snipes.

Mary Snipes, paternal grandmother of Chris Williams, was described as mentally ill in Ms. Vogelsang's interviews. When her son Dwight was hospitalized at Charter Psychiatric Hospital in 1994, it was noted (in Ms. Vogelsang's documentation) that "the hospital contacted his mother and she declined to come due to "bad nerves". In her interview with Mary Snipes, Ms. Vogelsang learned that "Mary described her husband A.C., Chris's paternal grandfather, as being from a dysfunctional family. Mary believes his mother's side of the family has mental problems. A.C only went to third grade. (Jan Vogelsang's 3/25/03 interview with Mary Snipes). All of this information was gathered and documented by Ms. Vogelsang and should have been provided to experts.[13]

At the time of the trial, there was a well-documented family history of mental illness. Diagnoses and treatment episodes were listed in the social historian's presentation, but the details and severity of this and its daily impact on the petitioner and his sister were not illustrated for the jury.  Dwight Williams, the petitioner's father, had psychiatric hospitalizations at Patrick Harris Psychiatric Hospital (SCDMH) for Major Depressive Episode; It was noted that he was "suicidal and homicidal on admission" and "carefully instructed about bipolar disorder; there is considerable evidence in the history that he may have a cyclothymic personality."  Three periods of outpatient

---

[13] <u>Code of Ethics of the National Association of Social Workers</u>; approved by the 1996 NASW Delegate Assembly and revised by the 2008 Delegate Assembly Value: Competence Ethical Principle: Social workers practice within their areas of competence and develop and enhance their professional expertise. Social workers continually strive to increase their professional knowledge and skills and to apply them in practice.

treatment at Piedmont Mental Health Center were documented, with listed diagnoses as "suicidal thoughts; major depression and alcohol abuse. He was also hospitalized at Charter Psychiatric Hospital for "Depression and Alcohol Abuse and multi-drug abuse; suicidal.

Daisy Williams Huckaby, the petitioner's mother, was admitted to the Greenville Hospital Emergency Room on at least three occasions for mental illness and alcohol abuse. In 1993 she was brought to the ER in police custody, having taken sleeping pills and drinking alcohol; the physician's clinical impression was "1. Overdose and 2. Depression. Blood alcohol was .15".  In 1997 she was again admitted for a possible overdose, with a blood alcohol of .14 with Xanax.  She was treated by family practitioner Dr. Kevin Smith for panic attacks.  In 1999 she was seen by Neurology Consultants for panic attacks, depression, alcohol abuse and Wellbutrin was prescribed. In 2003 she was again admitted to the Greenville Hospital Emergency Room after being found by her husband (Rodney Huckaby) unconscious and incontinent in the garage. She had taken an overdose of tricyclics and alcohol in a suicide attempt. Diagnoses: Anxiety, poisoning by antidepressant, and alcohol abuse. (See Exhibit 5).

Dwight Williams' brother, Bryant Williams, is severely mentally ill, mentally retarded, and epileptic.  He was noted by Ms. Vogelsang to have been in South Carolina State Hospital years ago, and a patient at Greenville Mental Health Center. Records from Chestnut Hills Psychiatric Hospital in 1986 reported that he was "admitted due to increasing suicidal and homicidal ideation and was diagnosed with Major Affective Disorder; depression, dysthymic disorder and Passive-Aggressive Personality Disorder".  Medications listed were anti-psychotics (Haldol), Clonopin for seizures and Halcion. Bryant Williams sexually abused both Chris Williams and his sister Maureen when they were children staying after school in the home he shared with his mother, Mary Snipes.

Mary Snipes, paternal grandmother of Chris Williams, was described as mentally ill in Ms. Vogelsang's interviews. When her son Dwight was hospitalized at Charter Psychiatric Hospital in 1994, it was noted (in Ms Vogelsang's documentation) that "the hospital contacted his mother and she declined to come due to "bad nerves". All of this information was gathered and documented by Ms. Vogelsang and should have been provided to experts.

4.    CHAOTIC HOME; MULTIPLE SCHOOLS/HOMES, MEN, 3 MARRIAGES DURING

PETITIONER'S CHILDHOOD.

The scene in Chris Williams' childhood home was one of constant fighting between the parents, including brutal violence to his mother, violence to his sister, and himself. There was often financial instability. The parents could not organize themselves to get to school meetings with school personnel regarding Chris' learning disabilities and behavioral/mental health problems. Schools documented multiple missed or canceled parent conferences. Chris was frequently moved from school to school within the district (9 schools in his 11 years in the system). (This information is gleaned from school records from The School District of Greenville County, including Taylor Elementary, Buena Vista Elementary, Brook Glenn Elementary, Northwood Middle School, Hillcrest Middle School and Riverside High School; also, a record for his 8th grade transfer to Hand Middle School in Columbia, SC, enrolled 8/25/97 when he was living with his adult sister).

Daisy was married to three different men during Chris's childhood (his father, who she divorced when Chris was 10, Hans Seifert, and then Rodney Huckaby.) This made for multiple moves within cities in Greenville County – seven residences in his life prior to incarceration. (Jan Vogelsang's records of interviews with parents, school records listed earlier and a listing of residences provided to Sara Flynn, LMSW, Social Work Expert, from petitioner.)

Maureen Bangcuyo, the petitioner's sister, describes life in the Williams home:

Q Now, I apologize for interrupting you, but tell us a little about what the household was like when Chris got there.
A From the day I can remember, even memories of when I was really young and living in Germany with Dwight and Daisy, Dwight was in the military at the – I just remember constant fighting, physical abuse on Daisy, physical abuse on myself. And I had, I had to endure that, and I had to keep quiet because we were never allowed to express how we felt. The violence and the alcohol every night, gallons gone in weeks, drugs, you know. I thought it was normal because I had no, nothing to compare it to.
(Sentencing testimony of Maureen Bangcuyo, Dkt. No. 20-6 at 351)

## 5. SEXUAL ABUSE

Chris Williams was sexually abused by his Uncle Bryant Williams while staying at his house after school for at least 2 years from about age 6-7 years old. He was forced to fondle Mr. Williams and to stick toothpicks in his urethra. Mr. Williams also molested Chris' sister. This abuse only stopped when Daisy separated from Dwight and thus the children were no longer taken to Bryant Williams/Mary Snipes home after school. (Flynn Affidavit Exhibit 4 page 16 paragraphs 22, 23, and

24; and testimony of Maureen Bangcuyo; interview of Jan Vogelsang with Dr. Seymour Halleck).

> Q: How about other family members in the extended family? Uncles, Aunts, so forth?
> A: He did have trouble with one uncle when he was about a six or seven years old. The uncle would ask him to fondle he, the uncle's, genitals; also asked him to do something quite strange, is put toothpicks into the uncle's urethra, which he did several times. (Sentencing testimony of Seymour Halleck, MD, Dkt. No. 20-6 at 327)

This information was known to the trial mitigation investigator and it would be expected that this was shared with trial counsel and with the social historian, but the extremely important fact of sexual abuse and its impact on a learning disabled, emotionally and mentally fragile, congenitally damaged Chris Williams never appeared in the bio-psychosocial testimony of Ms. Hammock. There was also sexual abuse of the petitioner by his mother from at least the ages of early childhood until almost 13. (Flynn Affidavit Exhibit 4).

> "His relationship with his mother was ambivalent. She ran his life and in some way he was very close to her. He was trying really hard to not have her run his life. She did some things that were strange. As he got older, she would let him sleep with her until he was 14 years old. She would sometimes in a playful way touch the genitals of Chris as well as the sister." (Seymour Halleck, MD, Sentencing testimony, Dkt. No. 20-6 at 326).

From sister Maureen's interviews with mitigation investigator Jan Vogelsang, Daisy Huckaby molested both children. Daisy used to grab Maureen and Chris in the genital area. They hated it. She called Maureen's private parts "twetche" and Chris's "stipfeI." Daisy thought it was funny and they hated it. She would say, if Chris protested, "what, I can't see my own boys stipfel?" Maureen has dreams of her mother molesting her. At thirteen, she told her mother she was uncomfortable with her grabbing. She was afraid her mother would be mad. Chris had pubic hair when Daisy was grabbing him. They were never allowed to close doors. (Jan Vogelsang's 5/31/04 interview with Maureen Bangcuyo, Exhibit 18).

Documentation from a visit to Taylors Family Practice on 1/11/1993 by family physician Kevin Smith indicated that petitioner (10 years old at the time) was diagnosed with a urinary tract infection. Patient complaint was stomach hurting and burning with urination. Dr. Smith's note further reported that Chris Williams had a "history of bladder infection 2 years ago". (Vogelsang Notes, Attached as Exhibit 25 and Medical record, Taylors Family Practice, Taylors, SC, Kevin Smith, MD,

1/11/1993, Attached as Exhibit 26.)  (The first episode of infection would have been around the time he was being abused by his uncle Bryant Williams, and the second would have been the time that he was being fondled by his mother. Urinary tract infections in this age child are uncommon, and are seen by social workers and health care practitioners who work with children as possible warning signs of sexual abuse.  This was not mentioned in notes by Ms. Vogelsang nor mentioned at all in the bio-psychosocial information provided to the jury.

**6. SEXUALIZED ENVIRONMENT:**

The petitioner and his sister lived in a highly sexualized environment that created great discomfort and confusion for the children. Though the following information was known to and documented by mitigation investigator Jan Vogelsang, none of the following information was shared with the jury in the biopsychosocial history presentation by Ms. Hammock:

> "Daisy was always seductive. A Dr. Kirkland used to come to their house. One day, Maureen walked in and her mother was on the sofa with her legs spread. Dr. Kirkland was standing over her with his wiener hanging out. She was eight. Daisy told her Dr. Kirkland was looking at her surgery scar." (5/31/04 Interview of Jan Vogelsang with Maureen Bangcuyo, Exhibit 18 at 2).

> "Daisy was never interested in Maureen, only Chris. She saw Maureen as female competition." (5/31/04 Interview of Jan Vogelsang with Maureen Bangcuyo, Exhibit 18 at 1).

> "If she looked better than her mother, Daisy would get angry. When Maureen had to be treated for hyperthyroidism, and got very skinny, Daisy got mad.  Daisy was always seductive." 5/31/04 Interview of Jan Vogelsang with Maureen Bangcuyo, Exhibit 18 at 2).

> "After the first assault on Miranda, Daisy was going out to get money for a lawyer. I asked Chris if this meant she was prostituting for the money and he said yes." (4/15/04 Interview of Jan Vogelsang with Chris Williams, Attached as Exhibit 22.

**7. HISTORY OF PARENTAL ABANDONMENT:**

The petitioner's mother, Daisy Huckaby, was abandoned by her white German mother, Erika Leis Shedd and the African American soldier who fathered her (Bruno) a few months after she was born. Erika left Daisy with her parents and ultimately left Germany to live in the U.S. and create a new family with multiple half-sisters and brothers of Daisy.  Erika never made any outreach to find Daisy.  Daisy married a white man in Germany at age 16 and then abandoned her children, Uwe and Sylvia Scheller, there. The petitioner's father, Dwight Williams, was abandoned by his father, A.C.

