STATE OF SOUTH CAROLINA
County of Greenville

In the Court of Common Pleas
2010-CP-23-9792

CHARLES CHRISTOPHER WILLIAMS, Applicant,

V.

THE STATE OF SOUTH CAROLINA, Respondent.

## AFFIDAVIT OF DR. DAVID A. GRIESEMER

Dr. David A. Griesemer, who appeared personally before me, affirms and states the following:

I am a neurologist presently working at Tufts Medical Center in Boston. From 1993 through 2010 I was employed full time at the Medical University of South Carolina in Charleston. I interviewed and evaluated Charles Christopher Williams for two hours on January 27, 2005 at the request of Mr. Williams' attorneys, and I wrote the attached report. It is now my practice to date when the report is drafted as well as when the examination is performed, but I did not date this final report and cannot say when it was delivered to the attorneys. I do not recall whether I talked to either of Mr. Williams' attorneys or anyone else on the defense team about the findings of my examination. I have no independent recollection of the evaluation of Mr. Williams, but I have reviewed my report and subsequent neuropsychological testing done by Dr. Jim Evans.

In reviewing my report, I immediately noted that the evaluation was based exclusively upon interview and examination of Mr. Williams, and that no medical, educational, or judicial records were made available for review. I reported this fact on page 4 of my report, "No school-based psychoeducational test results or court-ordered psychological assessments were available for review." I also noted it on page 5 of my report, "These above opinions are based upon limited information presently available; should there be additional data (particularly that which addresses educational, psychological, or adaptive capabilities) which alter my opinions, I will supplement this report."

I also noted on page 5 of my report that Mr. Williams should be evaluated for high blood pressure and a scalp condition, and, "More importantly, given subtle (but likely stable) neurologic abnormalities, including slight asymmetry of eye movements and balance, formal neuropsychiatric evaluation may be helpful."

I have since reviewed additional information from the defense team, including notes from Jan Vogelsang regarding performance on neuropsychological testing, a brief history of school

performance, and new history that Mr. Williams' mother drank alcohol throughout her pregnancy with him.

Had this additional information been made available to me, I would have structured my report and my recommendations differently. The information that was available to me at the time of evaluation was certainly less information than I normally have when completing a patient evaluation. To begin with I was unaware that there was neuropsychological testing results available for review. I was also unaware that Mr. Williams suffered a head injury. I was also unaware that his mother consumed alcohol during her pregnancy, or that Mr. Willaims had poor performance in school.

Despite this lack of history, I did note that he had delayed recall and difficulty with frontal lobe flexibility. These are indicative of cognitive problems. Were I to have seen neuropsychological test results that I did not see, characterized by a 15 point spread between Verbal IQ and Performance IQ, and and by evidence of frontal lobe difficulty and rigidity, I would have expressed greater concerne about Mr. Williams' neurological functioning.

Particularly important would have been the results of the Wisconsin Card Sorting test. During this test the rules change as the patient progresses through the test and part of the evaluation is whether the subject has the ability to detect changes in the rules. Mr. Williams took 18 trials to understand the very first rule; this poor performance placed him in bottom three percentof test takers.

The mother's drinking is a significant piece of history. If this were made known to me, I would have certainly informed the team to investigate fetal alcohol syndrome or to at least rule out fetal alcohol effects.

I have never testified as an expert on fetal alcohol syndrome (FAS) and I was not aware of the CDC Guidelines regarding FAS until speaking to Mr. Enderlin.  While I have patients with FAS that I follow for neurologic issues, I would not consider myself an expert on FAS.. Furthermore, regardless of the FAS diagnosis, had I been given the neuropsychological testing information as well as other relevant data, I would have noted compelling evidence of problems with judgment and cognitive functioning that might be significant in understanding his actions.

_____
David A. Griesemer

Boston, Massachusetts

Sworn to me this ____27____ day of September, 2012

_____
Notary Public for MA. My commission expires:  11/9/18

# Neurological Evaluation

Name:            **Charles Christopher Williams**
Date of Birth:   **December 11, 1982**
MUSC ID:         1521683

Evaluation Date:  **January 27, 2005**

Referred By:      Mr. William Nettles          Billing To:   Greenville Court
                  914 Richland Street                        Public Defenders Office
                  Suite A-102                                 Attn: Mr. John Mauldin
                  Columbia, SC 29201                          P.O. Box 10264
                  (803) 779-9966                              Greenville, SC 29603

## Sources of Information

The following evaluation is based exclusively upon interview and examination of Mr. Charles Christopher Williams. No medical, educational, psychological, or judicial records are available for review.