Williams, after Dwight's parents divorced. Dwight Williams then, to a great degree, abandoned Chris after his divorce from his mother. Although his sister Maureen Williams Bangcuyo was extremely loving and protective of Chris, he did have a sense of abandonment when she left home for college when he was about 7 years old.  Although she was unable to shield him from the violence, abuse and chaos of the home, she did provide a caring presence. Very tragically, ultimately Maureen abandoned her own two children when she committed suicide in 2010.

**8. RACIAL/CULTURAL ISSUES**

Biracial parentage and biracial/cultural tensions are a theme in this family.  The petitioner's mother, Daisy is biracial - the child of a white, German mother (Erika Leis Shedd) and an African-American father who was stationed near her town of Nuremberg during World War II. Chris Williams's father, Dwight Williams, is African American. Dwight's mother, Mary Snipes, disapproved of Daisy because she was biracial and appeared black. Daisy's biological mother, Erika Leis Shedd, rejected her because she was biracial and she felt that her new Caucasian suitor (and later husband) would leave her if he knew she had the child of a black man. Daisy's first husband denigrated her because she was biracial, and called her racist names as he beat her. At times, when Daisy was inebriated, she used racial slurs to demean Chris. Chris reported that he was rejected by black students in school. Ultimately, Chris learned from his girlfriend, Maranda (the victim in this case) that her parents did not approve of him because he was black.

**ii.** Trial and collateral counsel have a duty to supervise and manage the investigation development and presentation of all relevant information necessary for a jury to make a reasoned moral decision regarding the sentence. In this case there simply was no development of essential biological information. What information was available was not shared among the trial team members and studies requested by Robert W. Richards, MD were done with inadequate information and not received in time to inform Richards' testimony. (See Richards' affidavit Exhibit 1). The three medical/biological experts who provided evaluations did not have access to each other's work and they were blind to the information developed by their counterparts. When the team mitigation investigator was asked about this lack of supervision, organizational and developmental structure the testimony at post-conviction was:

Q. Right. Okay. So if you know, is it fair to say that at some point in time through his trial, Evans didn't know what Richards was saying, Richards didn't know what Evans was saying and Griesemer didn't know what either one of them were saying?
A. That is correct.  (Dkt. No. 20-9 at 240).[14]

**B.**    **THE ASSESSMENT FAILED TO EXPLAIN THAT THE PETITIONER'S BEHAVIOR, IN THE CIRCUMSTANCES OF THIS CRIME, WAS DETERMINED BY THE COMBINED EFFECTS OF THE UNIQUE SOCIAL AND BIOLOGICAL CHARACTERISTICS UPON HIS VOLITION. THE ASSESSMENT DID NOT DEVELOP AND PRESENT THE ROLE BIOLOGY PLAYED IN COGNITIVE DEVELOPMENT, THE ABILITY TO LEARN FROM PAST EXPERIENCE AND TO MODERATE IMPULSES.[15]**

The bio-psychosocial history and presentation is intended to paint a vivid picture for the jury of the interaction of all factors (biological, psychological, social, environmental and cultural).  By the time the crime occurred, Chris Williams' had become a "perfect storm" of mental illness, congenital brain damage, genetic predisposition to mental/behavioral disabilities, learning disabilities, brain injury, lifelong environmental/family violence, chaos and sexual and mental abuse. The jury made their decision without access to a comprehensive story of his life, his illness, and his limitations. The most appropriate avenue to communicate and explain this myriad of disabilities and facts is through the presentation of the bio-psychosocial history, but instead Ms. Hammock's conveyed a very shallow and flawed description of his life story.

The circumstances of this crime play directly into the petitioner's cognitive weaknesses. The victim was the estranged lover of the petitioner. The demise of the relationship was recent in relation to the date of the offense. The petitioner made a "serious" attempt at suicide rather than to go on living shortly after the demise of the relationship.[16] Although the petitioner was armed when he confronted the victim, more than three hours of negotiations were ongoing when the victim broke and ran. (Exhibit 11). The victim's sudden, initially offensive maneuver panicked the petitioner and

---

[14] James Evans, PhD neuropsychologist; Robert W. Richards, MD psychiatrist who ordered an MRI; David A. Griesemer, MD was the neurologist who attempted to interpret an MRI that was done just eleven days prior to jury selection.

[15] The Supreme Court recognized the significant interplay between developmental biology and moral culpability when it determined that intellectual disability renders a defendant ineligible for a death sentence (*Daryl Atkins v Virginia*, 536 US 304 (2002)); that a person committing a capital eligible crime prior to majority is ineligible for a death sentence (*Roper v Simmons*, 543 US 551 (2005)); and young people committing repeated criminal offenses are not eligible for a sentence of life without parole because of impaired volition (*Graham v Florida*, 560 US 48 (2010); and *Hall v Florida*, 134 S. Ct. 1986 (2014) that bright-line definitions of mental impairments, especially in the intellectual disability circumstance, do not adequately capture the condition for which a person is ineligible for a sentence of death – impaired adaptive functioning).

[16] The attempt at suicide was on June 13, 2004; the offense date was September 3, 2004.

he shot several rounds killing her. As noted, the family tree, or genogram, was quite limited in scope, with potentially more family members with mental health or neurobiological issues than were identified. This gap should have been investigated. Late in the PCR phase, a mitigation investigator in Idaho, Linda Mroz, was engaged to, and did, interview the petitioner's maternal grandmother. In Linda Mroz' affidavit of January 23rd, 2013 she stated: "I was asked to conduct an interview with the Petitioner's grandmother, Erika Shedd. I work for the Federal Capital Habeas Unit in Idaho and have for several years. I would have gladly conducted this interview in 2004 or 2005 if the Defense team had called me." (Attached as Exhibit 12).

Christopher Williams had a myriad of inter-related bio-psychosocial problems and the damaging *interplay* of all of these serious issues was ignored by trial counsel and, in all but FAS, by collateral counsel. As an example, not only was the family violence exceedingly under-described by the social historian[17] but the profound sexual abuse - previously cited - by the client's mother of both children was not investigated, developed, or presented as part of the mitigation case. Collateral counsel focused on the mother's drinking to the exclusion of all other issues. The home environment was violent and chaotic but the mitigation case never related that violence to the Petitioner. As an example police found Chris hiding in an upstairs closet when they responded to a domestic violence call. Another example, Chris' mother would threaten and beat him if he refused to beat her so that she would have physical bruising to support her allegation that her husband had beaten her. Chris Williams was a neglected child who had no parental advocate in school - as evidenced by almost no kept appointments with school personnel for special needs appointments. In fact, the mother continuously blocked school efforts to arrange medication for Chris, additional testing, and special needs resource services. The social historian's bio-psychosocial history not only missed the biological elements but failed to provide the jury with a real view of the horrific environment in which the Petitioner grew up, and which impacted all of his social development and later interactions. (See Flynn Affidavit Exhibit 4). Missed mitigation opportunities abounded at trial and, because of collateral counsel errors, the mitigation case has never been vetted against the *Strickland v*

---

[17] The testimony of the Petitioner's sister Maureen Bangcuyo was that violence within the family was a daily occurrence. (Dkt. No. 20-6 at 347-369).

*Washington* standard.

Another missed opportunity was the evidence that at age 2 ½ the petitioner was diagnosed with Strabismus (eye abnormality) by his pediatrician. He was hospitalized for surgery to correct this eye problem. This particular abnormality of the eye frequently appears concurrent with FASD. Richard Adler, MD, testified at the post-conviction merits hearing that the petitioner had nystagmus.

> Q: All right. And, again, it [nystagmus] goes back to the brain dysfunction? There's something- - it's a red flag?
> A: Right.  (Dkt. No. 20-11 at 134)

In his PCR testimony Dr. Adler referred to findings by Dr. Jim Evans, an experienced neuropsychologist and member of the trial team who evaluated the petitioner in 2004. Those findings were overlooked or disregarded, and did not inform the investigation.

> "The corpus callosum is the largest white matter structure in the brain. And it connects the right and left sides of the brain. (Dkt. No. 20-11 at 117, lines 5-7).

> The right hand has to know what the left hand is doing (line 14-15).

> And in actuality, in this case, when Dr. Evans evaluated Mr. Williams, lo and behold, there's a special test, which he (Defendant) did poorly on, the right hand didn't know what the left hand was doing." (Lines 17-20).

> And it's calling on different parts of the brain to integrate information.  (Line 25 to p.118, line1).

Referring to studies that confirm the relationship of an abnormal corpus callosum to FASD, Dr. Adler states:

> "And they showed that by and large people with FASDs have abnormalities of their corpus callosum." (P. 118, lines 16-17).

> "Not only is Mr. William's corpus callosum abnormal, but his brain itself is abnormal." (P. 121).

> Q: Okay. So number one, the corpus callosum is just thinner than normal?
> A:  Yes. (P. 125).

> Q:  So about fifty percent thin.
> A:  Actually, you're right, more than 50% thin. (P. 126).

> A: "However, what's fascinating in this case is that in 2004 Dr. Jim Evans can show and did show neuropsychological impairment that he predicted would correlate with an abnormality of the corpus callosum.  (P.128, line 4-7)

Dr. Evans also made trial counsel aware that the petitioner had a seizure disorder, which is

common in people with FASD. Additionally, trial counsel were aware that Mr. Williams' brother,

Bryant Williams, suffered from epilepsy. Dr. Adler later confirmed this diagnosis in his evaluation.

Speaking about Dr. Cohen's evaluation, Richard Adler, MD, testified at the PCR merits

hearing:

> A: And she said it was located directly above the isthmus of the corpus callosum and that this is also a finding that is rare… and she said that when she sees it, it is typically associated with cases where there is epilepsy; seizures for a clear reason, right? You've got tissue where tissue ought not be.
> Q: Is epilepsy quite often associated with FASD?
> A: Yes. In fact there is a six times higher rate of seizure and brain electrical activity abnormalities in FASD. (Dkt. No. 20-11, p. 131)

Information about Chris Williams' seizure disorder was not presented at trial or incorporated

into the Assessment presented to the jury. This data should have been part of a complete bio-

psychosocial assessment. Dr. Evans found that the petitioner had an average IQ but that there was a

split of 15 points between the verbal and performance sections of the tests. On the neuropsychological

portion of the test, the Halstead, he scored a .3 on the Impairment Index indicating mild brain damage.