## Venue of Examination

Mr. Williams was transported for evaluation from the Greenville County Detention Center, where he has been incarcerated for the past 18 months, to the Medical University of South Carolina, Rutledge Tower, 135 Rutledge Avenue. He arrived at 10:30 AM with evaluation taking place between 11:00 AM and 1:00 PM. Un-handcuffed and unshackled, Mr. Williams met with me privately in a patient examination room, with security guards outside the room. The available time was divided between review of neurological history, testing of cognitive abilities, and physical examination of general and neuromuscular function.

At the outset of the evaluation we established that Mr. Williams understood the purpose of my evaluation and the absence of typical patient confidentiality; that he could hear my questions and would ask for clarification if he did not fully understand them; that he could adequately see me, my gestures, and materials that I showed him; that he would seek to clarify any confusion that he encountered during the evaluation; and that there would be no questions about the criminal act for which legal proceedings are ongoing.

## Current Medical Concerns

Mr. Williams indicated that he had no medical problems or concerns at the present time. However, he acknowledged that he had been hospitalized in June, 2003, at Greenville Regional Medical Center with an overdose of **Klonopin**. He indicated that is last medical evaluation was in December, 2003, when he was given **Risperdal** for depression. He said that he is no longer taking the medication because he did not sleep as well while taking it, even though during the day it made him sleepy and it "mentally slowed (him) down."

## Review of Systems

Review of all organ systems was negative, indicating that Mr. Williams reported no abnormal symptoms. Hew specifically denied prior head injuries, seizures, loss of consciousness, or fainting spells. When asked about sleep, he indicated that in high school – because of his need to work – he only slept 4 or 5 hours a night, struggling to wake up when

called and often falling asleep in class. (He purchased a car and was carrying both the car payment and the $200/month insurance payment; he "didn't want to shift responsibility" to his parents; he considered this his personal "obligation, otherwise I would have.") He is sleeping satisfactorily now.

When asked about sadness, he indicated that he has experienced no problems recently. However, before he was arrested (June through September, 2003) he was very "irritable," feeling himself to be "a loner. . . unfriendly." This surprised him as he considers himself to usually be a "high energy" person. He said he was "definitely a big spender . . . money would flow out of my pocket." He acknowledged that he "oversteps boundaries at times." When asked how he handles anger, he indicated that he "separates himself from the situation and from people" and that he is "never violent."

### Family Profile

Mr. Williams stated that his mother, Daisy Huckaby, is of German-Polish descent. Now 56 years old, she separated from Mr. Williams' father in 1991 and remarried in 1998. She is a cosmetologist who graduated from high school and college. He is aware the she takes medication for high blood pressure and "nerve pills" for what may be bipolar illness.

Mr. Williams stated that his father, Dwight Miller, is African-American and also 56 years old. A graduate of high school and the University of Maryland, he met Mr. Williams' mother in Germany, when he worked for the Army as an aircraft mechanic. Now retired from the military, he has worked in the mortgage loan business for 7 or 8 years. Mr. Williams describes his relationship with his father as "irregular," with communication occurring "off and on." They may talk as often as once a month, or they may allow 6 to 18 months to pass between conversations. Mr. Williams said that his father was "fun to be around" and taught him "ethics and morals." Mr. Williams recalls that "it was a task to get him to spend time with me" and that he was "irregular with (playing) sports or videogames (with me)."

Mr. Williams has one sister, Maureen Bangoyo, who is 33 years old and a registered nurse. Mr. Williams recalls that his "sister did as much as his mom" in raising him. His step-father is Rodney Huckaby, who was married previously but had no children.

Mr. Williams grew up in Taylors, South Carolina (in Greenville County) because his father was working as an aircraft mechanic at Lockheed. He recalls that his parents were always fighting that there was physical abuse involved. When his mother called the police, his father left and it was necessary for them to sell their house. Mr. Williams recalls having to move every 2 to 3 months, going "from place to place, to the Women's Shelter in Spartanburg" until his mother married Rodney Huckaby.

### Psychosocial Profile

Mr. Williams described his strengths as being "loyal" and "dependable," noting that he would both *finish* his work and *do it well*. He felt his weakness was being "stubborn (but agreeable)," especially "about what I wanted to do." He described his sense of humor as "pretty decent . . . no comedian, but I try to make people laugh."

### Educational History

Mr. Williams stated that he dropped out of school during his 9th grade year for financial reasons, even though he felt he was "good in class." He recognized the importance of getting his GED, however, and he took preparatory classes at Greenville Tech. Ironically, he never took the test because he was "too nervous" about how he would do.