This could account for the IQ "split" between verbal and performance. If school records had been

analyzed and elaborated upon in detail in the assessment presentation, it would show that they tracked

closely, back then, with the discrepancy Dr. Evans describes in his evaluation. Dr. Evans went on to

note additional brain damage. He reported that there was impairment in the parietal cortical area with

low decreased coherence. He noted that Chris had an indentation in his head where he was hit with a

hammer at the age of four or five. Dr. Evans also found evidence of frontal lobe damage with rigid

thought and impulsivity. He felt that the frontal impairment could contribute to the mild brain damage

combined with a psychotic depression. These features were not mentioned during trial counsel's

mitigation presentation with Marjorie Hammock. The Tactual Performance test indicated parietal

impairment. All this information is taken from a "Draft Confidential Attorney Work Product"

memorandum authored by trial team mitigation investigator Jan Vogelsang dated August 25, 2004

Exhibit 10. There is no indication that this information was utilized by trial counsel to inform the

investigation, development and presentation of the unique circumstances of the petitioner particularly

as these conditions reflect upon executive functioning, compromised volitional control of conduct

and concomitant reduced moral culpability. The neuropsychological information underscores how

collateral counsel was drawn into a single congenital condition (FAS) to the exclusion of the more

profound impact of the global genetic aberrations which impair executive functioning.

**XII.** **IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, TRIAL AND STATE POST-CONVICTION COUNSEL WERE INEFFECTIVE TO THE PREJUDICE OF THE PETITIONER BY FAILING TO INVESTIGATE, DEVELOP AND PRESENT OBJECTIVE AND SCIENTIFIC EVIDENCE OF STRUCTURAL AND FUNCTIONAL BRAIN DAMAGE RESULTING FROM 1) GENETIC ANOMALIES; 2) CONGENITAL MALFORMATIONS (FASD); AND 3) EARLY CHILDHOOD TRAUMA THAT MATERIALLY LIMITED THE PETITIONER'S ABILITY TO MAKE INFORMED DECISIONS, LEARN FROM PAST BEHAVIOR, AND CONTROL IMPULSES RESULTING FROM RECURRENCE OF SITUATION PROMPTS IN DAILY LIVING WHICH WERE THE SAME OR SIMILAR TO THOSE OF HIS EARLY CHILDHOOD.**

    **A.** **INFORMATION ESTABLISHING DIMINISHED CAPACITY AND IMPAIRED VOLITION WAS NEVER INVESTIGATED DEVELOPED OR PRESENTED EVEN THOUGH A SPECIFIC REQUEST FOR THAT INFORMATION WAS MADE TO TRIAL AND COLLATERAL COUNSEL.**

Trial counsel utilized several experts in the investigation, development and presentation of

the unique factors of the petitioner's character.[18] Trial counsel engaged three medical specialists and

at least two suggested or referred to the need for genetic based investigation. The record as developed

by trial counsel included a significant and profound, multigenerational familial history of mental

illness. Defense Trial Exhibit 29. Seymour Halleck, MD, who is a forensic psychiatrist, testified as a

mitigation witness. When Dr. Halleck was asked about the "family history" his testimony was limited

to the social aspects to the exclusion of the biological component of the family history. (Dkt. No. 20-

6 at 322-337). He did not have the benefit of the genetic studies which reveal significant

chromosomal variations, deletions and aberrations which present real limitations for the petitioner's

ability to cope and modulate his emotions and confirm Dr. Brown's opinion that the Petitioner lacked

sufficient capacity to conform his behavior to the requirements of the law. (Butler Report Exhibit 6).

This is one point at which trial and collateral counsel departed from prevailing norms by failing to

follow their witnesses' suggestions that more investigation be performed and specifically in the

---

[18] Counsel's duty is to investigate, develop and present all mitigation evidence which is relevant for a jury to appreciate whether the petitioner: "…has the kind of troubled history relevant to assessing a defendant's moral culpability. *Penry v. Lynaugh,* 492 U.S. 302 (1989). *Wiggins v Smith,* 539 US 510 (2003). *Williams v Taylor,* 529 US 362 (2000). When a person's physiology impairs his volitional capacity to make decisions, learn from past events, respond appropriately to social prompts and control impulses, his moral culpability is concomitantly reduced. See *Atkins v Virginia,* 536 US 304 (2002) intellectually disabled capital offender ineligible for death sentence; *Roper v Simmons,* 543 US 551 (2005) juvenile capital offender ineligible for death sentence; *Graham v Florida,* 560 US 48 (2010) life without parole for juvenile offenders is violates Eighth Amendment; *Hall v Florida,* 134 S. Ct. 1986 (2014) bright-line definitions fail to assess impairment.

biological field.[19] Under *Strickland*, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," measured according to "prevailing professional norms." 466 US 668 at 688 (1984). Trial counsels' strategic focus was to use a master's degree prepared social worker to present a "bio-psychosocial assessment" (Assessment).[20] Trial counsel's social historian, Marjorie Hammock, testified that the assessment draws upon the biological, psychiatric, psychological and social components of an individual to establish the unique characteristics of a defendant[21] and to appreciate his volitional limitations.

> "It [biopsychosocial assessment] deals with the biological background of a client, and we work in a multi-disciplinary arena that is, I consult with the medical community to see what their information is about the client. We refer to and receive reference from -- referrals from doctors and other health providers. We share records and use a collaborative amount of information to make a determination about how important is that biological piece to the whole picture." (Dkt. No. 20-6 at 263-264).

Unfortunately, the case as investigated developed and presented by trial counsel did not include the biologic component and especially the genetic link suggested by the profound familial history of mental illness.[22] Trial counsel and their experts failed to pick up on cues that there was genetic organicity and congenital defects (FAS) at work in the Petitioner's biology. The biological and physiologic components required as part of a valid assessment have never been investigated, developed or presented within the context of a complete bio-psychosocial assessment by either trial or collateral counsel. The profound familial history of mental illness demanded that such an inquiry be made. The complete mapping of the human genome was completed in 2003; the trial of this case was in 2005. Whole genome sequencing was not necessary to conduct discrete specific genetic inquiries which had been available for years prior to this case.[23]

---

[19] Robert W. Richards, MD, states in his affidavit that had trial counsel followed his leads and presented him with the information contained in the Bookstein report and the QEEG that he would have suggested investigating the morphologic/genetic aspects of the case. (Richards' Affidavit Exhibit 1).

[20] The Assessment is a fundamental tool for social historians. It provides the framework by which the expert may bring together the client's entire biological, psychiatric and social histories and illustrate the unique characteristics of the defendant to aid the jury in determining which sentence to recommend.

[21] *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), held that the capital defendant must be treated as a "uniquely individual human being."

[22] Exhibit 5 chronicles six prolonged hospitalizations for the petitioner's father who was suicidal and homicidal; four hospitalizations for the petitioner's mother who was "mentally ill" and had numerous treatment records for mental illness; a paternal uncle with three major hospitalizations for suicidal and homicidal ideations and mild mental retardation; a sister with suicidal ideation and depression, insomnia; and a paternal grandmother who is reported as being mentally ill and threatening.

[23] "Now that the human genome has been sequenced there exists the possibility of identifying specific genes that affect human cognition. In this article, recent studies that have found associations between common gene variants and specific cognitive processes are reviewed. Several principles for evaluating this new field are also discussed. The

The bio-psychosocial investigation that was prepared (in terms of the family tree or genogram) was itself inadequate. The genogram and its explanation minimally covered, with scant detail, only two generations on the paternal side and no interviews were done beyond the client's mother and grandmother on the maternal side. The vital importance of heritability/genetics of mental illness was completely neglected. At the post-conviction merits hearing lead trial counsel John Mauldin testified concerning the inadequacy of the Assessment:

> Q: And you knew that part of the social history, essentially at the time you went to trial, had some gaps, correct?
> A: Yes, sir. Yes sir.
> Q: Yet you still presented the social history as you understood it, through Dr. Hammock?
> A: That's right.  (Dkt. No. 20-9 at 400)

There was evidence of mental instability on the petitioner's mother's side (most of the family members and medical records are in Germany) but there was no evidence of any attempt to reach any of the maternal family members, despite the fact that the petitioner's maternal grandmother, Erika Shedd, lived in Idaho at the time of the trial and now lives in Florida. The possibility of arranging to send the mitigation investigator to Idaho and collateral counsel to Florida to interview the maternal grandmother was mentioned by the Defense Team but ruled out. Also ruled out was sending an investigator to Germany.[24] There is no evidence that trial counsel attempted to reach out to the German family members. No international organization was sought nor retained, although such an organization exists (Reprieve) to assist in gathering bio-psychosocial information on the large German side of the petitioner's family. Thus the social historian was never provided with adequate information and the mitigation investigator was woefully ill informed concerning the petitioner's

---

interpretation of results is far from simple because a single gene can affect multiple processes, multiple genes can impact on a single process, and multiple cognitive processes are intercorrelated. In general, functional neuroimaging has been a more sensitive assay of cognitive processing than behavioral measures used alone, although there are important caveats regarding its use. Replicated findings so far involve associations between a *COMT* polymorphism and prefrontally-based executive functions and neurophysiology, and a *BDNF* polymorphism and medial-temporal-cortex based declarative memory processes. Implicit in this review is a concern that many of the cognitive paradigms used evolved for purposes well outside those described here. As such it may be necessary to view cognition in novel ways, based on constraints imposed by genomics and neurobiology, in order to increase the effect size of genotypic influences on cognition." *Genes and the Parsing of Cognitive Processes*; Trends in Cognitive Sciences Vol 8, Issue 7 pps. 325-335 July 2004. **See also** *Child Developmental and Molecular Genetics and What Can be Done;* Child Development; Vol 69, Issue 4, August 1998.

[24] Lead Trial attorney John Mauldin's testimony on this point is located in the PCR Transcript, Dkt. No. 20-9 at 326-351, 399-400. Mauldin states that Germany was not an issue brought to his attention for funding.

dual citizenship (USA/German) and Reprieve as a resource to aid in the very tasks which should have been undertaken. The investigator, Ms. Vogelsang, testified at the post-conviction merits hearing as follows:

> Q: Did you know that because of Chris being born to a German national that he was, in fact, a dual citizen?
> A: I did not know that.[25]
> Q: Okay, have you ever heard of the group Reprieve?
> A: I had not.
> Q: Okay. And you now know that Reprieve is a European group that helps people that have this kind of problem with indigent Defendants?
> A: Yes.   (Dkt. No. 20-9 at 219-220).

Co-counsel William Nettles testified that he was aware of the German heritage but the record is silent about pursuing the resources for German intervention and to collect family history, medical records, and conduct necessary interviews. Dkt. No. 20-9 at 302.

**B.    GENETIC STUDY WAS THE GATEWAY THROUGH WHICH TRIAL AND COLLATERAL COUNSEL COULD HAVE INVESTIGATED DEVELOPED AND PRESENTED THE EXISTENCE OF BIOLOGICAL DEFECTS, THEIR DEGREE OF SEVERITY, AND THEIR IMPACT UPON THE PETITIONER'S CAPACITY TO CONFORM HIS BEHAVIOR TO THE REQUIREMENTS OF THE LAW.[26]**

Genetics offers the most objective and particularized method for accurately diagnosing and understanding the functional impairments consequential to gene aberrations and deletions. Although we see symptoms in the petitioner's behavior there has been no effort to determine their cause or to understanding the resulting volitional restraints known to be associated with specific genetic aberrations and deletions. Merlin Butler, MD, PhD. is one of the leading geneticists in the world. He has been consulted about this case and he offers this suggestion as a starting point to understanding the unique characteristics of the petitioner:

> "I would opt to do a structural high resolution microarray first via Lineagen, Inc., Salt Lake City as they have the most powerful array for neurodevelopmental disorders prior to whole genome or exome sequencing. If he does have FASD (fetal alcohol spectrum disorder), then his cognitive impairment and judgement can hence be accounted for but should rule out a genetic lesion(s), as well initially using the microarray approach."[27]

---

[25] The petitioner is a citizen of the Federal Republic of Germany. Article 102 of the Constitution for that Country prohibits capital punishment. However, the trial team was not aware that the petitioner was a German National or of the many resources made available by the European Union and Germany to defendants facing capital sentences.