In elementary and middle school, Mr. Williams got "in trouble daily for talking. . . the things I did before were just not funny anymore." He noted that his grades were "average or

slightly below at the beginning of the year, and got much better at the end of the year when tested." All things considered, Mr. Williams concluded: "I know I had the ability to be a good student" and "I could have been a lot better than I was at the time."

Cognitive Evaluation

Mr. Williams was focused, respectful, restrained, and cooperative throughout the visit. He answered questions promptly, clearly and with detail, revealing no evidence of confusion or delay in processing what he heard. There were no lapses of eye contact or vigilance that might suggest seizure activity. There was no suggestion of fatigue in his attention, effort or cooperation, and there was no suggestion of distractibility at any time during the 2-hour session. There were no restless movements or tics. Mr. Williams' affect was appropriate; he demonstrated no jocularity, excessive familiarity, suspicion or apathy. Although subdued and perhaps mildly dysthymic, he demonstrated a normal range of emotions, without lability, anger, or euphoria. Intensity and congruence of emotions were appropriate. Mr. Williams' speech was fluent, his vocabulary was good, and his sentences were moderately complex and appropriate for casual conversation.

Mr. Williams' cognitive skills were evaluated using the mental status assessment recommended by the American Academy of Neurology[1], supplemented by elements from the Neurobehavioral Cognitive Status Examination[2]. Mr. Williams' *global attention*, as measured by orientation to time and by A-vigilance, was normal. *Speech comprehension* assessed by verbal commands (token test) was also normal. *Language screening*, as assessed by verbal repetition and category fluency were normal. His writing to dictation was normal, with clear, neat printed letters and correct use of capital and lower case forms. *Visual naming to confrontation* was marginal; he called the stem of a watch the "winder" or "dial" and he called a belt buckle a "belt loop." *Memory screening* using the reverse digit span was normal; Mr. Atkins could correctly recall 5 digits backwards. A more detailed test of memory, the serial word list learning test, was also administered; this is a sensitive screening device for frontal lobe dysfunction and left mesial temporal lobe dysfunction. In this test a normal response is to recall five of 10 unrelated nouns on the first trial and nine of the same 10 nouns by the fourth trial. Mr. Williams recalled seven of 10 on the first trial, nine of 10 on the second trial, and ten of 10 on the third trial. On a 5-minute delayed recall, Mr. Williams had borderline normal performance, recalling seven of the 10 words, but with correct recognition of only one of the two nouns that he had forgotten; he correctly rejected four of 5 distracter nouns offered.

*Higher cognitive visual perception* was assessed finger constructions and clock-drawing, both of which were normal. Abstract construction ability with design tiles was very good, with designs optimally completed within 30 seconds, taking 13, 20 and 22 seconds. Calculation skills were average. Without use of paper, he was able to correctly answer screening questions, including 39 divided by 3, 31 minus 8, and 5 times 13.

*Executive function* screening was done with the Luria 3-step test ("fist-edge-palm" test) which evaluates premotor, prefrontal and parietal cortex, as well as visual working memory; his performance was normal bilaterally. He demonstrated no abnormal grasp response, imitation behavior, or problem with anti-saccades. Additional tests of executive function included 3-finger go-no go test and parapet drawing, both of which were normal. Design fluency, in which an individual is asked to draw as many nameless designs as possible, was between normal and abnormal. Mr. Williams produced nine designs in the allotted two minutes; whereas most people produce 6 or more different designs, Mr. Williams produced four designs which involved intersecting lines, three designs that were ameba-shaped, and one design that was a variation on a demonstration example. This performance suggests some difficulty with frontal lobe flexibility. *Reasoning* was assessed using word similarities. He correctly identified painting and music as

"art;" all other word pairs were quickly and correctly categorized. *Judgment* was assessed with situational responses. When asked what he would do if he was walking along the sidewalk of a busy street and saw a 2-year-old by himself playing in the street, he provided the following sequence: he would first rescue the child and then "call the police; it makes no sense to ask a 2-year-old where his parents are." When asked what he would do if he came to his mother's house and found the kitchen flooded, he indicated that he would turn off the water, soak up the water with towels, and then call the insurance company. Only with prodding did he consider calling a plumber to fix the leak.