[26] There is a profound connection between genetics and major illnesses that involve executive functioning of the brain. The single greatest diagnostic tool is rapidly becoming gene studies. For a brief overview of the trend visit the National Institute of Health at https://www.nimh.nih.gov/news/science-news/2013/new-data-reveal-extent-of-genetic-overlap-between-major-mental-disorders.shtml.    On the heritability of suicide see https://www.ncbi.nlm.nih.gov/pubmed/16775759.

[27] Dr. Butler's report and the microarray are attached as exhibit 6. This approach was available, although

The touchstone to determining a just sentence requires assessing the defendant's moral culpability for the crime. Moral culpability cannot be determined without first knowing to what degree the defendant's conduct was or was not volitional.[28]   As an example, in *Daryl Atkins v Commonwealth of Virginia*, the Supreme Court of the United States announced a rule of law that a person who is intellectually disabled is not eligible for a death sentence. The Court's reasoning was that the physiological/biological condition of intellectual disability so compromises the defendant's volition that his moral culpability is reduced. Further, the Court determined that it offends the evolving standards of decency that mark the progress of a maturing society to execute such a person. The rule that an intellectually disabled individual is ineligible for death applies without regard for how striking, offensive or severe the facts and circumstances of the crime and its consequences may be.

Dr. David Griesemer, neurologist, who was retained to evaluate the petitioner two weeks before the trial, complained that trial counsel provided inadequate information about the client prior to his last-minute work on the case. He was given no school-based information or psychological assessments. He notes in the section of his neurological evaluation entitled "Recommendation" done on January 27, 2005 that: "The above opinions are based on very limited information available." Ultimately, Dr. Griesemer's opinions were disregarded by trial counsel and this fact constitutes yet another departure from prevailing norms in the capital litigation defense community at the time of trial. By affidavit, admitted during the PCR merits hearing (Current Exhibit 3) Dkt. No. 9 at 336, Dr. Griesemer stated:

> "If this additional information had been made available to me, I would have structured my report and recommendations differently. I was unaware that there were neuropsychological testing results available for review. I was also unaware that Mr. Williams suffered from a head injury.  I was also unaware that his mother consumed alcohol during her pregnancy or that Mr. Williams had poor performance in school."

Suicidality is associated with genetic abnormalities.[29] Trial counsel knew of the profound

---

utilizing different methodology, in 2004.

[28] Volition, or "will", is the cognitive process by which an individual decides on and commits to a particular course of action. It is defined as purposive striving and is one of the primary human psychological functions.

[29] "A new study from the Centre for Addiction and Mental Health has found evidence that a specific gene is linked to suicidal behavior, adding to our knowledge of the many complex causes of suicide." Clement C. Zai, Mirko

family history for suicide and of the Petitioner's own attempt at suicide. Nonetheless, neither trial nor collateral counsel made any effort to understand suicide and its implications on the Petitioner's executive functioning. On June 13, 2003, just prior to the September 3, 2003 death of the petitioner's estranged girlfriend, Maranda Williams, the petitioner made a very serious suicide attempt. Psychiatrist Dr. Robert Richards stated that the petitioner "took an overdose of tricyclic antidepressants." When asked "What was done for Chris?" Dr. Richards stated "He only stayed (in a hospital) thirteen hours. It was a near-lethal attempt and I can't see where he had a psychiatric consult. (Dkt. No. 20-5 at 494-497). Dr. Seymour Halleck testified to the severity of the Petitioner's mental health just on June 13, 2003 but no effort was made to investigate develop or present evidence of the impact this condition had upon the Petitioner's ability to conform his conduct to the requirements of the law just 63 days later when the offense conduct occurred. Dkt. No. 20-6 at 332-337. The fact is, the mental illness substantially mitigated the Petitioner's moral culpability but was never included in the case for life. It is important to note that in the entire bio-psychosocial presentation, the petitioner's very serious suicide attempt 63 days prior to the death of Miranda Williams was not mentioned. Dr. Hammock did state that the petitioner's father Dwight Williams made multiple suicide attempts, as did his mother, brother and sister. But there is no mention or investigation of why these events were occurring; the genetic component screams for investigation. In fact, the petitioner's sister, Maureen, committed suicide a few years after petitioner's trial.   Dr. Richards'[30] diagnosis of the petitioner was Bipolar Disorder with Rapid Cycling, Mixed Features.  In terms of genetics and mental health, bipolar disorder is highly heritable. The petitioner's sister, Maureen Bancuyo and his uncle, Bryant Williams also had diagnoses of bipolar disorder. This fact and the biological heritability were not brought out in the social historian's testimony at trial or during the collateral proceedings. There was simply not enough detail in the presentation of the family's history of mental illness.  At the time of the trial, the science of genomics was very public, as the

---

Manchia, Vincenzo De Luca, Arun K. Tiwari, Nabilah I. Chowdhury, Gwyneth C. Zai, Ryan P. Tong, Zeynep Yilmaz, Sajid A. Shaikh, John Strauss, James L. Kennedy. The brain-derived neurotrophic factor gene in suicidal behavior: a meta-analysis. The International Journal of Neuropsychopharmacology, 2011

[30] Dr. Richards specifically refers to the nature of bipolar disorder as genetic with a clear invitation to follow that lead to determine the cause and to quantify the severity of the condition upon the Petitioner's capacity to conform his behavior to the requirements of the law. Trial Trans p. 1977.

Genome Project was just completed, and scientific articles on the genetics of schizophrenia, bipolar disorder, and major depression were available to the trial and collateral counsel. No one, including the Social Historian whose role and expertise might have provided a comprehensive view of the relatedness of neurobiology, heredity, and environment relevant to determining the unique characteristics of the petitioner in deciding the sentence, offered up these key limitations for consideration.

With all the multigenerational familial history of organicity resulting in psychiatric illnesses as indicated in trial exhibits 28 and 29 (Dkt. No. 20-6 at 268-279) no one undertook a biological investigation of the structural/functional features of the petitioner's brain. Not until collateral counsel investigated, developed, and presented fetal alcohol spectrum disorder (FASD) was any effort made to understand the biology of the petitioner's decision making process. As noted in the PCR testimony FASD is congenital and not genetic.[31] Assessing the genetic component is a separate and essential requirement to understanding the petitioner's degree of volitional control over his thoughts, impulses, and his ability to learn from past experiences. The mitigation case must include more than the petitioner's social influences; it must also uncover and present the biological explanation for why the petitioner's decision making is so markedly aberrational. Answering that question implicates volition directly and moral culpability ultimately.

Although collateral counsel are to be credited for picking up on the fact of mother's drinking during a critical gestational period, a fact and detail totally missed by trial counsel,[32] both teams failed to see the greater global issue of one or more functional/structural organic brain conditions resulting from the petitioner's genetic script. His seriously impaired frontal lobe functioning, the inability to learn from past experience, to respond appropriately to social cues and to modulate and control impulses is, in his case, an outgrowth of genetics more than of any acquired congenital circumstance (FASD). Understanding the petitioner's biology is the key to assessing his degree of volition and ultimately his moral culpability for this crime.

---

[31] See Dkt. No. 20-15 at 150-218 Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis.

[32] Trial attorneys were aware that the petitioner's mother was drinking alcohol during the gestational period. See PCR Exhibits 7, 8, and 10 and Transcript 32-35, 91, 119-120, 156-157 and 192. Yet trial attorneys were unable to explain why FASD was not investigated or why it was not ruled out. See PCR Transcript 97, 174.

None of the defense team members, including collateral counsel, have followed up on the genetic implications of the family mental health history which would have provided a very different understanding of the petitioner's degree of working volitional control over the decisions he makes. The defense asked the jury for sympathy without providing hardwire objective genetic circumstances that would have given at least one juror – among a jury hung at 9-3 for death - an objective pathway to reach a reasoned moral judgment to recommend life. Given the impaired volition of this petitioner a death sentence offends the evolving standards of decency that marks a maturing society. Hard times growing up do not persuade jurors but an objectively determined and compelling reason for why the petitioner behaved as he did would have most probably resulted in at least one juror refusing to impose death.

**XIII.   TRIAL COUNSEL WERE INEFFECTIVE BY FAILING TO INVESTIGATE DEVELOP AND PRESENT EVIDENCE THAT WOULD HAVE DEMONSTRATED THAT THE PETITIONER'S CAPACITY TO CONFORM HIS BEHAVIOR TO THE REQUIREMENTS OF THE LAW WAS SUBSTANTIALLY IMPAIRED. THAT FAILURE PREVENTED THE COURT FROM INSTRUCTING THE JURY THAT IT COULD CONSIDER DIMINISHED CAPACITY AS A REASON TO RECOMMEND A LIFE SENTENCE BECAUSE THE GENERAL ASSEMBLY DESIGNATED IT AS A STATUTORY MITIGATOR. COLLATERAL COUNSEL WAS INEFFECTIVE BY FAILING TO CHARGE TRIAL COUNSEL WITH IAC FOR MISSING THE OPPORTUNITY TO HAVE THE JUDGE CHARGE THE STATUTORY MITIGATOR.[33] COUNSEL'S COMBINED FAILURES VIOLATE THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION, PREJUDICED THE PETITIONER'S CASE, AND UNDERMINES CONFIDENCE IN THE OUTCOME.**

### Summary of Argument

Trial counsel did not investigate develop and present evidence that the petitioner's capacity to conform his behavior to the requirements of the law was substantially impaired. Not only did the jury not have evidence of diminished capacity during deliberation but the absence of that evidence precluded the judge from instructing the jury that the General Assembly designated diminished capacity as a statutory mitigator. Collateral counsel failed to allege trial counsel IAC for missing the opportunity to have the judge instruct the jury that diminished capacity was a statutory mitigator. The end result is that the jury never had the evidence or the jury charge pertaining to diminished capacity.

---

[33]The Legislature has provided a set of specific statutory mitigating facts which suggest diminished moral culpability. If the jury determines such facts exist, that finding alone may support a recommendation of a life sentence. SC Code Ann. § 16-3-20(b)(6) provides the following mitigator: "The capacity of the defendant to appreciate the criminality of his conduct <u>or</u> to conform his conduct to the requirements of law was substantially impaired." Emphasis added. In sentencing the judge defined a statutory mitigator as: "What is a statutory mitigating circumstance? It is in fact an incident, a detail, or an occurrence which the South Carolina General Assembly has declared by statute will reduce the severity of the offense of murder. In other words, a circumstance recognized by statute as one which in fairness and mercy may be considered extenuating or as reducing the degree of moral culpability for the commission of the act of murder." (Dkt. No. 20-6 at 421).