## Physical Examination

Mr. Williams is a 22-year-old right-handed African-American male, whose height was 161.5 cm and whose weight was 67.8 kg. His head circumference was 58 cm and roundly shaped. Vital signs included an elevated blood pressure of 167/90 in the left arm and 155/100 in the right arm' his pulse was 88. He had a prominent raised, erythematous rash over much of his scalp, which appears to be chronic because of associated hair thinning in the region of rash. Scalp lesions were occasionally pustular. Mr. Williams had no dysmorphic facial features. There were no café-au-lait spots or other neurocutaneous abnormalities, although there was a small area of depigmentation above his right eyebrow. *HEENT* examination was normal except for erythema of the right external auditory canal and erythema in the center of the right tympanic membrane. Ophthalmoscopy revealed unremarkable fundi with no A-V nicking. Examination of the nose, mouth, dentition, palate, and pinnae was normal. No thyroid enlargement or adenopathy was seen. *Chest* examination revealed normal cardiac rhythm and rate without murmers. Lungs were clear. *Abdominal* and *genitourinary* examinations were not performed. *Skeletal* examination revealed no joint abnormalities or bony malformations. Posture, station and gait were normal.

## Neurological Examination

Cranial nerve examination revealed normal visual fields by confrontation and finger counting. Eye movements were full with smooth pursuits and normal saccades. There was, however, fine end-gaze nystagmus with movement of the eyes to the left. Pupils were briskly and symmetrically reactive to light. There was no asymmetry of facial sensation or musculature. Hearing was adequate to hear the rubbing of fingers. Bulbar function was normal.

Motor examination showed normal muscle bulk and resistance to passive movement. There was no suggestion of rigidity or spasticity. Strength was symmetric and normal throughout, in fact quite impressive for his medium physique. There was no drift or pronation of outstretched arms while the eyes were closed; however, there was a fine tremor of both hands. Rapid alternating movements of fingers and feet were well performed. There were no mirror movements, tics, or tremors. Finger-to-nose testing was normal. Muscle stretch reflexes were bilaterally symmetric, measuring trace at the chin, 3++ at the biceps, 3+ at the brachioradialis, and 2+ at the triceps. In the lower extremities, knee jerks were 3++ bilaterally, with 3+ at the ankles; a trace crossed adductor reflex could be elicited. Plantar responses were downgoing.

Screening sensory examination, focusing on touch and position sense, was normal. Romberg sign was present, with falling to the left. Mr. Williams, however, was able to stand on either foot alone, briefly with eyes closed.

## Review of Neuropsychological Testing

No school-based psychoeducational test results or court-ordered psychological assessments were available for review.

Review of Neuroimaging Studies

Following examination, Mr. Williams underwent magnetic resonance imaging imaging of the brain. This demonstrated no structural abnormalities upon my review. Independent interpretation by Dr. Ranjiv Saini was normal.

Diagnostic Impressions

*Physical Assessment*
  (1) Hypertension, untreated
  (2) Mild hyperreflexia with crossed leg adductor reflex, suggesting minimal impairment of corticospinal tract function
  (3) Mild "cerebellar" dysfunction with asymmetric end-gaze nystagmus and Romberg sign and symmetric tremor of outstretched hands
  (4) Scalp rash with secondary alopecia
  (5) Mild right otitis externa

*Cognitive Assessment*
  (1) Average intelligence with effective communication skills
  (2) Good visual-motor speed despite fine motor impairment

*Psychosocial Assessment*
  (1) Impaired reciprocal relationships with parents
  (2) School drop-out *without* academic failure
  (3) History of behavior reflecting extreme moods, suggesting bipolar illness or anxiety disorder

Recommendations

Mr. Williams should be evaluated and treated medically for significantly elevated high blood pressure, which is not likely related to a stressful environment. In addition, dermatologic evaluation for chronic scalp rash and hair loss should be considered. More importantly, given subtle (but likely stable) neurologic abnormalities, including slight asymmetry of eye movements and balance, formal neuropsychiatric evaluation may be helpful. Finally, formal psychiatric evaluation may provide diagnostic evidence of manic-depressive illness or anxiety disorder.

This above opinions are based upon limited information presently available; should there be additional data (particularly that which addresses educational, psychological, or adaptive capabilities) which alter my opinions, I will supplement this report.

David A. Griesemer, M.D.
Professor of Neurosciences and Pediatrics
Medical University of South Carolina
Charleston, SC

---

[1] Grabowski TJ, Anderson SW, Cooper GE. Disorders of Cognitive Function. **Continuum** 8:130-158, 2002

[2] Manual for the Neurobehavioral Cognitive Status Examination. (Fairfax, CA: Northern California Neurobehavioral Group, 1988)