This claim has never been vetted against the *Strickland v Washington* standard because of the combined ineffective assistance of trial and collateral counsel.

    a.  **TRIAL COUNSEL'S PERFORMANCE**

        The medical mitigation case at trial consisted of testimony from three experts; Robert W. Richards, MD a general psychiatrist; Eric LeBogen, PhD a clinical forensic psychologist; and Seymour Halleck, MD a forensic psychiatrist. Only Drs. Roberts and Halleck offered diagnosis and medical testimony. Dr. LeBogen testified on the petitioner's ability to adapt to prison conditions.

        i.    **ROBERT W. RICHARDS, MD**

        Dr. Richards was called as a defense witness in the guilt phase of the trial. He was qualified as an expert in the field of "general psychiatry" Dkt. No. 20-5 at 478. His direct testimony was limited to matters pertaining to the petitioner's psychiatric condition. Dr. Richards was not a forensic psychiatrist and could not offer an opinion concerning whether, at the time of the offense, the petitioner lacked capacity to conform his behavior to the requirements of the law. Dr. Richards was asked to determine whether the petitioner suffered from any psychiatric conditions (Dkt. No. 20-5 at 479) and he was to serve as a general mitigation witness. As regards diagnosis Dr. Richards stated: "Chris is a quite complicated case. I'd say that his primary diagnosis is bipolar disorder, type one or type two. I'd lean towards type one, probably with rapid cycling mixed features." (Dkt. No. 20-5 at 479). After explaining what features support the diagnosis and describing the component parts, Dr. Richards adds the additional diagnosis of obsessive compulsive disorder (Dkt. No. 20-5 at 481). Dr. Richards then refers to a journal that the petitioner had been writing just prior to the crime and noted: "And as the journal progresses, he gets less and less relief from it [writing the journal] as if his illness is spiraling, and what would ordinarily help him feel better is just not working anymore." (Dkt. No. 20-5 at 489). The next statement of significance offers insight into how trial counsel failed to investigate develop and present the global medical conditions which pertain to the petitioner's brain. Collateral counsel likewise did not inquire concerning trial counsel's preparation of this witness prior to calling him to testify. Nonetheless, trial counsel asked the witness "…where do they [illnesses] come from?" and the witness answers: "The current thinking with bipolar disorder, it's a combination of genetics, inherited, and nurturing or environment. Now the reason we know that

there's a component of genetics, if mom or dad has a mood disorder or bipolar disorder, specifically, a youngster can have up to a 12 percent chance of having the bipolar. If mom and dad have bipolar, it's much higher." (Dkt. No. 20-5 at 491). Then trial counsel demonstrates an awareness of the existence of genetic components to the conditions he is attempting to establish through the testimony of this clinical psychiatrist when he asks: "Let's go back to genetics. Did you find evidence in your research that would support Chris may have received this through genetics?" The answer is "Yes". (Dkt. No. 20-5 at 492). For pages that follow the witness provides the factual substrate indicating the need for an evaluation by a geneticist. See Exhibit 1 Richards' Affidavit. None was obtained. There were no questions and no testimony pertaining to guilt phase issues by Dr. Richards.

On cross examination of Dr. Richards the following colloquy occurred:

"Q All right. Let me go back to you. Are you aware of the legal standard for competence in a criminal trial?
A I'm not a forensic psychiatrist, so I'd have to say I'm not sure.
Q Are you familiar with what the standard for legal competence is to stand trial under the law of the state of South Carolina?
A I'd have to say I'm not sure.
Q You do not know what the mental standard to stand trial under the law of the state of South Carolina is?
A I'd really, if I was asked that question, I'd want to review it in advance because I haven't had forensic training.
Q All right. Is this…
The court: is that a yes or a no?
The witness: I'd say I'm not sure.
The court: all right. Go ahead.
Q Does this defendant, Mr. Williams, know the difference between right from wrong; and did he know the difference between right and wrong on September the third, 2003?
A I believe he did.
Q And on September 3 2003 was he able to conform his behavior to the requirements of the law?
A I'm not sure.
Q And on September 3rd 2003 was he competent to stand trial and to assist his attorneys in his defense?
A Given that I'm not 100 percent sure about the law, and those are legal terms, I'd have to say I don't know. If I just look at being able to understand what we're talking about and be able to think through the questions and give answers, I'd say yes, he was.
Q So your testimony today, not knowing what the law is, your testimony is not that he is insane under the law of this state?
A I never said he was insane.
Q I just wanted to make sure I was clear on that.
A If I implied that, I made a mistake.
Q I just was asking the question, I didn't say you implied it. That he knew -- you're not saying he didn't know right from wrong?
A I never said that.

Q And you're not saying that he couldn't conform his behavior on September
3rd to the requirements of the law?
A I never said that.  (Dkt. No. 20-5 at 505-507)

The cross examination of Dr. Richards concluded with the solicitor obtaining testimony from

Richards that he was in agreement with the State's forensic psychiatrist on the point in question here.

The solicitor asked: "And Dr. Crawford, in her opinion, which you have read her report, said that the

defendant knew right from wrong on September the 3rd 2003?" The answer was "Right, And I don't

disagree with that". Again, from the solicitor: "And that he was able to conform his behavior to the

requirements of the law on September 3rd 2003?" The answer from the witness was: "Right." (Dkt.

No. 20-5 at 508). This presentation totally undermined the value of the mitigation case to follow. We

also know after collateral counsel's investigation that qualified medical experts determined that the

Petitioner lacked sufficient capacity to conform his behavior to the requirements of the law. We also

know that the Petitioner's ability to conform his conduct was "substantially impaired" as stated in

the statutory mitigator.

Because of trial counsel IAC in failing to develop the diminished capacity evidence the

Solicitor was able to make the following erroneous argument to the jury in sentencing:

> His mental issues may have existed at the same time as this killing, but they're not the
> why. They just existed concurrently with it. Because he knew right from wrong. And
> he could conform his behavior to the requirements of the law. No one has said the
> mental issues caused him to kill Mandy. They have talked about those mental issues.
> The reason they haven't said they caused him to kill Mandy is because they didn't.
> They may have affected the way he thought about things. But didn't cause him to kill
> Mandy, because he knew what was right, he knew what was wrong, and he knew how
> to conform his behavior, which means he knew what his choices were. And he made
> those choices intentionally and willfully.  (Dkt. No. 20-6 at 394)

ii.    **SEYMOUR HALLECK, MD**

Dr. Halleck's testimony was apparently intended to establish that the petitioner

suffered from a major depressive episode and obsessive compulsive disorder. Dr. Halleck offered

significant social, education and vocational data and underscored how unfortunate it was that the

petitioner was in the hospital after a suicide attempt on June 13, 2003 just prior to the date of the

offense September 3, 2003 and no one undertook to have the petitioner civilly committed. Dr. Halleck

was of the opinion that the petitioner was committable because he was a clear danger of serious injury

or death to himself. (Dkt. No. 20-6 at 335). Dr. Halleck believed that, at the time of the crime, the

petitioner "was having a terrible time trying to conform his behavior to the requirements of the law." (Dkt. No. 20-6 at 337). This testimony should have prompted trial counsel to request that the court instruct the jury that the General Assembly determined that a person whose capacity to conform his behavior to the requirements of the law was "substantially impaired" was less culpable and that fact may support a life sentence. The trial record makes does not document any such request. The post-conviction merits hearing transcript does not include any questioning concerning why trial counsel let this opportunity to have the trial judge charge the statutory mitigation pass by. After hours of deliberation this jury was hung 9-3 for death.  This diminished capacity issue was not investigated developed or presented by trial counsel and they did not ask that the statutory mitigator be charged even though Dr. Halleck provided the necessary testimony.[34] Dr. Halleck was unaware of the organic brain conditions being developed by MRI just prior to trial and did not know of Dr. Richards' suggestion of genetic script issues or offer any of his own.

On cross examination the solicitor asked: "…At the time of this event on September the 3rd, Mr. Williams knew criminal right from criminal wrong and he knew and was able to conform his behavior to the requirements of the law, correct?" Dr. Halleck answered: "I think he knew right from wrong. I think he was having a terrible time trying to conform his behavior to the requirement of the law." (Dkt. No. 20-6 at 337). Continuing, the solicitor inquires: "But under that standard you are not testifying he didn't know right from wrong and he couldn't conform his behavior to the requirement of the law?" The answer was: "That's not my testimony. I would testify that his capacity to conform his behavior was somewhat impaired." (Dkt. No. 20-6 at 338). Had trial counsel properly prepared the witness alerting him that the standard in South Carolina for purposes of the statutory mitigation charge was "substantially impaired" instead of "somewhat impaired" the ambiguity created when the witness first stated on direct that the defendant was have a "terrible time" and on cross that the defendant's ability to conform was "somewhat impaired" would have been eliminated and the factual basis established for the mitigation instruction. This single quantifying word "somewhat" is contradicted by suggestion in the witness's earlier statement that the petitioner was having a "terrible

---

[34] See paragraph 5 of lead trial attorney John Mauldin's affidavit, Attached as Exhibit 2.

time" trying to conform his behavior to the requirement of the law. This testimony establishes that trial counsel simply was not thinking in terms of the statutory mitigation charge.

As developed during the post-conviction merits hearing the petitioner suffered from biological conditions that established the Petitioner lacked sufficient capacity to conform his behavior to the requirements of the law (GBMI). Those conditions also resulted in the Petitioners' ability to conform his conduct to the requirements of the law being "substantially impaired" SC Code Ann. § 16-3-20(b)(6). (See Attached Exhibit 13 Affidavits of Natalie Novick Brown, Ph.D.).

Trial counsel were ineffective to the prejudice of the petitioner in failing to provide diminished capacity testimony to the jury for its consideration during the deliberative process and in failing to secure the GBMI jury instruction at the close of the guilty phase and the statutory mitigation jury instruction during the sentencing phase. Offering diminished capacity as part of the guilty phase deliberation would have accomplished trial counsel's stated desire to "front-load" the mitigation case and also would have armed the life oriented jurors with an opportunity to secure a pledge from the death group that in exchange for surrendering guilty but mentally ill and agreeing to a guilty verdict that the death oriented jurors would agree to a recommendation of life without parole as the sentence recommendation.[35]

    **b.**    **POST-CONVICTION MERITS HEARING.**

    **i**    Jan Vogelsang was the mitigation specialist for the trial defense team. Vogelsang was asked at the post-conviction merits (merits) hearing whether it was a fair characterization that the experts retained to investigate the unique characteristics of the petitioner's biological circumstances were not communicating and sharing information in what should have been a collaborative effort the answer was "that is correct". (Dkt. No. 20-9 at 240). Trial counsel's themes as set forth in exhibit 11 at the merits hearing did not include investigating fetal alcohol or other biological impairments that would support the statutory mitigation instruction concerning diminished capacity. Collateral counsel focused upon the failure of the trial team to investigate develop and

---

[35] This was a hung jury after hours of deliberation (9-3 for death). Even though § 16-3-20 provides that if a jury cannot reach a unanimous recommendation of death "after reasonable deliberation" the judge should discharge the jury and inter a sentence of life without parole, this judge gave the jury and *Allen* charge. After continued deliberation the jury returned a sentence of death.

present fetal alcohol spectrum disorder (FASD) but failed to charge IAC of trial counsel for not obtaining the diminished capacity testimony and not requesting the related jury instructions for GBMI and the statutory mitigation instruction.

    **ii.**    Collateral counsel did not question trial counsel about failing to develop the lead given them by Dr. Halleck who testified that the petitioner was having a "terrible time" trying to conform his conduct to the requirements of the law. Furthermore, collateral counsel did develop and present testimony that the petitioner's capacity to conform his conduct to the requirement of the law was substantially impaired but failed charge IAC of trial counsel for failing to request a guilt phase jury charge that petitioner was guilty but mentally ill. Collateral counsel also failed to charge trial counsel with IAC in failing to request the statutory mitigation instruction. That failure resulted in collateral counsel missing the opportunity to question trial counsel on why they did not request the two instructions.

    Nonetheless, the trial lawyers were cross-examined on the issue of whether the petitioner had the capacity to conform his conduct to the requirements of the law.

> Q Do you recall that Sy Halleck testified that he did not meet that definition?
> A. I don't. I mean, if that's what his testimony says, that's what his testimony says.
> Q. And that Dr. Richards was not saying that he could not conform his requirement, his conduct and requirements of law on September 3rd?
> A. If that's what his testimony said, I don't disagree. (Trial Counsel Nettles, Dkt. No. 20-9 at 339)

    On cross examination lead counsel John Mauldin testified concerning the petitioner's capacity to conform his conduct to the requirements of the law:

> Q. Okay. And with that theme in the case did you investigate whether, in fact, your client had satisfied terms of insanity as we know it in South Carolina of guilty but mentally ill?
> A. Did we make a determination of whether he would fit in either of those two categories?
> Q. Did you investigate it and upon investigation make a determination?
> A. Well, we listened to what the psychiatrist had to say to us. And, you know, if the psychiatrist had told us that he felt that Chris, because of his mental condition, was unable to conform his conduct to the requirements of the law, then certainly that would have led to a different presentation than what we made. (Dkt. No. 20-9 at 393).

Mr. Mauldin's answer demonstrates trial counsel took a passive role with the retained expert – "we listen" - instead of an active role by providing the expert with the legal framework for dealing with

mental status issues. Mr. Mauldin's answer also demonstrates that the trial team conflated insanity[36] with guilty but mentally ill.[37] If front-loading the mental status component to the mitigation case was the strategic reason for presenting Dr. Richards as a defense witness in the guilt phase then the jury instruction on GBMI would have been most important. In addition, the testimony that the petitioner lacked sufficient capacity to conform his conduct to the requirements of the law was also squarely on point with the General Assembly's statutory mitigator number six and furthered trial counsel's strategic purpose of front-loading the mitigation case.

Although collateral counsel did fully develop and present FASD, they failed to recognize and connect testimony by a number of their expert medical witnesses concerning the petitioner's capacity to conform his conduct to the requirements of the law and the significance of the testimony to the jury instructions.[38]

### iii.    NATALIE NOVICK BROWN, PhD

Dr. Brown is a clinical psychologist with special training and extensive work in diagnosing and assessing FASD. She testified at length during the post-conviction merits hearing. She testified that "executive functioning" as she uses that term included, and was synonymous with, "self-regulation. I'm talking about behavior control." Dkt. No. 20-11 at 284. She quantified the petitioner's ability to self-regulate his conduct as "significantly impaired". (Dkt. No. 20-11 at 286). Concerning FASD patients' generally she stated their ability to understand the significance of their behavior on others as "really impaired". (Dkt. No. 20-11 at 290). Trial and now collateral counsel failed to pick up on the genetic significance of the petitioner's impairments as that related to his "capacity" to "control his conduct." Dr. Brown stated: "The bipolar would exacerbate the problem of mood management And in Mr. Williams' case he also has a genetic or hereditary component in his mood illness. His father had a significant depressive disorder, psychotic at times, And so with that genetic

---

[36] SC Code Ann. § 17-24-10(A) "It is an affirmative defense to a prosecution for a crime that, at the time of the commission of the act constituting the offense, the defendant, as a result of mental disease or defect, lacked the capacity to distinguish moral or legal right from moral or legal wrong or to recognize the particular act charged as morally or legally wrong."

[37] SC Code Ann. § 17-24-20(A) "A defendant is guilty but mentally ill if, at the time of the commission of the act constituting the offense, he had the capacity to distinguish right from wrong or to recognize his act as being wrong as defined in Section 17-24-10(A) but because of mental disease or defect he lacked sufficient capacity to conform his conduct to the requirements of the law."

[38] See affidavit of PCR counsel Derek Enderlin's Exhibit 14 paragraph 7.

predisposition, that would only increase the mood <u>control problems</u>. Emphasis added (Dkt. No. 20-11 at 311).

Finally and directly on point Dr. Brown is asked:

Q. Based on a reasonable degree of medical certainty, did Chris Williams lack sufficient capacity to conform his conduct to the requirements of the law?
A. Yes
Q. At that moment could he control himself?
A. No, he could not because of a biological impairment.
Q. Would you have testified the same way in 2005?
A. Yes. (Dkt. No. 20-11 at 367).

In Dr. Brown's affidavits Exhibit 13 she reaffirms that, to a reasonable degree of medical certainty, at the time of the crime, Chris Williams' "lacked sufficient capacity to conform his conduct to the requirements of the law" See SC Code Ann. § 17-24-20(A) guilty but mentally Ill, and that his ability to confirm his behavior to the requirements of the law was "substantially impaired" SC Code Ann. § 16-3-20(b)(6) statutory mitigator.

### iv.     COLLATERAL COUNSEL'S INEFFECTIVE PERFORMANCE

During collateral counsel's investigation of FASD, testimony was developed that the petitioner had biologically based impairments that diminished his capacity to conform his conduct to the requirements of the law. Nonetheless collateral counsel failed to pick up on numerous cues concerning the genetic component of the petitioner's global organic brain disorders.[39] The initial and only genetic studies to be performed demonstrate multiple severe functionally debilitating cognitive functioning. (See Butler Affidavit Exhibit 6). In addition collateral counsel failed to pursue not only trial counsel failure to secure diminished capacity evidence but because of that trial counsel missed the opportunity to have the jury instructed on diminished capacity as a statutory mitigating fact which reduces the petitioner's culpability and would support a life sentence. SC Code Ann. § 16-3-20(b)(6). As a consequence of collateral counsel's failure to articulate and exhaust the claim, trial counsel' performance has never been tested against the *Strickland v Washington* standard. Pursuant to *Martinez v Ryan* this issue is itself, and by itself, "substantial" and warrants review either by staying

---

[39] As an example among many, collateral counsel called Dr. Natalie Brown, PhD who testified in response to counsel's question regarding Mr. Williams' mood disorders: "And in Mr. Williams' case, he also has a genetic or hereditary component in his mood illness…And so with that genetic predisposition, that would only increase the mood control problem." Dkt. No. 20-11 at 311.

this action until a successive post-conviction application in State court may be exhausted or by finding sufficient cause not to treat the issue as procedurally barred and setting an evidentiary hearing.

Although trial and collateral counsel knew that Dr. Richards had requested specific investigative studies to develop biological information about the petitioner, neither contacted Dr. Richards to share the information developed and presented during the post-conviction proceedings. Having now seen portions of that information Dr. Richards offers by affidavit Exhibit 1 that had trial counsel secured the investigative materials he requested those materials would have led him to recommend additional consults and in particular a consult with a morphologist/geneticist (Richards' Affidavit Exhibit 1).[40] Had collateral counsel contacted Dr. Richards and shared the diminished capacity evidence Dr. Richards would have made the same recommendation concerning genetic studies prior to the post-conviction merits hearing. The genetic consults would have uncovered the FASD and the genetic script abnormalities which so substantially impair the petitioner's capacity to conform his conduct to the requirements of the law. Dr. Richards would have put trial counsel on the trail to securing evidence of diminished capacity and a statutory mitigation jury instruction supporting a life sentence. Collateral counsel's errors were failing to secure the global biological inquiry and failing to articulate a specific claim that trial counsel's deficient performance resulted in the jury not being instructed on the GBMI verdict and the statutory mitigator.

**XIV.** **TRIAL COUNSEL WERE INEFFECTIVE 1) IN CALLING AN EXPERT WITNESS TO TESTIFY IN THE GUILT PHASE OF THE CASE WHO WAS NOT QUALIFIED BY EDUCATION, TRAINING OR BY EXPERIENCE TO SERVE IN THAT CAPACITY. THE WITNESS' TESTIMONY PROFOUNDLY PREJUDICED THE PETITIONER'S MITIGATION CASE. 2) TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO ADEQUATELY PREPARE THE WITNESS FOR THE INEVITABLE CROSS-EXAMINATION QUESTIONS AND TO PROVIDE THE WITNESS WITH THE NECESSARY FACTS TO RESPOND TO THE STATE'S QUESTIONS. 3) TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO HAVE A QUALIFIED EXPERT WITNESS TESTIFY THAT THE PETITIONER MET THE STATUTORY DEFINITION FOR GUILTY BUT MENTALLY ILL.[41] 4) COLLATERAL COUNSEL WERE INEFFECTIVE FOR FAILING TO TETHER THE AVAILABLE EVIDENCE OF GBMI TO TRIAL COUNSEL'S FAILURE TO REQUEST A JURY CHARGE OF GBMI. 5) TRIAL COUNSEL'S STRATEGIC DECISION TO "FRONT LOAD" THE MITIGATION CASE BY USING AN UNQUALIFIED, IMPROPERLY PREPARED AND ILL EQUIPPED WITNESS WAS INHERENTLY UNREASONABLE. COLLATERAL COUNSEL WERE INEFFECTIVE IN FAILING TO ARTICULATE AND PURSUE THIS ISSUE DURING THE POST-CONVICTION CASE. COUNSEL'S FAILURES VIOLATE THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION, PREJUDICED THE PETITIONER'S CASE, AND UNDERMINES CONFIDENCE IN THE OUTCOME.**

---

[40] That consult has now been undertaken and the results of the biological studies form the basis for a separate joint *Martinez* IAC claim.

[41] SC Code Ann. § 17-24-20(A).

**a. TRIAL COUNSEL PERFORMANCE.**

As noted in Section III(a)(i) trial counsel presented one witness in the guilt phase. That was Robert W. Richards, MD a clinical psychiatrist. During the qualification *voir dire*, petitioner's own counsel underscored that the witness was not qualified to answer forensically based questions and more importantly would not be able to answer cross-examination questions about the petitioner's mental state at the time of the crime. (Dkt. No. 20-5 at 478). Dr. Richards testified that "Chris is a quite complicated case. I'd say that his primary diagnosis is bipolar disorder, type one or type two. I'd lean towards type one, probably with rapid cycling mixed features." By this testimony the witness has demonstrated that he is undecided about the diagnosis and undecided about whether it is "rapid cycling mixed features". (Dkt. No. 20-5 at 479). Dr. Richards later describes the criteria for whether the condition is "rapid cycling" which is a records-based determination and one he should have been able to make if he was presented with the complete medical history. (Dkt. No. 20-5 at 480-481). It is clear that Dr. Richards is on the witness stand with insufficient records to determine whether the diagnosis is rapid cycling. Dr. Richards adds a secondary diagnosis of obsessive-compulsive disorder. (Dkt. No. 20-5 at 482). In fact, Dr. Richards relied upon the findings of Pam Crawford, M.D., the State's psychiatrist in forming his opinions. (Dkt. No. 20-5 at 485). Dr. Richard's was never asked whether he holds his diagnostic opinions to a reasonable degree of medical certainty.[42]

At this point in his testimony Dr. Richards reveals a very significant cue to a matter that was not investigated developed or presented by trial counsel. Dr. Richards testified concerning the genetic influence bipolar disorder had upon the petitioner. (Dkt. No. 20-5 at 481). He goes further and testifies that: "The current thinking with bipolar disorder, it's a combination of genetics, inherited, and nurturing or environment. Now, the reason we know that there's a component of genetics, if mom or dad has a mood disorder or bipolar disorder, specifically, a youngster can have up to a 12 percent chance of having the bipolar, If mom and dad have bipolar, it's much higher." This testimony and Dr. Richards' notes indicate that investigating the client's genetics should be undertaken. The

---

[42] See Dr. Richards' affidavit Exhibit 1 regarding 1) the lack of trial testimony preparation; 2) trial counsel failure to follow-up with his request for further studies as reported in the PCR testimony of Jan Vogelsang; and 3) the difference in his testimony had he had the diminished capacity evidence of Dr. Brown.

mapping of the human genome was completed in 2003 and the technology to run the study was available at the time of the trial. A study of an individual's DNA objectively determines genetically based conditions – bipolar disorder - which heretofore could only be differentially diagnosed. Genetic sequencing studies will also quantify the degree of severity of the condition by measuring the number of deletions and aberrations involved and their respective locations on the DNA helix strand. After several pages of testimony about what a genetic study could reveal the questioning on this point ends with the witness stating: "So, I think it's very safe to say there's a very high genetic predisposition for mood disorders." (Dkt. No. 20-5 at 492).

The State argued in closing that Dr. Richards agreed that the defendant was able to conform his conduct to the requirements of the law. (Dkt. No. 20-6 at ?? Trial Trans. p ____). Further, the State argued that there was nothing wrong with the petitioner. As we now know both of these assertions were wrong.

### b. THE POST-CONVICTION MERITS HEARING CASE.

Collateral counsel pulled together a mitigation investigation seizing upon the indications in the trial record that the petitioner's mother was drinking alcohol during the gestational period of the petitioner's life. Collateral counsel developed and presented a very thorough case that the petitioner suffered with partial fetal alcohol syndrome.[43] (Dkt. No. 20-11 at 184).  The State offered no witness in opposition to the petitioner's case. The PCR case on FASD was presented by three expert witnesses who regularly deal with FASD. One was Natalie Novick Brown, PhD. Dr. Brown qualified as an expert witness in forensic psychology with a particular emphasis and training in FASD. (Dkt. No. 20-11 at 270). She spoke in detail about the effects FASD has upon "self-regulation" which she also stated was synonymous with "behavior control". (Dkt. No. 20-11 at 284). She characterized the petitioner's ability to control his behavior as "significantly impaired"[44] and later as "really impaired." (PCR Trans p 650). She, like Dr. Richards in the trial presentation, left an open invitation and que

---

[43] See Connor PCR Testimony, Dkt. No. 20-10 at 4-15 and Adler's PCR Testimony, Dkt. No. 2011 at 72-190 for the differentiation between partial fetal alcohol and fetal alcohol disorder.

[44] Dr. Brown has signed affidavits Exhibit 13 stating: "I have a current recollection of the petitioner, his condition and my testimony. To a reasonable degree of psychological certainty, on September 3, 2003, at the time of the crime, Charles Christopher Williams' capacity to conform his conduct to the requirements of law was substantially impaired." This is the language contained in the statute governing a guilt phase verdict of guilty but mentally ill.

for collateral counsel to consider a genetic assessment. "The bipolar would exacerbate the problem of mood management. And in Mr. Williams' case, he also has a genetic or hereditary component in his mood illness. His father had a significant depressive disorder, psychotic at times, and so with that genetic predisposition, that would only increase the mood control problem. (Dkt. No. 20-11 at 311). Finally, Dr. Brown testified, to a reasonable degree of medical certainty, the petitioner lacked sufficient capacity to conform his conduct to the requirements of the law. She was asked: "At that moment [moment of the crime] could he [Williams] control himself?" Dr. Brown's answer was: "No, he could not because of a biological impairment." "Would you have testified the same way in 2005?" "Yes." (Dkt. No. 20-11 at 367).

Collateral counsel had the evidence necessary to advance a claim that trial counsel were ineffective by failing to investigate develop and present the diminished capacity testimony in the guilt phase. If the capacity testimony had been presented at trial the judge would have charged the jury concerning the SC Code Ann. § 17-24-20(A) guilty but mentally ill, and that charge would have bolstered the mitigation case presentation when the judge yet again charged the jury on the statutory mitigator. Collateral counsel did not charge trial counsel for being ineffective by failing to investigate develop and present evidence in support of the jury charge of guilty but mentally ill and the statutory mitigation charge concerning diminished capacity.

C. **The combined errors of trial and collateral counsel resulted in the petitioner being sentenced to death when, by reason of his inability to conform his conduct to the requirements of the law, that sentence violated *Wiggins v Smith*, 539 US 510 (2003) and the fifth, sixth, eighth and fourteenth amendments.**

First, had trial counsel investigated developed and presented evidence that the petitioner lacked sufficient capacity to conform his conduct to the requirements of the law the solicitor's argument to the jury that the petitioner was of sound mind at the time of the offense would have been at least mitigated. Second, the diminished capacity evidence would have armed Dr. Richards with testimony that confirmed his diagnosis and it would have prevented the complete collapse of the petitioner's mitigation case as a consequence of the State's cross examination. Third, the diminished capacity evidence would have provided a factual basis for the judge to instruct the jury on a verdict of guilty but mentally ill during the guilt phase of the trial. That option, guilty or guilty but mentally

ill, would have given the pro-life jurors an opportunity to agree to a straight guilty verdict in exchange for the death jurors agreeing to a sentencing recommendation of life without parole. Fourth, the capacity evidence would have provided a platform to argue that the petitioner, by reason of his diminished capacity, was not eligible for the death penalty on the same grounds that Daryl Atkins raised in his case against the Commonwealth of Virginia. Fifth, developing and presenting the diminished capacity evidence would have been an effective "front-loading" strategy since the instruction would have been given to the jury as GBMI and then as a statutory mitigator to a recommendation of death.[45] Collateral counsel did not tether the evidence developed and presented in the PCR merits hearing to trial counsel's failure to investigate develop and then present it along with the two statutory charges.[46] Because collateral counsel did not present these issues to be ruled upon they are unexhausted.

## V.    TRIAL AND COLLATERAL COUNSEL WERE INEFFECTIVE TO THE PREJUDICE OF THE PETITIONER BY FAILING TO PRESENT EVIDENCE OF HIS REMORSE.[47] THIS FAILURE VIOLATED THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.

"In [capital cases] assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the defendant lives or dies."[48]

Experienced capital defenders know that their clients cannot simply opt out of the juror's probing scrutiny on the issue of remorse.[49] The prevailing assumption is that "what is not shown is also not felt."[50] Therefore one of trial counsel's primary duties in defending a client who faces death is to prepare that person for the inevitable juror probing to determine whether he is genuinely remorseful. There are real and significant challenges for trial counsel in making the case for remorse. Not the least is determining whether the client will or will not testify or offer an allocution. When

---

[45] See the affidavit of lead trial counsel stating that there was no strategic reason for failing to present these issues.  Affidavit of John Mauldin, Attached as Exhibit 2.

[46] See the affidavit of lead collateral counsel Enderlin Exhibit 14.

[47] For an informative empirical presentation on the significance of remorse in capital sentencing see Remorse and Demeanor in the Courtroom: the Consequences of Misinterpretation; Susan Bandes, Law and Philosophy Workshop, University of Texas Law School November 21, 2013. The Role of Remorse in Capital Sentencing; Cornell Law Review, Vol 83, 1599 (1997-98); Remorse, Apology and Mercy; Murphy, Jeffrie G., Ohio State Journal of Criminal Law 4:424, 2007.

[48] *Riggins v Nevada*, 504 US 127, 143-44 (1992).

[49] See Attached Exhibits 2, 14, and 15 containing trial and collateral counsel's statement of no strategic reason for omitting remorse as part of the mitigation case.

[50] Haney, *et al*, *Deciding to Take a Life*, *supra* note 28 at 163. See also Michael E. Antonio, *Arbitrariness and the Death Penalty: How the Defendant's Appearance During Trial Influences Capital Jurors' Punishment Decision,* 24 BEHAV. SCI. & THE LAW 215, 223 (2006) (finding that when jurors viewed the defendant in the courtroom as emotionally involved, sorry and sincere they were much more likely to favor a life sentence than when they viewed the defendant in the courtroom as emotionally uninvolved and bored. When

the decision is that the defendant will not testify or offer an allocution, as in this case, the presentation of all evidence supporting remorse must be presented to the jury by means of expert witnesses, who use the evidence of remorse as part of the factual basis for their opinions, and as part of the mitigation case. In this case, such evidence existed but it was not presented by any witness in mitigation or used as part of any of the petitioner's mitigation efforts including the closing arguments.

Remorse is a state of mind and a condition of a person's soul. Remorse implies a painful process leading to acceptance of personal responsibility for the harm one has caused; a desire to atone or to make restitution; or even a desire to transform oneself. Thus it is a complex blend of emotion and cognition consisting of reflection on one's past acts, an abiding sense of distress, and a desire to take future actions. In her article <u>Remorse and Demeanor in the Courtroom</u>, Susan Bandes offers a narrative on the processes one goes through to arrive at a state of remorse. Infra at p. 29.

Remorse is regarded as a measure of whether the defendant's act is consistent with his general character or a deviation from it. Susan Bandes p. 30. Remorse is the lens through which the jury measures the risk of future dangerousness and recidivism. Although trial counsel presented a case on prison adaptability,[51] both trial and collateral counsel failed to consider remorse separately and that remorse is the segue to assessing future dangerousness. At least one set of studies supports the conclusion that the importance jurors accord to remorse is based in large part on the assumption that the remorseful defendant is less likely to repeat the offending behavior.[52]

Remorse in capital sentencing is an issue which needs close consideration by trial counsel. In the right circumstances remorse may win a life sentence before any other mitigation evidence. Remorse, in the context of acceptance of responsibility, is a key component of the United States Sentencing Commission's Guidelines. In considering remorse and acceptance of responsibility as part of the heartland of federal sentencing practice remorse was determined to be so fundamental to pre-guideline sentencing that a separate application for "acceptance of responsibility" became

---

[51] The tendency is to conflate adaptability with future dangerousness. See dissent in *Patterson v South Carolina*, 471 US 1036 (1985). Remorse is integral to assessing future dangerousness and future dangerousness is a key component of whether the sentencing recommendation will be life or death.

[52] Gregg J. Gold & Bernard Weiner, *Remorse, Confession, Group Identity, and Expectancies About Repeating a Transgression*, 22 BASIC & APPLIED SOC. PSYCHOL. 291 (2000)(Role of mercy as part of our sentencing phase jury instruction and what is mercy but a reflection of the juror's perception of whether or not the defendant is remorseful.)

necessary. In the history to the Guidelines it is apparent that defendants, who do more than merely admit wrongdoing and attempt to rectify their wrong by making some sort of restitution, even if restitution is limited to a genuine expression of remorse made to the victim, are entitled to more by way of sentence reduction.[53]

Preparing a mitigation case that includes remorse requires that the attorney consider and prepare for a number of factors. The first of these concern the nature and circumstances of the crime itself; just how brutal and cruel was it? The second are defendant related factors that include his demeanor at trial and his character and capacity for remorse as developed and presented during the mitigation case. The third set of factors pertains to juror characteristics as revealed during *voir dire* and including their socio-economic, ethnic and racial backgrounds. Finally, counsel must consider the insidious nature race plays in the case.[54]

### A. NATURE AND CIRCUMSTANCE OF THE CRIME.

The petitioner and victim were romantically involved and each very young. At twenty this was the petitioner's first love relationship that promised long-term commitment. Nonetheless, the relationship deteriorated as the victim determined to move on. As indicated in the portion of this Petition that challenges the adequacy of the mitigation case, the combined bio-psychosocial characteristics of the petitioner overtaxed his coping skills[55] and on June 13, 2003, days before the September 3, 2003 events resulting in the death of the victim, the Petitioner made a serious attempt at suicide. Trial Testimony pps. Halleck. His choice, as he saw it, was going through the agony of the separation and living without her or dying. He chose to die. The Petitioner spent hours with the victim trying to convince her that the relationship should continue. Police negotiators were on the telephone with both the Petitioner and the victim. Nonetheless, the victim bolted and ran and the Petitioner reactively shot. (Exhibit 11). This crime was an outgrowth of the unfortunate disentanglement of two romantically involved young people. It was a single discreet event with little to no potential to recur. As regards future dangerousness and the potential of recidivism a life sentence with this seriously hung jury would have benefited from remorse being featured as part of

---

[53] Acceptance of Responsibility Working Group Report; USSC October 16, 1991.
[54] See Role of Remorse in Capital Sentencing, Cornell Law Review Vol 83:1599 (1998).
[55] See testimony of Dr. Seymour Halleck. Dkt. No. 20-6 at 337-338.

the mitigation case and argument.

## B. DEFENDANT RELATED FACTORS.

Among the most important factors of a juror's assessment of remorse is the defendant's behavior and demeanor at trial. A primary function of jury service is to assess the credibility of witnesses. That assessment is informed primarily from the body language, nuances of speech and inflexion, eye contact, and witness respect for the parties including the jury. The record demonstrates that the Petitioner, although not testifying, expressed remorse in the presence of the jurors by the tears he shed when the subject of the trial turned to the victim. He demonstrated remorse by his self-effacing demeanor. Trial and collateral counsel failed to recognize this important evidence and failed to argue or feature remorse as a factor for a life sentence. The way we know that the Petitioner was contrite and remorseful is that it impressed the court reporter enough to record the Petitioner's crying in the transcript.  Dkt. No. 20-6 at 222. It was not enough that the record reflects that the Petitioner was crying while the victim impact testimony was being presented because we do not know that the jurors, or even any one juror, noticed it, or that the jurors after noticing it were able, without reflective and deliberate direction by trial counsel during argument, to discern that genuine remorse is a key mitigating factor to be considered during a capital sentencing deliberation. Trial counsel failed to argue to the jury that genuine remorse prompts mercy and that the judge would instruct the jury that they can return a life sentence for any reason, for no reason, or simply as an act of mercy.[56]

In addition, there is a letter written by the Petitioner found among trial counsel's file materials. It is a letter to Seymour Halleck, MD, who was the defense forensic psychiatrist. The letter was written in August of 2004 after Dr. Halleck had visited the Petitioner during his pre-trial detention at the Greenville County Law Enforcement Center (LEC). The Petitioner writes two and one half pages of sincere regrets and remorse for his actions. See Petitioner's Letter, Attached as Exhibit 16. The Petitioner particularly addresses the impact the death of Miranda Williams will have upon her young daughter. It is a letter that does not appear among Dr. Halleck's materials. Neither the letter nor remorse were mentioned by Dr. Halleck during his testimony. There is no indication that either trial

---

[56] See *Rosemond v Catoe*, 383 SC 320, 680 SE2d 5 (2009) a life sentence can be recommended for any reason, no reason at all or as an act of mercy.

or collateral counsel made any use of the letter or attempted to develop and present a mitigation case that included remorse. This is yet another missed opportunity to secure a life sentence recommendation from a jury hung at 9-3 and continuing to be hung for hours after receiving the trial judge's *Allen* charge. Trial counsel failed to use remorse to mitigate the Solicitor's aggravating rhetoric that this defendant was the worse of the worse.

### C. Juror-Related Factors.

The Petitioner is a mixed-race male and the victim was white. The *voir dire* process was intended to provide counsel with an opportunity to supplement the juror questionnaire with vital attitudinal information by each individual chosen to sit on the jury. The petit jury ultimately consisted of ten whites and two blacks, one man and one woman. The social demographics of this jury qualification as death qualified are reflected by the fact that it was hung up for hours on reaching a sentencing recommendation. It is apparent that had trial and collateral counsel prompted this jury to consider evidence of remorse a life sentence was within reach.

### D. Race-Related Factors.

Race constitutes a factor among jurors deciding whether to recommend a life or death sentence.[57] There is empirical data that supports the conclusion that in capital cases jurors correlate remorse in the case of a black defendant more readily than in a case with a white defendant.[58] Inasmuch as this case involved a mixed race defendant, trial and collateral counsel should have been particularly alert to the advantage of developing and presenting a mitigation case featuring remorse. There is no indication that the issue of remorse was considered by either of the counsel in any way. See Attached Affidavits of Mauldin Exhibit 2, Nettles Exhibit 15, and Enderlin Exhibit 14.

### Additional Procedural Information

13.    Grounds I, II, III, V, and VI have been presented to the South Carolina Supreme Court. The remaining grounds arguably have not been presented to the South Carolina Supreme Court due to inadequate assistance of postconviction counsel. *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

---

[57] See e.g., David C. Baldus et al., *Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia*, 83 Cornel L. Rev. 1638, 1684-85 (1998) (finding that the victim's and defendant's race influences the jurors' weighing of aggravating and mitigating factors).
[58] See Role of Remorse infra pps. 1627-28.

Counsel's conduct was deficient, not based on reasonable strategy, and prejudicial. *Strickland v. Washington*, 466 U.S. 668 (1984).

14.    Petitioner has not previously filed any type of petition, application, or motion in this Court regarding the conviction and death sentence challenged in this petition.

15.    The petitioner has a petition for a writ of certiorari pending with the Supreme Court of the United States (16-5909) challenging the denial of relief after a merits hearing before the South Carolina Court of Common Pleas and the subsequent denial of relief before the Supreme Court of South Carolina. The issues are whether trial counsel were ineffective to the prejudice of the petitioner for failing to investigate, develop and present adequate available mitigation evidence and whether the post-conviction trial court errored in issuing a final order that was contrary to standards set forth in *Strickland v Washington,* 466 US 668 (1984) and 28 USC § 2254(d)(1) & (2).

16.    (a)/d    John I. Mauldin, Post Office Box 10264 FS, Greenville, South Carolina 29604; William Norman Nettles 1441 Main Street Suite 500, Columbia, South Carolina 29201; Mark J. MacDougall, 1333 New Hampshire Avenue NW, Washington DC, 20036.

    (e)    Robert Michael Dudek, SCCID Post Office Box 11589, Columbia, South Carolina 29211.

    (f)    Derek Joseph Enderlin, 330 East Coffee Street, Greenville, South Carolina, 29601; Richard W. Vieth, 360 East Henry Street, Spartanburg, South Carolina 29302

    (g)    Derek Joseph Enderlin and Robert Michael Dudek as previously identified.

17.    Petitioner does not have future sentences to serve.

18.    This petition is timely filed under the one-year statute of limitations contained in 28 U.S.C. § 2244(d). The judgment became final at the conclusion of direct review on October 4, 2010, when the United States Supreme Court denied a Petition for Writ of Certiorari. *Williams v. South Carolina*, 562 U.S. 899 (2010). Fifty-seven days elapsed before the time was tolled by the filing of an application for post-conviction relief on November 30, 2010. The time remained tolled until the dismissal of the writ granted in Petitioner's PCR appeal as

improvidently granted on April 13, 2016, and the tolling of time ended on that day leaving 308 days to timely file the petition in this Court.[59] Thus, the petition is timely as it is filed on or before February 15, 2017.

## Prayer for Relief

WHEREFORE, Petitioner prays that the Court grant:

(a) an evidentiary hearing as to all claims not fully developed on the trial, appellate, and state post-conviction record;

(b) summary judgment of issuance of the writ of habeas corpus under 28 U.S.C. Section 2254, vacating either Petitioner's convictions, sentences, or both, where there are no genuine issues of material fact as to the claims pled in this petition; and

---

[59] Respondents have already conceded that these calculations are correct.  Dkt. No. 5 at 5.

(c) such general or other relief to which petitioner may be entitled in this proceeding.

February 15, 2017

s/William Harry Ehlies, II

_____

WILLIAM HARRY EHLIES, II, 690
Building A, Suite 201
310 Mills Avenue
Greenville, South Carolina 29605
864-232-3503
hank@ehlieslaw.com


s/Teresa L. Norris

_____

TERESA L. NORRIS, 6447
101 Meeting Street, Fifth Floor
Charleston, South Carolina 29401
843-958-1858
tlnorris@charlestoncounty.org

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing document via the Court's ECF system on Counsel for Respondent:

This the 15th day of February 2017.

s/Teresa L. Norris

_____

TERESA L. NORRIS, 6447