**Affidavit of Sara Baldwin Flynn, LCSW**
**Expert Witness/Mitigation Investigation; Social Historian**

**Case:  Charles Christopher Williams**

1.  I have been a Forensic Social Worker and Mitigation Specialist for more than 19 years.
    My date of birth is December 9, 1961.  I have been in private practice since 2003 and my
    office address is 4495-304 Roosevelt Boulevard, #245, Jacksonville, Florida, 32210.

2.  I graduated with Highest Honors from the University of North Carolina at Chapel Hill
    with a Bachelor of Science degree in Psychology in 1991 (Summa Cum Laude, Phi Beta
    Kappa) and earned my Masters in Social Work from University of North Carolina at
    Chapel Hill in 1998. I am licensed by the State of FL as a Licensed Clinical Social
    Worker (License #SW10740).

3.  Prior to entering private practice, I served as a full-time Mitigation Specialist at the
    Center for Death Penalty Litigation (CDPL) in Durham, North Carolina from 1997-2003.

4.  Since 1997, I have been authorized in more than 225 capital and non-capital cases
    including 46 capital cases in the state of Florida, 84 capital cases in the state of North
    Carolina,[1] 8 capital cases in the state of Georgia, 4 capital cases in the state of Louisiana,
    one capital case in the state of Kentucky, two capital cases in the state of Tennessee, three
    capital cases in the state of Virginia, one capital case in Alabama, and 16 cases in federal
    court, three of which were capital cases.  This case list does not include numerous cases
    in which, as a CDPL (full time) staff member, I routinely provided consultation through
    CDPL's Capital Trial Assistance Unit. Nor does this list include those cases in which I
    provided death row support services which did not include appointment on the client's
    capital post-conviction appeals. I have assisted in dozens of non-capital pre-sentencing
    mitigation investigations including *Graham/Miller* re-sentencing proceedings, 2nd degree
    murder, DUI manslaughter, rape, child pornography, mortgage fraud, kidnapping and
    drug-related cases in state and federal courts. (Please see CV and case list, attached).

5.  Since 2006, I have been qualified as a Mitigation Expert and testified in trials and
    sentencing hearings for capital and non-capital cases in state and federal courts.

6.  I have been a presenter/trainer at numerous local and regional training conferences,
    including CLEs provided by the North Carolina Academy of Trial Lawyers, National
    Institute of Trial Advocacy, CDPL, UNC-Chapel Hill and Duke University Schools of
    Law, and the Public Defender Offices of the 4th Circuit in FL. I was Terrence Graham's

---

[1] John Temple's book, **The Last Lawyer** (Jackson: University Press of Mississippi, 2009) book
chronicles my work on a NC capital case in which our client, Levon "Bo" Jones, was proven
innocent, the DA dropped the charges and Mr. Jones was released from prison after 13 years on
North Carolina's death row. His codefendant, Larry Lamb, was retried and acquitted as well. I
performed the entire mitigation investigation for Mr. Jones' case from 1997-2003.

mitigation specialist upon re-sentencing following the landmark US Supreme Court decision in his case, Graham v. Florida, which opened the floodgates to current litigation in juvenile sentencing in the United States. I was the only private (non-lawyer) mitigation investigator to present at the "Kids Are Different" seminar sponsored by the FL Association of Criminal Defense Lawyers in September 2015 at which I helped to educate over 400 attorneys preparing mitigation presentation for Juvenile Life Without Parole cases in FL. I have also appeared as a mitigation specialist before the FL Commission of Offender Review numerous times over the last 14 years.

7. Marjorie Hammock testified at trial that she interviewed[2] the following witnesses:
   - **Chris Williams** (client),
   - **Daisy Huckaby** (mother),
   - **Dwight Williams** (father),
   - **Maureen Bangcuyo** (sister),
   - **Ann Wilson** (teacher), though it never came out at trial, Chris said, [Ms. Anne Wilson] she caused me to repeat 1st grade twice. Ms. Wilson was mean to me." She was surprised by his white family photos. She rejected his school work several times and often made him stay in from recess to redo his work over and over. She was just trying to keep him from going to recess. He said, "I became frustrated and rebellious in her class."
   - **Miss Beddingfield** (teacher)[3] We can't know the extent of Hammock's interview with this teacher. We only have her testimony from trial. When I asked Chris about her, he said, "I was at Brook Glenn Elementary School then. I had a teacher named Ms. Beddingfield. She hated me. She was Ms. Wilson's sister. Ms. Wilson was no better. Ms. Bettingfield dumped out my back pack several times for no reason and left all my stuff on the ground. She single-handedly turned the entire class against me. I became a social pariah. When it was my turn to batt during games, my classmates chanted, 'Here we go he/she, her we go!" over and over. Ms. Bettingfield did nothing to stop it. I don't know why they called me that." Vogelsang interviewed Ms. Beddingfield  but we have no summary of that interview.

8. Ms. Hammock testified that she "spoke to" or "conferred with"[4]:

---

[2] We are not told whether these interviews occurred in person or over the phone. We are not told how long these interviews lasted or when they occurred. We have no summaries of these interviews.

[3] In her testimony, her name was spelled 'Bentenfield' but it was actually Beddingfield.

[4] Again, we are not told the extent or location of these contacts with mitigation witnesses and experts, but "spoke to" rather than "interviewed" seems to indicate an abbreviated contact that likely took place over the phone rather than in person, unless perhaps she met them in the

- **Alfred Leamon** (paternal cousin),
- **Ernestine Leamon** (wife of Alfred Leamon)
- **Mary Snipes** (paternal grandmother).
- **Dr. Rob Richards** (psychiatrist, expert)
- **Dr. Seymour Halleck** (psychiatrist, expert)
- **Dr. Eric Elbogen** (psychologist, expert)

9. Hammock testified that she relied on the following records: educational records, medical records, psychiatric history, employment records, and Dwight Williams' military records. 35. P. 49, 50 – Vogelsang:  what was given to the expert, M Hammock

10. National practice standards dictate requesting records of family members going back at least three generations, a standard that was not upheld in this case. "In cases where medical or mental health or substance abuse issues are present or suspected, it is necessary to review records related to the defendant's siblings, parents, and grandparents, and even farther back *until no additional records can be located or no useful information is found* [emphasis added].As the net is deepened, it must also be widened to include cousins, aunts, and uncles with substance abuse or medical or mental health problems… For example, records indicating that the client's mother drank alcohol during her early teenage years would lead the mitigation specialist to question the mother, her family, and friends regarding her history of alcohol use, particularly whether she drank during pregnancy. To test and corroborate the responses, the mitigation specialist would gather the mother's school records, medical records, especially pre-natal and post-natal health care records, all mental health and substance abuse treatment records, the client's birth records, pediatric records (which may reflect slow growth and development of the client during childhood), school records (which may indicate social and academic problems as well as psychological evaluations), and social service or child protection agency records (which may contain references to the mother's drinking). Additional interviews would follow, focusing on family members, neighbors, coworkers, caregivers of the mother and the client who might have information about the mother's use of alcohol during pregnancy and the effects this had on the client. All of this information might give rise to a theory that the client suffers from Fetal Alcohol Syndrome, which, in turn, would lead to further evaluation by an appropriate mental health expert. All these steps are absolutely necessary for an accurate and reliable diagnosis by the expert evaluator."[5]

---

hallway of the courthouse before she testified. I have seen no summaries of any contacts with witnesses and/or experts by Ms. Hammock.

[5] Dr. Richard Dudley and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*. 36 Hofstra L. Review. 883 *passim* (2008)

11. Vogelsang made a list of records she requested and obtained:

    a.  Chris Williams' school records
    b.  Chris Williams' Greenville Memorial Hospital records
    c.  Bryant Williams' Chestnut Hill mental health records
    d.  Dwight Williams' Patrick Harris mental health records

12. Vogelsang made a list of records she intended to request. The record is not clear whether these records were ever requested or obtained:

    a.  Dwight's Greer Mental Health records
    b.  Dwight's Charter Hospital records
    c.  Dwight's Lockheed employment records
    d.  Dr. Kevin Smith medical records for Dwight, Daisy, Chris and Maureen
    e.  Birth certificates (for Chris, Daisy, Dwight and Maureen)
    f.  Dwight's Channel 16 employment records
    g.  Dwight's Cross Country Rd. employment records
    h.  Dwight's Apple Mortgage employment
    i.  Dwight's Orkin Pest Control employment records
    j.  Greenville County Library employment records
    k.  Dwight's Pleasantville Mortgage employment records
    l.  Dwight Wiliams' and Mary Snipes' Sterling High School records
    m.  Dwight's University of Maryland records
    n.  Dwight's North Greenville Jr. College records
    o.  Dwight's Greenville Tech records
    p.  Dwight's Rutledge College records
    q.  Bryant Williams' Gateway records
    r.  Bryant Williams' Voc Rehab records
    s.  Bryant Williams' South Carolina State Hospital records
    t.  Bryant Williams' birth certificate
    u.  Chris Williams' Capel Rug Co. employment records
    v.  Chris Williams' BiLo employment records
    w.  Chris Williams'Blockbuster employment records
    x.  Chris Williams' and Daisy Hickaby's Allen Bennett Hospital records
    y.  Chris Williams'La Petite Day Care records
    z.  Spartanburg Women's Shelter records
    aa. Bent Oak Apt. records
    bb. Daisy Williams Huckaby's Greenville Memorial Hospital records.
    cc. Clifford Terrace Apt. records
    dd. Oakview Apt. records
    ee. Daisy's Hungry Fisherman employment records
    ff. Daisy's JC Penney's employment records

       gg. Daisy's St. Francis Hospital records
       hh. DSS records on Mary Snipes
       ii.  Mary Snipes' Greenville Memorial Hospital records

13. The following list of records were requested and not received:
       a.  Chris Williams' DSS records
       b.  Bryant Williams' school records
       c.  Bryant Williams' SSI records
       d.  Dwight Williams' military records

14. Hammock presented the "Williams Family Tree", presumably a genogram. However, Hammock merely states the names of the individuals on the genogram without identifying any useful information about them.

15. Typically, a social historian uses genograms to help fact finders conceptualize familial patterns of biological, psychological and social traits exhibited in a client's family. In essence, genograms can be used to pictorially illustrate to fact finders all of the themes in mitigation. With a case as complex as this one, one would expect to see numerous genograms for various mitigation themes. For example, in Chris's family, one could use genogram(s) to show:

16. Familial pattern of substance abuse - both of Chris's parents were/are alcoholics and this fact alone would have led a competent mitigation specialist to suspect the possibility of Fetal Alcohol Spectrum Disorders in the client and his maternal siblings. Such a suspicion would have led to a cascade of questions and inquiries which would have changed the complexion of this case entirely.

17. Familial pattern of criminal behavior - paternal first cousins killed each other by accident; Kenneth Smith killed Gofus Jr. when Dwight was 7 months old. One of Mary Snipes' sister's children was in prison; Mary Snipes' sister, Mamie Lee Ellison, was murdered by her boyfriend, Joe Griffin; Chris's father, Dwight Williams, was arrested for assaulting Chris's mother; Chris's parents smuggled marijuana from Mexico to the US by putting marijuana in Maureen's diapers; Chris's parents tried to get Chris to forge papers.) None of this was mentioned in the social historian's testimony.

18. Familial pattern of psychological disorders - Chris' father and sister were both diagnosed with Bipolar Disorder; Chris's father was diagnosed with Dependent Personality Disorder; his uncle, Bryant Williams, was diagnosed with an intellectual disability ("mild mental retardation"), a seizure disorder, dependent personality, passive-aggressive

5

personality disorder, major affective disorder, depression and dysthymic disorder; Chris's mother suffers from alcoholism, depression and an anxiety disorder for which she has been medicated with Benzodiazepines and anti-depressants for many years.

19. Familial patterns of suicidal ideation, including attempts and completions - Chris made at least two suicide attempts; his mother, father and sister all made suicide attempts that were documented in emergency room treatment records; his sister, Maureen, successfully completed a suicide by hanging in 2011. When Maureen testified in 2005, counsel asked her if she had ever thought of committing suicide and she answered, "Every day."

20. Familial pattern of trauma - Chris, his mother and sister all suffered from Complex PTSD; I base this provisional diagnosis on a comprehensive review of the record and symptomology exhibited by each individual. It is my professional opinion that Christopher, if not all of his immediate family members (mother, father and sister, Maureen, now deceased as a result of suicide), suffers from Complex PTSD having been exposed to chronic domestic violence as well as inter-familial sexual abuse perpetrated against him and his sister, Maureen, by their paternal uncle, Bryant Williams, and their mother, Daisy Huckaby; Mary Snipes and her children (including Chris's father, Dwight) also endured episodes of domestic violence.

21. Familial patterns of physical abuse - Chris's father, Dwight, physically abused Chris's mother; Dwight's father physically abused Dwight's mother; Dwight's mother mentally and physically abused her children; Chris's mother, Daisy, mentally and physically abused her children; Dwight's mother "scalped" Dwight's father; Chris's mother "scalped" Chris's father;

22. Familial pattern of sexual abuse - Chris's mother sexually abused Chris and his sister, Maureen[6]; Chris's father sexually abused Chris's sister, Maureen[7]; Chris's paternal

---

[6] In Vogelsang's summary of her interview with Maureen Bangcuyo dated 5/31/04, Vogelsang reports, "Daisy used to grab Maureen and Chris in the genital area. They hated it. Daisy thought it was funny and they hated it… Maureen has dreams of her mother molesting her. At thirteen, she told her mother she was uncomfortable with the grabbing. She was afraid her mother would be mad. Chris had pubic hair when Daisy was grabbing him. They were never allowed to close doors." According to Maureen, Chris slept with Daisy until he was 14 years old. Chris told Lyn Phillips and me that his mother also "nursed" him at her breasts until he was 14 years old.

[7] According to Daisy, Maureen said Dwight raped her and they "went all the way" (i.e., engaged in sexual intercourse). Maureen told Daisy years later but Daisy didn't believe her. Maureen committed suicide less than a month after making this confession to Daisy.

uncle, Bryant Williams, sexually abused Chris and his sister, Maureen, and may have sexually abused Chris's paternal first cousin (Miles' daughter), Lisa.; Daisy's German "brother", a known "pedophile" sexually abused Maureen.[8]

23. Familial pattern of fetal alcohol exposure - Chris's siblings were all alcohol exposed in utero; when asked if she drank excessively throughout all five of her pregnancies, Daisy said, "Yes, I have been drunk since I was 6 years old, including during all of my pregnancies."

24. Familial pattern of learning disabilities - Chris dropped out of school in 9th grade; AC Williams dropped out of school in 3rd grade); paternal uncle Bryant Williams was intellectually disabled and did not finish school.[9]

25. Familial patterns of divorce - Chris's mother and father divorced; Chris's paternal grandparents divorced; Chris' mother, Daisy Leis Scheller Williams Seifert Huckaby was divorced three times – twice during Chris' childhood and once before Chris' birth.

26. Familial patterns of child abandonment (Chris's mother, Daisy Huckaby, was abandoned by her mother, Erika, and her father, Bruno; Daisy abandoned her children, Uwe and Sylvia; Dwight's father abandoned him after Dwight's parents divorced; Dwight abandoned Chris after his divorce from Chris's mother; Chris's sister, Maureen, abandoned her children when she committed suicide).

27. Familial pattern of death (Daisy's son, Peter, died in infancy (cause not known to this writer) and Chris's sister, and Maureen's daughter also died in infancy (cause not known to this writer). Whenever a client's sibling has died, a competent mitigation specialist will try to discover everything about the death because our clients' parents are often abysmal in their protection of their children (alcoholics are not good protectors of children). In this case, Daisy and her first two husbands were extremely abusive to one another and their children. Peter might have died at the hands of one of his parents. Was there social service involvement in Germany? Are there hospital records regarding Peter's death? A death certificate? Divorce records? School records? Criminal records? National practice standards would have dictated requesting all of the records.

---

[8] Maureen previously told Vogelsang in an interview dated 5/31/04, "Daisy's brother is a pedophile. He touched her [Maureen] as a child. Daisy told her [Maureen] that is what happens to little girls."

[9] All of his educational and psychiatric records should have been requested.

7

28. Familial patterns of homicide (Chris's father reported homicidal feelings toward his family; Dwight's brother, Bryant Williams also expressed homicidal feelings toward family members; Daisy constantly expresses homicidal intentions toward family members and others[10].

29. Familial pattern of biracial parentage and racial tension in intimate relationships (Chris's mother, Daisy, is the child of a Caucasian, German mother and an African-American father; Chris's mother is therefore biracial and Chris's father is African American; Dwight's mother rejected Daisy because she was biracial; Daisy's mother rejected Daisy because she was biracial; Daisy's first husband castigated her during beatings because she was biracial; when Daisy was drunk she used racial slurs to demean Chris; Chris's girlfriend, Miranda (the victim in this case) told Chris her parents did not approve of him because he was black).

30. Ms. Hammock testified that, "Daisy is from Germany. She was born there. She was… the child of Erica. Her father was unknown. Erica was a teenage parent and Daisy was actually raised by her grandparents after Erica left her. She in fact had a somewhat troubled life herself and was… abandoned by her own mother, never saw her father. She was of mixed background. That caused some consternation in the family because she was clearly darker than the rest of the members and was challenged by that.

   "She leaves the home at a relatively early age. She is 16 when she marries Uwe [Scheller]. She in fact has difficulty… dealing with her grandparents at that point. That marriage to Uwe was not a successful one. There was a great deal of violence reported to be in that. And ultimately she leaves him after a relatively short period of time. He assumes responsibility for raising Uwe and Sylvia, their children."

31. Ms. Hammock hereby introduces several critical mitigating factors which were not developed:

32. Chris's mother is a German citizen, making a Chris a German national by birth, and therefore entitled to representation by the German government in a capital case. (See below for a full discussion of failure to investigate and present cultural mitigation in this case.)

33. Hammock testifies incorrectly about Daisy's father. Daisy's father's identity was in fact known to her; his name is Norman Bruno Brown and he was an American military man

---

[10] During my interview with Daisy she reported telling Chris she wanted to kill his father on many occasions. She also threatened to kill her mother-in-law, Mary Snipes, because she said Mary Snipes intended to hire Dwight's mistress and next-door neighbor, Priscilla Bruton, to kill Daisy. Bruton has never been interviewed by anyone.

from Brooklyn, NY. No one on Chris's defense team attempted to identify Mr. Brown at the time of the trial, though attempts were made prior to his PCR hearing.

34. Daisy's mother, Erika, gave birth to Daisy when Erika was reportedly 19 years old and then abandoned Daisy for reasons not disclosed to the jury.

35. Daisy is "of mixed background." Hammock uses a euphemism to describe Chris' mother's racial composition. Instead of telling the jury that Chris's mother is the daughter of a white, German mother and an African American service man, he simply says Daisy is "mixed." None of the valuable cultural mitigation which could have been presented to the jury was ever mentioned. Hammock alludes to the idea that Daisy faced some challenges as a biracial child being raised by her white, German grandparents in post-war Nuremburg, but we have no idea what those challenges are.

36. We are told that Daisy marries her first husband at age 16. Why? Was she pregnant? We know nothing about her first husband other than he was Caucasian, German and abusive but we know nothing about the abuse Daisy suffered in her first marriage, which undoubtedly impacted her in a way that affected her second marriage (to Chris's father).

37. Daisy abandoned her children, Uwe and Sylvia, when she and her first husband divorced; this is a critically important piece of information. It not only points to a troubled attachment style which no one has ever explored, but it also raises questions about Daisy as a mother: did she lose custody of her children? If so, why? If not, why did she abandon them? Did she run away from Uwe to escape the abuse, leaving her children behind? If so, where did she go? Who helped her? Why did she fail to return to her children? Didn't she miss them? Did she ever try to contact them again? Hammock testified that Daisy brought her daughter, Sylvia, to the United States when Sylvia was five years old but the child withdrew and was returned to her father. Hammock also said Daisy's son, Uwe, remained with his father. How were these custody matters determined? Was it the father's right in Germany to retain custody of his children in every circumstance? We simply don't know.

38. At the very least, national practice standards dictate requesting court records whenever there has been a divorce in our client's family of origin, including marriages that precede the defendant's birth but no one in this case requested the records from Daisy's German divorce. Did Chris even know his maternal half-siblings existed? We know his brother, Uwe, visited once but otherwise, we know nothing of Chris's relationship with his maternal half-siblings. How did Chris feel about the fact that his mother had abandoned her first set of children? Did this fact affect Chris's attachment to his mother; did he feel more vulnerable and fear being abandoned himself? Chris's attachment style is important in this case because the victim is a former girlfriend with whom he had a disordered

attachment. None of these questions were raised, investigated, developed or presented to Chris's jury.

39. Marjorie Hammock's testimony lacks compelling detail. It is well-known in capital litigation that broadly painted epithets and euphemisms are not nearly as valuable to jurors as are detailed anecdotes – real life stories from a client's background; such anecdotal information helps jurors connect psychologically to capital defendants on the basis of their shared humanity. Once death -qualified jurors make psychological connections with capital defendants, jurors are much less likely to want to sentence our clients to death. In the absence of these real-life stories of who our clients are in the context of their social history, jurors connect mostly with the crime, and not the defendant, and are therefore inclined not to show mercy by voting for a life sentence.[11] "The more a juror reported having felt sympathy or pity for the defendant, having found the defendant likeable as a person, and having imagined being in the defendant's situation, the more likely she was to cast her first vote for a sentence of life imprisonment." In this case, there was an avalanche of socially historical information available but either not properly investigated and collected, not properly distributed among team members (certainly it was never presented to the jury), not developed, or simply overlooked.

40. Mr. Williams' case was Vogelsang's first mitigation investigation.[12] Previously, she had functioned as the social historian in her capital cases. She appears to have lacked the training and expertise necessary to perform the function of the mitigation specialist in this capital case. The roles of mitigation investigator and social historian are not interchangeable; though they may overlap, they require differing skill sets and funds of knowledge. The mitigation specialist is charged with investigating the client's life history; the social historian's role is to testify to the results of the mitigation specialist's investigation. While Hammock performed a few interviews in this case, she by no means re-investigated all the mitigating circumstances available to Vogelsang as detailed in her

---

[11] Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26 (2000).

[12] Vogelsang testified at the PCR hearing that this was first mitigation investigation. Vogelsang was performing the mitigation investigation in another capital case (State of *South Carolina v. David Edens*) with John Mauldin at the same time she was investigating the mitigation in Chris' case (we know this because she makes reference to the Edens case in an email to John Mauldin). Edens was sentenced to life. According to Lyn Phillips, the current mitigation specialist in this case, Vogelsang is not willing to meet/talk with Chris's current defense team about her mitigation investigation in Chris's case. Instead, Vogelsang refers Ms. Phillips to her PCR testimony as sufficient.

10

comprehensive chronology. Indeed, if Hammock had simply testified to the information in Vogelsang's chronology, the jury would have benefitted greatly. Instead, the mitigation was presented in a cursory manner which is not very compelling to anyone, let alone a death qualified jury. While it is not the role of the social historian to investigate the mitigation, it is always the role of every member of a capital defense team to employ at least a modicum of curiosity about the defendant. If the social workers, and particularly the mitigation specialist, on Mr. Williams' defense team weren't curious enough about him to investigate his cultural mitigation, how could anyone expect a death-qualified jury to independently take an interest?

41. None of the cultural mitigation in Chris's history was investigated or introduced at trial. Cultural mitigation is essential to every capital case. In their article entitled Cultural Competency in Capital Mitigation, Scharlette Holdman and Christopher Seeds write, "The obvious link between culture and the mitigation function of capital defense teams is summed up by the anthropologist Clifford Geertz, "there is no such thing as a human nature independent of culture." Because culture is an all-pervasive medium, cultural competency is essential to the ability of capital defense teams to discover and reveal the humanity of the accused."[13] In this case, the entire defense team performed abysmally in the area of cultural competency. In this way, Mr. Williams' defense team demonstrated an alarming level of cultural incompetency in its failure to discover and reveal to the jury the humanity of the accused…

"The Supplementary Guidelines describe the mitigation specialist's role in terms of "cultural competency," the touchstone term for an ethnocultural approach common to anthropology and other professional standards that has long been required in investigation, client communication, and overall strategic planning in capital cases: Mitigation specialists must be able to identify, locate and interview relevant persons in a *culturally competent* manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms .... They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures…

"This… view of culture is essential to understanding cultural competency in a capital defense context for two reasons. First, to enable capital decision-makers to respond to the client's intrinsic humanity, the defense team must investigate and present the anecdotal details of the client's life, which portray "the individual's existence as a

---

[13] Scharlette Holdman & Christopher Seeds, *Cultural Competence in Capital Mitigation*, 36 HOFSTRA L. REV. 883 *passim* (2008); *see also* Sean D. O'Brien, *When Life Depends On It: Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 693, 753-55 (2008).

member of the human community.,  Second, but equally important, viewing culture from the individual's perspective avoids the misinterpretation of culture as stereotype. Cultural competency eschews reliance on stereotype. The ever-present danger of stereotype lies not only in overlooking elements of culture that seem ordinary, but even more dangerously in equating cultural dictates with cultural compulsion-in assuming that cultural dictates apply with equal force to all who share a cultural background. Culture painted with a broad brush such as to distinguish "us" from "them" plays on and entrenches stereotype, and fails to address fully the complex effects of cultural dictates on individuals…

 "The Commentary to the NASW Standards gives some idea of culture's specificity as well as its range: Social workers need to possess specific knowledge about the particular providers and client groups they work with, including the range of historical experiences, resettlement patterns, individual and group oppression, adjustment styles, socioeconomic backgrounds, life processes, learning styles, cognitive skills, worldviews and specific cultural customs and practices, their definition of and beliefs about the causation of wellness and illness, or normality and abnormality, and how care and services should be delivered. They also must seek specialized knowledge about U.S. social, cultural, and political systems, how they operate, and how they serve or fail to serve specific client groups. This includes knowledge of institutional, class, culture, and language barriers that prevent diverse client group members from using services."[14]

42. Hammock glosses over large segments of the mitigation as if the details have no importance; nothing could be further from the truth. Though Hammock was not duty bound to re-investigate the case in mitigation, one still wonders why she failed to inquire into a few crucial areas of concern. Why wasn't Hammock curious enough about Chris's background to ask some rather basic questions of his mother? Why wasn't anyone curious enough about Daisy's pregnancy with Chris to ask how much Daisy drank during her pregnancy (it was known to everyone on the defense team that she drank alcohol during her pregnancy and continued to drink excessively throughout Chris's childhood, and indeed during the pendency of his case)? When counsel, Hammock and Vogelsang were asked in post-conviction proceedings why they failed to "connect the dots" in this case, no one had an answer. A competent mitigation specialist makes it her business to "connect the dots" in her client's life history. In fact, one reason to create a chronology is to help the mitigation specialist identify gaps in the history that still need to be investigated, understood and explained. Chronologies help mitigation specialists "connect the dots".

---

[14] Scharlette Holdman & Christopher Seeds, *Cultural Competence in Capital Mitigation*, 36 HOFSTRA L. REV. 883 *passim* (2008); *see also* Sean D. O'Brien, *When Life Depends On It: Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 693, 753-55 (2008).

43. In this case, Vogelsang created a detailed chronology but no expert ever references seeing it, nor does counsel. It was certainly never introduced to the jury or to any fact finder. The details of Vogelsang's chronology were somehow left out of Hammock's testimony. While a chronology may not be presented to experts and jurors in its entirety, it is commonplace to use partial chronologies to familiarize fact finders and experts with a client's history. In every case, counsel is privy to every detail in a life history chronology. The failure to properly distribute information among team members at the trial level in this case ultimately resulted in numerous missed opportunities to inform the jury of the mitigation in this case. When John Mauldin was examined at the PCR hearing, he testified as follows: p.205, line 5-11:

> "Q: and you knew that part of the social history, essentially at the time you went to trial, had some gaps, correct?"
> A: Yes, sir. Yes, sir.
> Q: Yet you still presented the social history, as you understood it, through Dr. Hammock?
> A: That's right.

44. Plentiful evidence was readily available. I interviewed Daisy for 4 hours one afternoon. She was very forthcoming in her responses to my questions; no one has ever accused her of hiding information from her son's defense team. When I asked Daisy about the circumstances of her birth, I learned much more than the jury ever knew.

45. Daisy knows nothing about her mother's pregnancy with her including whether Erika was drinking alcoholic beverages while she was pregnant with Daisy. She does know, because her family told her during her childhood, that her mother worked in a bar throughout the pregnancy and was seen dancing in the same bar two days after Daisy's birth. Daisy gave us the very colorful detail that her mother danced in a cocktail dress without any underwear on two days after Daisy's birth. Erika did not breastfeed Daisy. Erika's breasts thus became "hardened".

46. Daisy was always told by her German aunts and uncles (none of whom were contacted or interviewed prior to Chris's trial) that when Daisy was about nine years old, her mother and her mother's husband, Harold Shedd, visited Daisy and her family in Germany. Apparently, Harold wanted to see Daisy. Daisy was not at home when Harold and her mother visited so he was shown pictures of Daisy. (Daisy showed me a picture of herself which I attach below. In the picture, her aunt, Anita, appears on the far left, her step-grandmother, Marguerite Leis, is shown holding an infant, Andreas, and Daisy's grandfather, Otto Leis, is pictured next to Marguerite; Daisy appears on the far right.) When Herald saw the pictures of Daisy, his remark was, 'Well, she's not white!' Daisy

said, "Harold Shedd didn't want a chocolate baby." The decision was made that Daisy would not be allowed to live with Mr. Shedd and her mother because, Daisy assumed, of the fact that she is biracial.



47. In 1990, Daisy was a hairstylist living in Greenville, SC, with her husband, Dwight, and her son, Chris (her daughter, Maureen had already left the home and was in college). One of Daisy's clients had been adopted at birth but had recently located her birth mother online and mother and child had reunited. The client was telling Daisy the story when Daisy decided to inquire how she could locate her own birth mother. The client told Daisy that it was very easy and if she had her mother's full name and birthdate, she might be able to locate Erika within 24 hours. Daisy did not know her mother's birthdate. She did know that her mother was named Erika and she was 19 years old on December 24, 1948, when she gave birth to Daisy. She also knew that Erika had married someone named Harold Shedd. She believed Erika and Harold were living in California. Daisy's client got back to Daisy in less than an hour and gave her **Jeffrey Shedd**'s contact information. Jeffrey is Daisy's maternal half-brother. The client was not able to find any information on Erika or Harold Shedd. Daisy immediately called Jeffrey's phone number and he answered the phone. Daisy told him that she was his maternal half-sister and explained her birth history to Jeffrey. He told her he would have to speak with Erika and get back to her.

48. The next phone call Daisy received was from her mother, Erika. Daisy had never spoken with her mother before. When Daisy answered the phone, Erika simply stated that Daisy

had gone about finding her in the wrong way. Daisy said she had never spoken with anyone who was more cold or distant than her mother was during that telephone call. Daisy told her mother the reason she contacted her was to tell her mother that her grandfather (Erika's father, Otto) had cherished Erika (who Daisy described as having beautiful red hair and green eyes) and was deeply hurt that Erika had failed to visit him (Otto) after Erika moved away. All of Daisy's aunts and uncles and her grandparents lied to Daisy for years regarding Erika's whereabouts; they claimed not to know. Daisy had learned that they had known all along exactly where Erika lived and had even exchanged cards, notes, letters, photographs, Christmas, and birthday gifts with Erika, all while pretending to Daisy they had no idea what had become of Erika.

49. During Daisy's initial telephone conversation with her mother, Erika showed no interest in the information Daisy was trying to convey regarding Otto's broken heart. The phone call was quickly terminated. Subsequently, Daisy spoke with her mother on the phone every now and then but her mother showed a lack of interest in talking with Daisy. The more interested parties were Daisy's maternal half-sisters, Charlene, Kathy and Sandra. At the time of Daisy's initial phone call to her mother, Erika was living with Jeffrey and Kathy in California. Charlene and Sandra lived in Twin Falls, Idaho. After several telephone calls between the siblings there was much excitement and everyone (except Erika) was eager to meet Daisy. It was decided that Daisy and Chris should travel to Twin Falls via Greyhound bus and spend Christmas with the family there.

50. Charlene had married into a family that owned a large piece of property and a beautiful farmhouse and Daisy and Chris were invited to come and stay there with Charlene and her family for Christmas. Daisy arrived there with Chris after a three-day trip on the Greyhound bus. Chris had a delightful time on the bus and made friends with other passengers and was generally a very good sport. They arrived in Twin Falls feeling very excited and very grimy. They were welcomed warmly by Charlene, Sandra, and their families.

51. On Christmas Eve 1990, which is also Daisy's birthday, Erika, Jeffrey, and Kathy arrived in Idaho. Erika was at Charlene's house when Daisy woke up on the morning of her birthday. When she saw her mother, they just said 'hello' to one another; they did not exchange smiles or hugs. It was a bit awkward. It soon became apparent to Daisy that her mother was very ashamed of the fact that she had given birth to a black child.  Apparently, Erika had hoped to conceal the fact of Daisy's existence for the remainder of Erika's life. Erika was not pleased that Daisy had foiled her plan and tarnished her reputation in the eyes of her children. When some of the family eventually turned against Daisy, one of Daisy's sisters told Daisy that the only reason Otto wanted to keep Daisy was because he was receiving a check from the government. Daisy knew this

was not true and thought it was a spiteful thing for her mother to tell Daisy's half-brother and sisters. One of the sisters (Sandra?) was so angry at Erika for hiding Daisy's existence that she told her mother, Erika, she would not allow Erika to continue her relationship with her children, Erika's grandchildren. Of course, this created much distress on Erika's part.

52. During the Christmas visit, Daisy and her mother were able to sit down privately and have a brief conversation. Erika avoided Daisy and finally, when they found themselves in a private moment, Daisy took the opportunity to ask her mother about her father. Daisy said she knew her father's name was Norman Bruno Brown and wanted to know more about him. Erika's quick retort was, "What's to know?" Erika claimed to have very little information about Bruno and said he grew up in Brooklyn, New York. She said he had been a mechanic in the military but he had been demoted for heroin abuse.

53. Eventually Daisy's relationships with her siblings grew strained and Daisy stopped communicating with her brother, sisters and mother. Daisy is not certain whether her mother is dead or alive. Someone called her a couple of years ago from Twin Falls and said that her mother had passed away and they invited Daisy to come to Twin Falls for the funeral. Daisy says Chris adamantly opposed her going to Twin Falls and said she should try to verify the information first. Daisy was never able to verify whether Erika had died or not.

54. Daisy was nineteen years old when her grandfather, Otto, died. By then, Daisy was married to her first husband, Uwe Scheller.

55. Vogelsang, the mitigation investigator at the trial level, failed to learn any of this information from Daisy who was more than willing to talk with her about it. Ms. Vogelsang never contacted Daisy's half-siblings, Sandra, Jeffrey, Kathy and Charlene, or Daisy's mother, Erika Shedd, or Erika's husband, Harold Shedd, all of whom were alive in 2003-05 and residing in the United States. At the time of Chris's trial, a quick internet search such as the one conducted 6 years earlier by Daisy's salon client would have yielded contact information. At the very least, these relatives could have been called or Ms. Vogelsang could have written to them and requested interviews via telephone. National practice standards for a capital case, however, dictate personal, face-to-face, one-on-one interviews whenever possible. Had Ms. Vogelsang been more experienced, perhaps she would have known to ask trial counsel to arrange for her to travel to CA and Idaho where Erika, her husband, children and grandchildren were living then.

56. Vogelsang never left the county to interview witnesses. It is very importance to interview witnesses face to face. Vogelsang should have requested authorization to travel to CA to

interview Chris's sister, Maureen, a key witness with serious mental health issues; the state sent Detective Silvaggio and Dr. Pamela Crawford to interview Maureen in person. Likewise, Vogelsang should have requested authorization to travel to Idaho to interview Daisy's mother, Erika, at least.  Because Daisy's side of the family tree is basically empty, there is a big gap in information related to possible hereditary mental health and congenital issues. Mention is made in the trial testimony that Linda Mroz (a mitigation investigator in Idaho?) was engaged (to interview Chris's Grandmother, Erika?).

57. An organization called Reprieve which assists capital defendants who are foreign nationals in contacting their foreign governments was very much in existence in 2003-05 while Chris's case was pending pre-trial. Ms. Vogelsang could easily have contacted Reprieve and asked them to assist her in locating and contacting Chris's family in Nuremburg, Germany.

58. On page 25 of the PCR transcript, Vogelsang refers to questions about Reprieve and Linda Mroz and says no such service was pursued in trying to get information about the German side of Chris's family.

59. Some representatives from Reprieve recently interviewed some of Daisy's family members in Germany and were able to obtain some valuable cultural mitigation which was never presented at trial.

60. Reprieve interviewed Helga Kopka, née Leia on 4 and 5 February 2017. Helga is Chris Williams' maternal great-aunt.

61. Helga was born on 21 October 1937. Her mother, Maria Leis, died early, so that her father, Otto Leis Senior, had to raise his then six children by himself. Helga's older sisters, Elise and Erika, helped to raise the younger ones. Later Helga's father got married again, to her stepmother Margarete Leis.

62. Helga has seven siblings: Elise Welthe (née Leis), Erika Shedd (née Leis), Manfred Leis, Walter Leis, Otto Leis Junior, Anita Wägner (née Leis) and Andreas Leis. Anita and Andreas stem from Helga's father's second marriage and are her half-siblings.

63. The time of the second world war was a difficult and terrible time for Helga and her family. Nuremberg was heavily bombed and for years the Leis family lived in a wooden barracks that had been constructed to serve as emergency shelter. They lived in a very small space, with six to eight of people sharing the same room, and Helga's brother Otto Junior slept in the same bed. After Helga grew up and left the family home, her father, Otto Senior, was finally allocated a flat.

64. Helga said, "We were very cold during the winter, and I had to go to school without a winter coat. I remember the scarcity of food that my family was faced with during the

17

war. We were glad if we had bread or potatoes to eat. Sometimes there would also be a piece of cheese or some margarine, but butter was almost impossible to get and we could not afford it. My father, who was a shoe maker, tried to obtain food for his family by driving out into the country to the farmers, and offering his services in direct exchange against food. Everyone in my family was very skinny, and my bones were protruding at my shoulders."

65. When American soldiers were stationed at Bad Nauheim, it became known that they would often give food to their girlfriends. Many young women in the area were socialising with American soldiers, including Daisy's mother. Erika, Chris' grandmother, and Elise. Erika had a relationship with a black American soldier named Bruno. Helga remembered that Bruno, too, brought food to Erika, chocolate and other things. In 1948, Erika had her daughter, Margarete Theresa Leis, now also known as Daisy Huckaby, to whom she gave birth at home. Bruno had already left Germany at this point. Erika said to Helga that Bruno had told her that the reason why he could not take Erika with him to the US was that at the time it was not permissible for black soliders to bring white women with them.

66. Later Erika worked in a bar, where she met her future husband Harold Shedd. Erika told Harold that she already had a daughter, but did not let him know that Daisy's father was black and that consequently Daisy was a mixed-race child. Erika abandoned Daisy and left her in the care of our father, Otto Leis Senior. Daisy was raised by her grandfather and called him "Papa" [*translator's comment: This is the German equivalent to* "Daddy"]. Later Erika moved with Harold to the US.

67. Erika told Helga that she wanted to have Daisy with her, but that she was very afraid of what would happen if Harold found out that Daisy was half-black. Helga remembers having asked Erika about this once and she responded that Harold would surely have sent her away if he had found out that Daisy was of mixed race.

68. With her dark skin, Daisy very much stood out in the Leis family's white neighbourhood. Whenever she left the house she was stared at, and so was Helga's father when in her company. Back then it was extremely uncommon for black and white persons to live together in one family, and most people felt hostile towards such connections. Black-and-white couples could expect to have verbal abuse shouted at them in the streets.

69. Reprieve also interviewed Daisy's uncle, Manfred Leis, on February 3, 2017. During that interview, Mr. Leis told representatives from Reprieve that "Daisy struggled as the only mixed-race German child in the neighbourhood. People in the neighbourhood would make racist comments regularly. Even when Daisy trained to become a hairdresser her customers would sometimes make such comments, which upset Daisy deeply."

70. Mr. Leis also said, "Daisy and Uwe did not have a happy marriage. Uwe did not treat Daisy well and used to abuse Daisy, he would call her "*Mulattenweib*" [*Translator's Note: This is an insult that is strongly derogatory of mixed race women, both on account*

*of their racial heritage and of being female.*] Daisy and Uwe lived in Nuremberg until 1971 when they got divorced. Nobody from the Leis family, including me, approved of Uwe – he was a bad influence on Daisy and a "good-for-nothing".

71. As has been previously state, Vogelsang also should have requested authorization to travel to Germany to interview Daisy's aunt, Anita Leis, who was like a sister to Daisy, her uncles Manfred Leis and his wife, Anne Marie, and Daisy's grandfather Otto Leis and his wife, Marguerite, and other German family members living in Germany or elsewhere in Europe. Ms. Vogelsang testified that she and Mr. Mauldin joked about the fact that she was never going to be granted funding to go to Germany to perform interviews in this case and she never asked Mr. Mauldin to motion the court for travel funds, nor did Mr. Mauldin think to do so on his own. However, he testified at the PCR hearing that if Vogelsang had made such a request, he would not have "laughed it off". National practice standards dictate that the mitigation specialist submit an affidavit to counsel requesting funding to travel whenever there is a need to demonstrate to the court justifiable reasons for requesting extraordinary travel fees. Mitigation specialists have traveled to locations the world over to interview mitigation witnesses in preparation for capital cases. Even if the Court had denied such a request, Vogelsang could easily have used the telephone or the internet to attempt to open communication between herself and the Leis family. On page 27 of the PCR transcript, Vogelsang affirms the fact that there was no funding that she knew of to go to Germany and no efforts were made to contact that Daisy's family.

72. The reasons collateral interviews with Daisy's family would have been important include but are not limited to the following:

   a. Daisy drank throughout all her pregnancies which means she has two children in Germany who were also exposed to alcohol in utero but about whom nothing is known.

   b. Chris's maternal half-siblings might very well suffer from mental illnesses, behavioral problems, and learning disabilities, and may have been identified as having FASD. Had they been interviewed, perhaps Vogelsang would have been able to stress the importance of Daisy's alcoholism to Chris's trial counsel in such a way that they would have decided to investigate the possibility that Chris, too, has FASD.

   c. Daisy was previously married to a brutally abusive, racist husband, Uwe Scheller. Vogelsang should have interviewed Mr. Scheller to learn about his relationship with Chris's mother, Daisy, in her younger years. If Mr. Scheller admitted an abusive relationship with Daisy, perhaps Vogelsang might have begun to recognize a pattern of abuse in Daisy's relationships with men, including Chris's father, her second husband.

    d.  Daisy's third child, Peter, was Mr. Scheller's son. Peter reportedly died in infancy. Mr. Scheller may know the cause of his son's death which may in some way correlate to Daisy's decision to leave the marriage. At the time of Chris's trial, Vogelsang didn't even know Peter had ever existed.

    e.  Scheller might have insight into the "challenges" Marjorie Hammock referenced when she said Daisy was "of mixed background" which "caused consternation in the family". Chris, too, is a biracial child but the fact that he and his mother were both biracial was never explored at all.

73. Hammock testifies incorrectly and incompletely. When counsel asks Hammock about Chris's father, Dwight, Hammock testifies that Dwight and Daisy divorced when Chris was "at a fairly young age" and Chris was "for all practical purposes raised by a single parent, his mother." IN so testifying, Hammock rushes past the first 9 years of Chris' life, during which he was exposed to chronic domestic violence perpetrated by his father against his mother, and to some degree by his mother against his father. Hammock not only minimizes the violence in the home by referring to it as "conflict" but she testifies incorrectly that Daisy and Dwight had a "relatively harmonious" marriage until Dwight was discharged from the military.

74. Chris's sister, Maureen Bangcuyo, testified right after Marjorie Hammock at Chris's trial. Maureen said, "From the day I can remember, even memories of when I was really young and living in Germany with Dwight and Daisy, Dwight was in the military… I just remember constant fighting, physical abuse on Daisy, physical abuse on myself. And I had to endure that. And I had to keep quiet because we were never allowed to express how we felt. The violence and the alcohol every night, gallons gone in a week, drugs, you know… I can't remember a single time where we were happy as a family… I spent 17 years of my life being the referee for those two [meaning, her parents]…" Presumably Hammock had knowledge of these facts since she interview Maureen prior to testifying. Counsel failed to elicit a single incident to illustrate the abuse to which Hammock and Maureen referred.

75. Hammock does testify that Chris is exposed to "a great deal of violence" in the home but not a single incident of violence is described to the jury. Again, Hammock testifies in generalities instead of details. Vogelsang knew of numerous incidents of domestic violence Chris witnessed as a child and they are included in her chronology. For example, under the heading for 1986 in Vogelsang's chronology, she writes, "Chris remembers walking into the living room with his teddy bear and seeing his father on top of his mother with his fist drawn, beating her. He recalls them fighting daily, throwing things, throwing punches, pulling hair, destroying each other's possessions, etc." Even though Vogelsang gets the details of only one incident, she clearly knew of many other instances

in which Chris witnessed domestic violence. Vogelsang relates (and Hammock testified) that there were many 911 calls during these years but no one requested the 911 dispatch records.[15]

76. Maureen was so traumatized as a child that she suffered from ulcers by age 11 years (she was 11 years old when Chris was born) and was prescribed muscle relaxers but the jury heard nothing about that. In the same interview, Maureen said Chris's parents waited hours to take him to the hospital when he broke his arm in spite of the fact that he was in tears. Maureen also said her father used to beat her and Chris with a belt.  Vogelsang reported, "He [Dwight] backed her [Maureen] into a corner and would beat her until she cried. Daisy would break spoons across them [Maureen and Chris]. Maureen saw Dwight punch Daisy in the face. He knocked her across the room and broker her jaw. He ruptured her eardrum. She was in an out of consciousness." I find it curious that Vogelsang told Chris that his case represented the worst case of child abuse and domestic violence she had ever seen but not a single instance of that abuse was presented to the jury.

77. I interviewed Chris once, for 3 hours. During that interview, Chris said he remembers three or four specific incidents in which Dwight was particularly brutal to Daisy. The most memorable time was when Dwight "knocked Daisy unconscious". Dwight said Daisy choked on an ice cube but Chris, who was in his bedroom, heard Dwight beating Daisy. Chris heard the "thud" sound of his mother falling on the floor and came out to see what was happening. When he entered the room, Dwight was "half holding" Daisy in his arms. Chris said, "If someone is choking on an ice cube, you don't cradle their head in your arms." Chris felt guilty because he never tried to protect his mother from Dwight but Dwight was a large man and Chris knew he had no chance against Dwight. Dwight physically intimidated Chris. Chris felt very angry about the way Dwight treated his mother and as Chris got older, the anger festered and grew inside of him until he could no longer control it. He said, "I became a very angry boy."

---

[15] These records are vital because they give definitive dates, police officers' names and reports, times of day and night, names of other potential witnesses to the violence, remedies sought or recommended, etc. Police officers who responded to domestic violence calls at the home(s) of a client's family of origin make excellent mitigation witnesses. In addition to knowing the family through repeated interactions, they know the community and can testify as to cultural mitigation. Often police officers familiar with the neighborhood and the family know our clients well. Dwight was eventually arrested for assaulting Daisy and sent to jail. At that point, police insisted that Chris and his mother move into a shelter for abused women and children in Spartanburg because they were concerned about Chris. Though all of this was known to Vogelsang, she failed to (1) request the 911 dispatch records, (2) identify the police officers who responded and (3) interview law enforcement.

78. Daisy said Chris started "acting up" when they were living with her third husband, Hans Seifert, but she couldn't imagine why. She said, "Chris had everything but he was increasingly angry. After the divorce [from Dwight], Chris did not see Dwight for several years. They reunited after a couple of years. As time went by, Chris became angrier and angrier." The jury never heard this testimony.

79. Daisy was not respectful of Chris' boundaries. If he went in his room to escape her constant berating, she followed him there. If he dared argue with her, she wanted Hans to call the police. If he locked his door, she banged on it until he couldn't stand it any longer. He said, "I was not mature enough to escape her. I didn't know what to do. I just got more and more angry. We were too close."

80. Chris and his sister, Maureen, were sexually abused as children but the jury never hears this evidence because it is not presented. Though it was known to Vogelsang and counsel, counsel never asked Maureen during his direct examination if she or Chris had been sexually abused as children. Maureen said she was abused by three men during her childhood: her maternal uncle in Germany, her paternal uncle, Bryant Williams and her father, Dwight Williams.

81. Chris was also the victim of violent characters in his extended family. Also in her chronology under the heading for 1986, Vogelsang reports, "Chris recalled being left daily with his grandmother Mary Snipes and paternal uncle Bryant Williams who was treated frequently for his many disabilities at Greenville Mental Health and Chestnut Hills. Brant was hot tempered and could become violent. He molested Chris and forced him to engage in a number of sexual acts. Chris recalls that Bryant asked him to stick toothpicks in his urethra and to do oral sex on Bryant. Chris hated being alone with him. A boy down the street also made him do things to him." Neither Vogelsang, Hammock or any other witness testified to these facts so the jury never knew.

82. In Dr. Halleck's testimony, he reports two things as to sexual abuse of Chris. (Calls this "strange" - mother allows Chris to sleep with her till age 14. Mother touches both children's genitals "playfully"... and continues to until Maureen finally adamantly demands she stop.  Worse - at age 6-7 Chris is forced to fondle his Uncle Bryant... and Uncle Bryant makes Chris insert toothpicks into his (Bryant's) urethra... several times. Even though she "conferred" with Dr. Halleck, she never mentions sexual abuse of Chris by his mother or by his uncle, Bryant Williams. Halleck describes Uncle Bryant and his problems/disabilities, but never mentions that he sexually abused 7-8 year old Chris in a very sick way. These examples of inter-familial sexual trauma should have been described to the jury in detail. Hammock also never mentions that Uncle Bryant has seizures.

83. The following mitigation witnesses were interviewed by Vogelsang and she wrote summaries of her interviews with them:

   a. **Chris Williams** (client) -  Vogelsang interviewed him six times on 3/18/04, 3/19/04, 4/15/04, 4/29/04, 6/03/04, 6/05/04
   b. **Daisy Huckaby** (mother) – Vogelsang interviewed her twice on 4/01/04 and5/20/04,
   c. **Rodney Hickaby –** Vogelsang interviewed him on 6/5/04
   d. **Dwight Williams** (father) – Vogelsang interviewed him on 3/18/04
   e. **Maureen Bangcuyo (sister) –** Vogelsang interviewed her once on 5/31/04
   f. **Mary Snipes and Bryant Williams –** Vogelsang interviewed them once on 3/25/04

84. "Important knowledge and insight into the defendant, his family members, and their setting can come from neighbors, teachers, spiritual leaders, medical and counseling service providers, social workers, former attorneys, probation officers, and employers. It is necessary to locate and interview all people who have interacted with the defendant over time or at a critical time in the course of his life. They hold firsthand information about the defendant as well as knowledge of adverse environmental conditions such as lead poisoning, toxic farm or industrial substances, or other serious health risks; for example, substandard housing that resulted in respiratory problems, insects or vermin that created medical problems, or major safety hazards that resulted in physical injuries."[16] The following is a list of additional witnesses identified by Vogelsang who were never interviewed (arranged in alphabetical order):

- **Cora Adams –** AC Williams' mother
- **Monica Adams –** Daisy's employer for 6 years and best friend.
- **Amanda Altier –** Chris's only girlfriend before he met Maranda.His relationship with Amanda caused him to distrust women. He was too young to know how to deal with women and intimate relationships confused him.
- **Ms. Armstrong** – Chris's teacher
- **Caledio Bangcuyo –** Maureen's husband
- **Beth Barnes –** resource teacher at Brook Glen Elementary School where Chris was evaluated and placed in ESE classes
- **Rev**. **Beeks**
- **Kim Bentley** – a friend of Daisy. She worked at Pack Mail and Daisy met her there. Daisy blacked out while driving once and Kim called Chris. The paramedics intervened. Kim said that when Daisy was on the gurney, she was

---

[16] Dudley, Richard G. Jr. and Leonard, Pamela Blume (2008) "Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment," *Hofstra Law Review*: Vol. 36 : Iss. 3 , Article 12.

"babbling incoherently." Paramedics said they had been to Daisy's house before. Chris said, "Mom was lonely and wanted attention, especially when she was drunk. Sometimes she called 911."

- **Priscilla Bruton –** Dwight's mistress and the family's next door neighbor, together with her husband, **Curt Bruton** (a cocaine dealer who died shortly before Dwight divorced Daisy), until Dwight and Daisy divorced. She witnessed incidents of domestic violence between Dwight and Daisy, and allegedly was approached by Dwight's mother to kill Daisy.
- **Rory Case** – codefendant in the paintball incident and friend;
- **Kim Clark**
- **Chris's classmates** – Vogelsang should have interviewed classmates of Chris; such witnesses can be identified using yearbooks.
- **Ms. Cooley** – Chris's teacher.
- **Chris's coworkers and employers**
- **Dallas** 972-431-1000
- **Ms**. **Deacher** – Chris's teacher. **Ms. Deacher** and **Ms. Sinclair** were  Chris's favorite teachers. Ms. Deacher was a middle school teacher whose son went to middle school with Chris but he can't remember the son's name (check the school yearbook). He liked Ms. Deacher because she was very "congenial".
- **Gary Church –** a neighbor with whom Daisy had some sort of d'alliance. He was a friend of Chris; an older man who lived at 504 Waxman Way, Simpsonville, SC. Chris knew him in 2001. He was a biker. He had a Harley and he and Daisy were drinking buddies. Chris caught them dancing together once. Gary seemed embarrassed but Chris didn't mind. He liked Gary.
- **Dika Ezenekewe** was another friend; he was from Nigeria. They worked at Cabel Rug Outlet together. Dike was a good friend. They visited Forever Art Gallery in Asheville together.
- **George –** a friend who Daisy accused of rape.
- **Gofus (lnu) –** he killed another son, Charles, by stabbing him in a grocery store. Deceased.
- **Carol Head –** Participated in the evaluation of Chris at Brook Glen Elementary School; she was Chris's math teacher.
- **Julie Herr**
- **Doug Huffman –** Daisy's employer at Studio 1
- **Patty Jennings**
- **Mika Karvoven -** Maureen's first husband (Chris's brother-in-law with whom Chris lived for a time and felt close to; he would have been an excellent witness as to that critical period of Chris' life, when Chris was approximately age 10-12.
- **Dr. Levi Kirkland -** treated paternal uncle Bryant's seizure disorder. In Vogelsang Vogelsang's documentation of her 5/31/04 interview with Chris's sister, Maureen, Maureen stated that her mother was having an affair with Dr. Kirkland; that "a Dr. Kirkland used to come to their house. One day, Maureen

walked in and her mother was on the sofa with her legs spread. Dr. Kirkland was standing over her with his weiner hanging out. She was eight. Daisy told her Dr. Kirkland was looking at her surgery scar".

- **Alfred Leamon** (DOB) 6/22/44 –In an email to counsel and ravan219@charter.net, dated 2/06/05, Vogelsang wrote, "You may want to speak to Alfred Leamon, former police officer and detective in Greer. Lives off Augusta Road in Greenville. Wants to help. Dwight's first cousin. Wonderful man. Knows instability of family history on Mary's side. But never knew Chris. Knew about Maureen… Uncle Bryant used to stay with him and his wife to escape Mary, his mother. Mary was men and evil. Threatened to catch house on fire. Daisy was a street runner. They stayed with Alfred when they first returned from Germany because Mary would not let them stay with her. They can't believe Dwight never brought Chris around. They are a loving, warm family and their three children have turned out well. All graduated from college. One was a police officer. Alfred is now in property management. He was at the Greenville Police Dept. for one year and Greer for about 15. Think about letting Marj compare the two families."
- **Ozella Leamon –** wife of Alfred Leamon
- **Jonathan Lee** – friend of Chris who may have known about Miranda's abortion. His name and phone number appear in Jan's interview with Daisy dated 5/20/04. Jonathan was younger than Chris and Chris guesses he was 15 when Chris was arrested. They were both into remote control cars. They had a mutual friend, **Max Dodson**, who lived in Greer. Jonathan lived near Chris.
- **Manfred and Anne Marie Leis** – Daisy's maternal uncle and aunt
- **Otto and Marguerite Leis**  - Daisy's maternal grandparents who raised her**,;**
- **Anita Leis –** Daisy's same-age maternal aunt who was raised alongside Daisy in Germany
- **Andrea Leis -** Daisy's younger maternal uncle (full sibling of Anita Leis) who was raised alongside Daisy in Germany.
- **Dylan Lucas -** a friend in Columbia; they were classmates. **Dylan** lived in the Olympia area, on Texas St. They met in the neighborhood. He was the best friend Chris ever had. Dylan lived with his mom, Mrs. Lucas. She worked as a waitress at a diner. They met when Chris was in 7th grade and Dylan was in 8th grade. They rode their bikes all over the place.
- **Hank Mims –** Dwight's friend
- **Barbara Nell** in Gettysburg
- **Nicholas** (lnu) was a childhood friend when they lived on Osmond Dr. Nicholas lived in the Oak View housing project. It's a war zone over there. It was getting bad when Chris lived in the area.
- **Stephanie Parker**
- **Robin –** co-worker of Daisy at JC Penney

- **Sabrina –** works for attorney Richard Warder.
- **Marc Sanders** was another friend; they met while playing videogames at the mall. Chris went to Marc's house. Marc had nice parents. His father's name was Marc Sanders, Sr. Marc disappointed Chris once by stealing a CD from Chris' bedroom. He said he borrowed it but he did so without asking which is theft. Marc was a drinker and smoked marijuana. Marc blamed Chris when his parents found his pot and alcohol. Chris learned not to trust Marc. Chris last spoke to Marc in 2003. They were going to rent an apartment together but then Chris found out Marc blamed Chris for his drugs and alcohol and decided he didn't want to room with marc anymore. They never spoke again. Marc's birthday is in April and he's a year older than Chris.
- **Uwe and Sylvia Scheller –** Chris's maternal half-siblings; Daisy's children from her first marriage.
- **Uwe Scheller, Sr**. - Daisy's first husband.
- **Carol Schmid –** Dwight's girlfriend.
- **Rev. Donald Ray Smith**
- **John Heney (?) Smith** – doctor
  - **Hans Seifert –** Daisy's third husband; Chris's first stepfather. When I asked Chris about him, I learned the following: "Hans was a in sex ring. He was a pseudo-ambassador." He ran an escort service out of Charlotte, NC, where Hans now lives. Chris found out about the escort service when he found some brochures for the business in Hans' closet. When Chris told Daisy about it, she didn't believe him.[17]He also showed the nude photos to

---

[17] When Daisy described her marriage to Hans, she said he was away in Germany for the first three months she and Chris lived in his house on Sanderling Rd. in Summerville. She said it was a beautiful mansion and Chris enjoyed the neighborhood, too. When Hans returned from Germany shortly before Christmas, they married. On New Year's Eve, they had a party and invited hundreds of people. Daisy invited a young, blond woman from her salon to come to the party. Hans took a liking to the girl who was about 19 at the time. They danced together all night. After the party, Daisy stayed up cleaning the house until about 3:00 a.m. When she finally went to bed, Hans told her he was a swinger and showed her some nude photographs of a young woman with extremely large breasts, and an older, overweight married couple. Daisy was shocked and disgusted and told Hans she wanted nothing to do with his swinger lifestyle. The next day she called a lawyer. She and Hans had only been married two weeks and Daisy thought about an annulment but her lawyer recommended seeking a divorce instead so she could sue Hans for half of his estate which was very large. Daisy declined to sue Hans but did seek a divorce. Hans offered to pay her $10,000.00 and call it quits. Daisy agreed. By then, Daisy was living with Rodney. She had dated Rodney for a couple of years prior to meeting Hans. Hans was very wealthy and Daisy thought he was a much better catch than Rodney so she married Hans. However, after Hans' true colors emerged, she called Rodney and told him she had made a mistake. Rodney took her back right away. Rodney and Chris then moved into Rodney's apartment until Daisy could find a place of her own. Daisy and Rodney dated for a total of five years before they married in 1999.

his tutor, Rebecca (lnu). Rebecca said she wasn't surprised because Hans had made passes at her before.

➢ Hans hired a private investigator to follow Rodney and Daisy to Myrtle Beach. The investigator ransacked their hotel room. Hans was a very successful German businessman and knew lots of influential people. Hans could easily have hired a thug to intimidate Daisy and Rodney. Chris was just glad they weren't hurt.

➢ Hans never molested Chris, though Daisy wanted Chris to accuse him so she could try to sue him.

➢ Hans was a "disgusting individual". He table manners were atrocious. He burped and passed gas at the table which Chris found appalling. Chris sat down on his bed one day and quickly realized it smelled horrible. He looked at the spread and saw brown stains which indicated Hans had soiled the covers. However, Chris never hated Hans. He may have said he hated him when he was a teenager but Hans was very generous to Chris and never harmed him in any way. He just couldn't stand Hans' personal habits.

- **Erika Leis Shedd** – Daisy's mother who abandoned her as an infant in Germany; Erika Leis married Harold Shedd, a white US soldier she met in Germany, and came to the U.S., leaving Daisy behind. Mrs. Shedd was later (during the PCR mitigation investigation) very easily traced to Twin Falls, Idaho. There was no effort made by the mitigation specialist, social historian or trial counsel to interview her by phone or in person.  This was a critical mistake for many reasons. For one, per the history of circumstances surrounding Erika's becoming pregnant with Daisy, she (Daisy) may have been impacted in utero by alcohol also.

- **Harold Shedd** and his children by Erika Leis Shedd, **Charlene, Kathy and Sandra, and Jeffrey Shedd** all of whom lived in the US in 2003-05.

- **Sheila** - Daisy's coworker at JC Penney.

- **Ms**. **Sinclair** – Chris's 2nd grade teacher at Brook Glenn Elementary School. She encouraged Chris and was very "nice".

- **Emily Smith** – 1st grade teacher at Brook Glen Elementary School where Chris was evaluated and placed in ESE classes

- **Kevin Smith, M.D. –** family doctor

- **Mary Snipes' father, mother and sisters** - Vogelsang made a note that Mary hated her father and sisters and she created a handwritten genogram showing their names but no attempts to contact them were made. If they are deceased, no record of their deaths is apparent in the file.

- **Phyllis Spain** and her kids, **Sean, Lena and Cedric** were neighbors. Chris visited the Spain household fairly frequently after school.

- **Ms. Thompson** - a teacher who pinched CCW's arm in 7th grade.

- **Richard Warder** – attorney who handled Daisy and Dwight's contentious divorce.

- **AC Williams** – Paternal grandfather. Was in Thailand in WWII; "shell shocked" from service; mental health problems; 3rd grade education; cried all the time as a

baby. He died in 2007 but Vogelsang could have interviewed him in 2004-05, but did not.

- **Miles Williams –** paternal uncle. He lived with Chris and his family at one point. He has two children, Demetrius and Lisa. Chris told Vogelsang that Miles had a "split personality".
- **Mary Woods -** principal at Brook Glen Elementary School where Chris was evaluated and placed in ESE classes
- **Wallace Workman**

85. One of the roles of the mitigation specialist is to form and maintain rapport with the client and his family before and during his trial. In this case, Vogelsang succeeded in alienating both the client and his mother. When we asked Chris for his impressions of Vogelsang, he said he liked her initially but eventually felt that Vogelsang "blamed" his mother far more than was fair, especially considering the brutal abuse Dwight inflicted upon Daisy. Chris said Vogelsang made the remark that "this is the worst case of child abuse I have ever seen in my life." Chris disagrees and said in fact he was not physically abused nearly as badly as his mother, for example. Chris sees Daisy as the victim in her relationship with Dwight. Chris also grew to distrust Vogelsang because of what he perceived as unnecessary, unsolicited, subjective, negatively biased remarks Vogelsang made about his mother. He said, "Mom had a drinking problem but Jan seemed to think she was the worst mother in the world. Jan was very biased against Mom whereas she had nothing bad to say about Dwight. Dwight is a monster… Dwight ran over our dog, Susie, and then threw her in the woods. I mean who does that? Dwight said it was an accident but who throws their dog in the woods if they accidentally hit the dog? Dwight is a monster."

86. According to Dr. Dudley and Ms. Leonard, "During an interview, it is important to be fully attentive—to put aside your personal worries, assumptions, and biases—and to listen deeply to the person being interviewed. Judging and placating are also barriers to deep listening and establishing a relationship with life history witnesses."[18] Vogelsang failed in this regard.

87. Daisy said she initially liked Vogelsang, too. During their first interview, Dwight was present but in subsequent interviews, Daisy and Vogelsang met privately. Daisy told Vogelsang "everything" regarding her alcoholism, work, motherhood, marriages, etc. Vogelsang said to she had a friend from Russia who drank constantly and Vogelsang saw

---

[18] Dr. Richard Dudley and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*. 36 Hofstra L. Review. 883 *passim* (2008)

nothing wrong with it. Daisy reported that Vogelsang never mentioned fetal alcohol syndrome to Daisy at all. She was confused when Vogelsang made this remark and doesn't know why Vogelsang did so.

88. Eventually, Vogelsang told Daisy that Chris was "a spoiled brat." Daisy acknowledged that she never disciplined Chris other than the occasional time-out and that he was in fact spoiled. Daisy reports that Vogelsang said to her, "Do you know what they do to spoiled brats?" Daisy said, "What?" Vogelsang said, "They execute spoiled brats." The remark shocked Daisy; she immediately began crying and had a panic attack on the spot (this conversation occurred in John Mauldin's office). The employees in the office next door comforted Daisy and gave her a ride home. After that, Daisy wanted no contact with Vogelsang and there never was any further contact between them.

89. Though Vogelsang was informed almost a year before trial[19] that Daisy drank excessively during her pregnancy with Chris, and though she identified this as a "harmful risk factor",[20] Fetal Alcohol Spectrum Disorder (FASD) was never contemplated as a mitigating factor in Chris's capital defense at trial.

90. Even without the FASD diagnosis, Vogelsang failed to identify excessive maternal alcohol consumption during pregnancy as the trigger for a series of follow-up interviews relative to Chris's adaptive functioning. It is well-known that people whose mothers drank excessively during pregnancy often score in the average range of intelligence on IQ tests, and thus, to prove deficits in this area, one must prove deficits in adaptive functioning. "Children with fetal alcohol syndrome (FAS) and other alcohol-related diagnoses that fall under the umbrella term of fetal alcohol spectrum disorders (FASD) have multiple neurobehavioral impairments that affect occupational performance and participation. These primary neurobehavioral impairments include deficits in cognition, communication, learning, sensory-motor abilities, and executive functions that are associated with the teratogenic impact of prenatal alcohol exposure (Connor & Streissguth, 1996; Mattson & Riley, 1998; Osborn, Harris, & Weinberg, 1993; Rasmussen, 2005). Significant adaptive, social, and behavioral problems also are

[19] Chris's father, Dwight, told Vogelsang in an interview dated 3/18/04, that Daisy consumed copius amounts of alcohol during her pregnancy with Chris even though Dwight warned her that alcohol consumption might be harmful to the developing fetus. Daisy herself has never denied drinking excessively during pregnancy. Vogelsang makes a note dated 5/31/04 that both parents drank "everything" and smoked marijuana during Daisy's pregnancy with Chris. Vogelsang and counsel knew this was a fact worth mentioning and Hammock testified to it but for reasons no one can explain (certainly no strategic reason has ever been identified or is even conceivable to this writer), the jury never knew that Chris has practically no corpus callosum and other deficits due to FASD.

[20] The fourth item on Vogelsang's list of "Preliminary Accumulation of Harmful Risk Factors" is, "Mother drank and smoked throughout pregnancy".

described that indicate the challenges children with FASD face in their daily functioning in the home, school, and community (Olson, Morse, & Huffine, 1998; Roebuck, Mattson, & Riley, 1999; Thomas, Kelly, Mattson, & Riley, 1998; Whaley, O'Connor, & Gunderson, 2001). High rates of secondary disabilities later in life, such as failure in school, decreased independent living, substance abuse, and employment problems further reveal the persistent and lifelong functional challenges that individuals affected by prenatal alcohol exposure experience (Streissguth et al., 2004)"[21] National practice standards dictate that as soon as the mitigation specialist in a capital case learns that her client was exposed to alcohol in utero, the mitigation specialist immediately begins asking relevant questions of everyone who had the opportunity to observe her client since birth. In this case, we know that Chris's sister, Maureen, identified an awkward gait which caused Chris to fall so frequently as a child that she thought he should wear a helmet.[22] Upon hearing that Chris fell frequently as a child, a competent mitigation specialist would immediately begin to ask questions relative to brain injuries resulting from frequent blows to the head. In fact, Vogelsang knew that Maureen had hit Chris in the head with a hammer when Chris was a small boy, and in fact he suffers brain damage thought to be the result of such a blow. A mitigation specialist who is confronted with a history of head trauma then knows to ask questions relative to Traumatic Brain Injuries (such as, Did he suffer from depression or anxiety? Did he ever suffer loss of consciousness? Did he ever have double vision? Was his speech ever impaired? Was he ever dizzy? Was his personality ever different after a fall or a head injury? Was he ever taken to the doctor after suffering a fall or head trauma?) Vogelsang also knew that Chris had corrective eye surgery as a child and this, too, was evidence of FASD. Chris had also been diagnosed with ADD/ADHD and medication (Ritalin) had been recommended by educators. ADD/ADHD is a common diagnosis in alcohol exposed children. We also know he performed poorly in school and was identified as learning disabled – another commonality with alcohol exposed children. There were many clues that FASD and TBI were two important mitigating factors in this case – in fact so many that one simply scratches one's head in amazement that no one on the defense team ever "connected the dots".

91. Vogelsang failed to request Chris's birth records (including his birth certificate) which would have included the name of the doctor who delivered him, a doctor who could have been interviewed and asked if he suspected the mother, Daisy, was drinking during pregnancy. Daisy says she has not been sober since she was 6 years old and therefore it is worth asking if Daisy ever went to prenatal appointments under the influence of alcohol (counsel testified at the PCR hearing that she was inebriated when she visited the law offices of John Mauldin). We know Dwight was inebriated when Chris was born[23] and

---

[21] "Children with fetal alcohol spectrum disorders: A descriptive profile of adaptive function", Tracy Jirikowic, Deborah Kartin and Heather Carmichael Olson. October 2008. Revue Canadienne D'Ergotherape, Num. 4, Vol. 75

[22] Vogelsang interview with Maureen Bangcuyo dated 5/31/04.

[23] Documented in Vogelsang's interview summary dated 5/31/04 in which Maureen Bangcuyo told Vogelsang that Dwight was drunk when Chris was born. This one interview summary

perhaps Daisy was, too. Perhaps the doctor would have remembered but no one ever asked. Vogelsang did obtain pediatric records that clearly showed a remarkable difference in height and weight growth percentiles at age 10 months (growth retardation) and other indicators of FASD previously mentioned (i.e., ADD/ADHD).

92. According to Maureen, Daisy was struck by Dwight and fell on the floor many times during pregnancy with Chris. Maternal beating during pregnancy causes the secretion of hormones such as Cortisol which affect the fetus. Vogelsang knew that Daisy had suffered a miscarriage related to beatings sustained during a prior pregnancy (before Chris was born). Maureen told Vogelsang that Daisy constantly warned Dwight not to beat her lest she have another miscarriage.[24] Since the 1990's, researchers have known that mothers who experience trauma during pregnancy transmit harmful hormones to the fetus. Yet, again, Vogelsang fails to explore this mitigating circumstance. The experts in the case who would have been prepared to opine regarding the effects of trauma on a developing fetus were never made privy to this one important detail among many others.

93. The jury in this case was never told that Chris's exposure to violence began in utero and continued every day of his life until his arrest. The jury never heard that prison is the safest place Chris would ever live. The jury never heard that people with the same brain anomalies as Chris function best in highly structured environments like prison. The jury never heard that one of the reasons Chris performed so poorly prior to his incarceration was because he was immersed in a very unstructured, chaotic environment physically, emotionally and mentally.

94. Remorse is a critically important mitigating factor that was never presented in spite of the fact that counsel received letters of remorse from the client. For example, Chris wrote a letter of remorse to Dr. Halleck in August 2004 (the transcript of the letter is below); this letter does not appear in Dr. Halleck's records but instead was found in trial counsel's files. It seems Chris gave this letter to his lawyers to mail to Dr. Halleck but the letter was never mailed.

"Dr. Halleck,

"It has been a few weeks since the last time we spoke and I wanted to write you and tell you some of the feelings and thoughts that I had on my mind. The problem I have is one of extreme guilt and shame that I have suffered from since this ordeal unfolded. What I want to tell you is that over the time I have been at the Detention Center it has been a more or less constant struggle to accept the fact that I have changed so many people's lives in so many ways and that those lives are forever changed. I wanted to tell you that despite what everybody thinks is my viewpoint on the situation I can honestly tell you that it would be impossible for me to ever completely say how sorry I am for the

---

contains so many mitigating factors that an experienced mitigation specialist could have anticipated an entire capital defense based on this one interview alone.

[24] Interview with Maureen Bangcuyo n 5/31/14.

things I've done. For the longest time I have realized that Maranda's family has suffered a tremendous loss and also the fact that there is nothing I can do to ever make up for those losses.  I guess my main focus is how if there could be a way to bring her to the people who love her the most. I wish in some way, shape or form I could trade my life for hers and bring her back to her rightful place in this world. I can never fully forgive myself for the things that I've done no matter what may happen in the future because I have so many guilty feelings and have hurt so many people. It also puts a great pain in my heart that I have hurt someone that I love so much. What I really want to get across is this sympathies that I have for all her loved ones. The fact that Maranda is gone forever is a very painful concept to fully grasp and understand but the issue that is harder for me to accept is the reality of the family that has to try and resume their lives as best they can without a significant loved one there to fill the gaps they once did. Every day I think about how it will never be the same for them as it is for me. I cannot imagine the impact this has had on them, from her mother to father, but mostly her daughter. I couldn't imagine trying to explain to someone so young and innocent the reason why their mother isn't going to be a part of their life anymore. It was so selfish of me to take Maranda away from her daughter and I don't think I will be able to forgive myself for that reason alone. Now because of me there is no longer that person who brought joy into people's lives, there is only an empty space now. I wish they still had the opportunity to spend time together like they used to but unfortunately that will not be able to happen. Every day I have lived with these thoughts and they only get worse as time progresses and I don't think that I will ever be able to live with myself for these things I have done. If there was any possible (sic) I could trade my life for Maranda's I would have done it long ago. She is in a place where she doesn't belong. I know there is nothing that I will ever be able to do to make up for or undo so the world could go back to its natural pace and be devoid from the pain that life should never give anybody. I reach out to her every day and try to tell Maranda all the things I am telling you and tell her there is nothing I would not do to bring her back even [if that] meant trading my life for hers I would gladly do it without hesitation. I am so sorry for all the people that I've wronged and the lives that have fallen apart. All I can do is try to express how sorry I am and hope you see that this is a very sad situation. I will keep reaching out to her and hopes of someday having forgiveness given to me, so long as she keeps listening to me I will never stop trying. Chris"

95. Remorse is well known to be one of the most mitigating factors to capital jurors, and a lack of remorse is considered aggravating. No mention of remorse appears in Ms. Vogelsang's notes or in Ms. Hammock's testimony to the jury. Studies originating in South Carolina indicate that remorse is considered mitigating under South Carolina law. "Although South Carolina law does not list remorse as a mitigating circumstance, a capital defendant nonetheless enjoys a constitutional right to proffer in mitigation "any aspect of [his] character or record and any of the circumstances of the offense. Along

with most, if not all, other jurisdictions, South Carolina accordingly appears to treat remorse as a mitigating factor in capital-sentencing proceedings."[25]

96. The Capital Jury Project has studied death-qualified juries in the United States for decades. In 2004, John Blume, created a survey of significant Capital Jury Project findings, among which are findings concerning capital jurors' thoughts on remorse.

97. "Juror's perceptions of the presence or absence of remorse plays a pivotal role in juror's decisions to vote for life or death.[26]

98. "A juror was apt to respond to the remorseful defendant not only with good will, but also without fear or disgust, both of which tended to recede in the face of the defendant's remorse." [27]

99. "Lack of remorse is highly aggravating.  Almost 40% of jurors were more likely to vote for death if the defendant expressed no remorse for his offense. "Indeed, in terms of aggravation, lack of remorse was second only to the defendant's prior history of violent crime and future dangerousness. Jurors key in on this without prompting from the State."[28]

100.      "All things being equal, remorse does make a difference…Aside from the seriousness of the crime and the defendant's future dangerousness, no other factor plays a greater role in capital sentencing than remorse.  In short, jurors show no mercy to those who show no remorse."  "If jurors believed the defendant was sorry for what he'd done, they tended to sentence him to life imprisonment, not death." And, conversely, "if jurors

---

[25] Eisenberg, Theodore, Stephen P. Garvey, and Martin T. Wells. "But was he sorry? The role of remorse in capital sentencing." *Cornell L. Rev.* 83 (1997): 1599.

[26] Blume, John H. "An Overview of Significant Findings from the Capital Jury Project and Other Empirical Studies of the Death Penalty to Jury Selection, Presentation of Evidence and Jury Instructions in Capital Cases." *Cornell Law School* (2004).

[27] Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26 (2000).

[28] Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?* 98 COLUM L. REV. 1538, 1560  (1998).

think the defendant has no remorse they are more apt to sentence him to death."[29]

101.     "The more preparation, and planning, premeditation etc. jurors thought went to the crime, the less likely they are to believe that the defendant is sorry and the less likely they are to believe "belated expressions of remorse." Not surprisingly, jurors are more likely to believe a defendant is remorseful if the defense he mounts emphasizes his minor role in the crime or otherwise reduces his responsibility.  The less planning, the more remorse, etc.  Jurors were more likely to think a defendant was remorseful if he appeared "uncomfortable or ill at ease."  The same is true if the jurors detect a change in his mood or attitude after the guilty verdict.   But, if the defendant looks bored, jurors are not likely to think the defendant is sorry."[30] In this case, Chris Williams had to be removed from the courtroom after the victim's family members gave their impact testimony because he was so distraught, openly crying inconsolably, and could not regain his composure. Yet no one ever mentioned his remorse to the jury.

102.     "And, while having the defendant speak is often dangerous, "in general jurors are more likely to think a defendant is remorseful if he speaks on his behalf than they are if he says nothing."[31]  It is not known to this writer whether Chris wished to address the jury. However, his letter to Dr. Halleck would have been permissible evidence had it been introduced through Dr. Halleck who testified.

103.     In addition to those items previously stated in this affidavit, Vogelsang identified the following mitigating factors but never pursued any of them:

104.     Hammock testified that Chris's father, Dwight, had a "serious stuttering problem" but this was never explored. Stuttering may indicate an underlying anxiety disorder. We know Dwight grew up in a household marked by domestic violence so it follows that he may have been anxious. Yet, the jury was never told how chronic anxiety can impact a person like Dwight throughout life and especially in their adult relationships, including relationships with their children.

105.     Vogelsang noted that Chris said a boy down the street "made [him] do things".

106.     Daisy tried to catch Priscilla Bruton's grass on fire when Chris was 8-9 years old. Chris watched from the car.

---

[29] Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Mitigation Means Having to Say You're Sorry: The Role of Remorse in Capital Sentencing,* 83 CORNELL L.REV.1599, 1617 (1998).

[30] Ibid.

[31] Ibid.

107.     Chris was beaten at YMCA (by another boy – a bully) when he was 11 years old. Said he was beaten so badly, he would rather have died.  (This is yet another un-explored opportunity for TBI, as were hits that occurred in karate and Maureen's telling Vogelsang that Chris had "an imbalance" as a child and that he "walked with an odd gait". This was known to Vogelsang (her notes) but not utilized in any way.

108.     Frequent moves by the defendant's family during the defendant's youth are used to show the chaos that often characterizes a capital client's unstable home. Presumably, there were reasons for each move and some moves would have necessitated a change in schools but this information was not adequately developed. The jury heard nothing about the neighborhoods in which Chris lived with his mother after his parents divorced. No list of residences was ever presented to the jury but would have been as follows:

- Osmond Dr., Taylors, SC
- Bent Oak Apts., Greer, SC
- Green Tree Apts., Taylors, SC
- Cliffwood Terrace Condos, Taylors, SC - Chris started drinking in 1998; he always knew when to stop. He started smoking cigarettes when he was 12 or 13 years old.  He never needed alcohol the way Daisy did. She craved it and wanted it in a way Chris never experienced. He first became aware of his mother's drinking problem when they lived on Cliffwood Terrace in Taylors, SC, in 1994-95.[32] During that time, he had virtually no supervision and could stay out late at night without arousing his mother's attention. Cliffwood was their first long-term location after a long succession of moves.[33] He had very little parental supervision then. He became mischievous.
- 102 Sanderling Lane, Mauldin, SC – Chris lived here with Daisy and Maureen for a few months when she and Hans Seifert were married.
- 711 Maryland St., Columbia, SC (lived with Maureen and her husband for a time when Chris was in the 8th grade.
- 506 Waxford Way, Simpsonville, SC

109.     "Mo [mother?] died from malnutrition."  This statement appears in Vogelsang's notes of her interview with Mary Snipes.

110.     "Husband sexual to 8-year-old girl."  This statement appears in Vogelsang's notes of her interview with Mary Snipes; it is unclear if "husband" refers to her husband, AC Williams, or someone else.

---

[32] The crime statistics in the Wade Hampton area of Taylors, SC, indicate that this area is among the least safe places to live in Taylors, SC.
https://www.neighborhoodscout.com/sc/taylors/crime/

[33] Chris is going to create a list of residences where he lived from infancy until his arrest; he will give the list to Jan the next time they meet.

111.     First cousins killed each other by accident. Kenneth Smith killed Gofus Jr. when Dwight was 7 months old? This statement appears in Vogelsang's notes of her interview with Mary Snipes.

112.     One of Mary Snipes' sister's children was in prison; for what? who? where? how long?

113.     AC (Alvin Charles Williams) was "shell shocked" from service (showing a family history of PTSD).

114.     Bryant Williams had a seizure disorder (showing a family history of brain disorders).

115.     Chris went to summer school every year (he would have been retained in every grade had he failed ot go to summer school).

116.     Dwight's mental health history, part of which was noted in Vogelsang's notes as follows (these would have demonstrated vividly to the jury just how mentally disordered Dwight Williams was in the years when Chris was 12-16 years old):

- 8/3/92-12/6/93 Admission crisis management; low tolerance for insight; Major Depression, PD NOS with depressive and passive aggressive traits.
- 8/10/92 – 20 years he and wife mutually physically abusive. Feelings of hatred toward son and Daisy. Up all the time.
- 8/17/92 – M put him out; drinking back in house with wife who acted out. (M=Mary?) Rel. patterns man wife girlfriend.
- 11/3/92 – C has two sessions; attendance erratic. Called Crisisline recently threatening to kill family and himself.
- 1/11/93 – Crisisline call. Says wife ruined his life. No one should suffer pain he is feeling.
- 1/27/93 – Still obsesses about wife, Daisy. Remains addicted to his wife. Admitted to HPH.
- Pt. depressed, suicidal. Living in van. Patrick Harris – call from hospital – did not show.
- Often does not show up or arrives late.
- 5/3/93 – Has a passivity which leads him to be victimized.
- 5/4/93 – Picked up meds.
- 6/25/93 – Reports feelings of hatred, manipulative, promiscuity, lack of _____.
- 3/1/94 – Going thru divorce. Drinks to cope. Suicide thoughts. No means. No sleep 3 days. Almost went to jail for almost hitting a drunk lady.
- 5/19/94 – Carol [Schmid] took him back in.
- 8/23/94 Crisis – can no longer stand pain of last four years. Previous suicide attempts 8 weeks earlier. Plan to OD today. Refused suicide contract. Ended call.
- 5/22/95 – Crisis phone call; OD's twice last year.

36

117.    Daisy called the police on Dwight 14 times, according to Mary Snipes, but the 911 dispatch records were never obtained or requested. (Please see item 75, intra.)

118.    Chris's parents were not responsive to the schools' efforts to arrange and provide special education services for Chris. Daisy and Dwight canceled parent-teacher conferences repeatedly, and disrupted educators' goodwill attempts to provide Chris with assistance. Chris's sister, Maureen, often attended parent-teacher conferences instead of Chris's parents.

119.    While Hammock lists the diagnoses given to Dwight, Daisy, Maureen and Chris, she never develops this as a theme. The jury never heard what it was like on a daily basis for Chris who is himself mentally ill to be was raised by mentally ill parents, with a mentally ill sister, and was sexually abused by a mentally ill uncle whose mother (Chris's paternal grandmother) was also mentally ill, for example. Nor were jurors informed as to the impact each family member's mental illness had on Chris's development, attachment styles, and cognitive ability.

120.    Daisy had a Xanax[34] "problem". Chris first noticed it when he and Daisy were living at Hans' house. Daisy claimed to have panic attacks. When the paramedics came to the house, they found Xanax spread all over the floor. Her behavior was very erratic.[35]

---

[34] "Among the benzodiazepines used primarily for the treatment of anxiety or panic, alprazolam (Xanax) seems to have an especially bad record. In the field of drug addiction, Xanax is the most frequently implicated psychiatric drug. Often it occurs in cross-addiction with alcohol and other sedatives. Withdrawal problems and rebound increases in anxiety and panic were so extreme in key studies used for FDA approval of Xanax for panic disorder that many or most patients had more frequent or severe symptoms at the end of the studies than before they took the drug." (Breggin, 1991, http://www.benzo.org.uk/breggin.htm)

[35] Dyscontrol is another negative side effect of Xanax, and is associated with overdose in people who are addicted to the drug. According to Dr. Breggin, "Reports that Xanax and other benzos are not usually lethal when taken alone are vastly misleading. Xanax is rarely taken alone. Why? Because as much or more than any other prescribed drug, Xanax causes medication spellbinding. It corrupts judgment, memory and self-control, so that individuals have no idea how badly they are being impaired. Eventually it erodes all mental faculties, often without the person fully grasping this loss of function. The impairment of judgment and self-control causes people to overdose on drugs or alcohol without intending to, leading to coma, cardiovascular collapse and death. The Xanax-induced memory impairment causes them to forget how many pills or how much alcohol they have already taken, again increasing the lethal risk.

"Xanax has been called "alcohol in a pill" because its effects are so similar to alcohol. However, …Xanax can be far more dangerous than alcohol. It should not be prescribed to patients with alcohol problems, because it becomes a powerful impetus for alcohol abuse.

121.    "Mother and father fought throughout pregnancy and mother was beaten." This mitigating factor was recorded on Vogelsang's list of "Preliminary Accumulation of Harmful Risk Factors" but was never presented to the jury.

122.    "Early exposure to guns, violence and threat of harm." This mitigating factor was recorded on Vogelsang's list of "Preliminary Accumulation of Harmful Risk Factors" but was never presented to the jury.

123.    "Witnessed mother's sexual behavior with other men." This mitigating factor was recorded on Vogelsang's list of "Preliminary Accumulation of Harmful Risk Factors" but was never presented to the jury.

124.    "Chris witnessed parents illegal behavior and was pressured to join them." This mitigating factor was recorded on Vogelsang's list of "Preliminary Accumulation of Harmful Risk Factors" but was never presented to the jury.

125.    "Used by mother to protect her whenever she cries rape." This mitigating factor was recorded on Vogelsang's list of "Preliminary Accumulation of Harmful Risk Factors" but was never presented to the jury.

126.    It is part of the mitigation specialist's role to recommend experts to counsel. "Competent mitigation specialists are versed in various specialties of mental health, and they assist attorneys in identifying the area(s) of mental health expertise needed in a particular case as well as advise counsel regarding the suitability of a specific mental health expert… Testifying mental health experts, counsel, and the mitigation specialist work together to ensure that the expert's findings are supported by credible evidence, the testimony is comprehensible to the fact finder, everything the expert writes and says is integrated with other evidence presented by the defense, and all of their opinions and testimony relate to the comprehensive mitigation themes put forward by the defense. This way, the development of mitigation themes is substantiated by a variety of evidence, including the findings of the mental health experts, rather than counsel seeking an expert to support the theories and themes of defense… It is common for defense teams to call upon pediatricians; neuropsychologists; school psychologists; social workers;

---

"At critical moments in their lives when individuals are suffering from serious emotional problems, their ability to deal with them is further compromised as a result of Xanax-induced medication spellbinding and cognitive deficits. In acute distress, they often have no idea what is happening to them. They have no idea how impaired they have become, they forget what they've already taken, or increase the dose, or increase or add other medications or alcohol.

"This cannot be over-emphasized: Benzodiazepines, including the worst offender Xanax, can change people so that they become no longer rational, responsible or aware of the consequences of their behavior. Whether or not Xanax intoxication specifically causes death in these cases, Xanax-induced mental dysfunction contributes to the death."
http://www.huffingtonpost.com/dr-peter-breggin/xanax-whitney-houston_b_1288122.html

psychopharmacologists; endocrinologists, who understand the effects of medical disorders on behavior; geneticists, who can assess the physical traits of Fetal Alcohol Syndrome; neurologists and neurosurgeons, who understand the effects of nerve and brain diseases; and radiologists or other experts in the interpretation of various types of scans and images, experts in child neglect, child sexual abuse and other types of childhood psychological or physical trauma, the impact of environmental factors on childhood growth and development, or substance abuse… Mitigation specialists must be familiar with all these areas of expertise, have access to resource materials on these subjects, and be prepared to assist counsel and expert witnesses in these areas. Further, they must be familiar with the potential contributions of experts such as culture brokers, anthropologists, public health officials, sociologists and criminologists, and community leaders who can support the testimony of mental health experts and contribute to the strength of the mitigation case."[36]

127.    National practice standards would have supported recommendation to trial counsel of **James Garbarino or other developmental psychologist**; Chris' brain was not fully developed at the time of this crime. He was 20 years old and therefore, the advantageous language of *Miller* regarding juvenile brain development pertains to Chris. Boys between the ages of 15 and 25 are known to be very impulsive, poor interpreters of social situations, bad decision-makers, have poor judgment, and are especially susceptible to peer pressure. They often have low self-esteem. Though these issues were not as well-developed in 2005 as they currently are, Chris would very much benefit from having a Developmental Psychologist on his case. *Roper v. Simmons* was argued in October 2004 and decided March 1, 2005, less than 2 weeks after Chris was sentenced to death. All the Amicus Briefs from *Roper* would have been available and would have been very helpful for Chris' defense strategy. (*Roper v Simmons* Amicus Briefs are available at http://fairsentencingofyouth.org/roper-v-simmons-amicus-briefs/) Vogelsang mentions Dr. Garbarino in an email to Bill Nettles and John Mauldin dated 2/07/05, "We need to make decisions about visuals… How about Garbarino model that demonstrates emotional abuse and neglect?" Was this "visual" ever presented to the jury? Was counsel familiar with Dr. Garbarino?

128.    If Chris was taking Paxil or another SSRI medication in the three months between his suicide attempt in June 2003 and the crime in September 2003, then Vogelsang should have requested a **psychopharmacologist** be involved in this case. (Vogelsang makes a note in her files concerning Paxil but it appears only once and is not clear where she may have obtained the information. Chris had a suicide attempt in the months prior to the crime and therefore, if he was prescribed an SSRI medication such as Paxil, one assumes the prescription would have been noted in the records. If Chris was on Paxil at any point in the months prior to the crime, this issue was missed entirely. Paxil has been known to cause suicidal and homicidal behavior especially in teenage and young adult males. Even if he was taking it sporadically, or had not taken it in a month, this is an

---

[36] Dudley, Richard G. Jr. and Leonard, Pamela Blume (2008) "Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment," *Hofstra Law Review*: Vol. 36 : Iss. 3 , Article 12.

issue that explains Chris's unusual violent behavior (i.e., the assault in July and the murder) and his inability to stop thinking about suicide/homicide.

129.      Chris overdosed on **Klonopin** which is a benzodiazepine and reportedly belonged to his mother; had he ever used benzodiazepines before? If so, when? Were there other drugs in the house that Chris used/abused?

130.      Chris was prescribed **Risperdal** in December 2003, after the crime but this issue is never explored. How easy is it to get medication in the Greenville County jail? Do we have the jail psychiatric records? If so, were they introduced at trial? If not, why not? Chris was in isolation for 155 days in the jail; this was traumatic for Chris. If Chris was on an anti-depressant medication at any time on the months prior to the crime, this expert would have helped explain how drugs may have impacted Chris's behavior and thinking processes before, during and after the crime.

131.      Vogelsang should have recommended a **trauma** expert. Chris was exposed to a tremendous amount of trauma over a 20-year period. A trauma expert would have administered the ACE (Accumulation of Risk Factors). Instead, Vogelsang identified "risk factors" but they were not properly developed. A trauma expert could have testified the many ways trauma impacts youth (i.e., the effects of trauma may look a lot like ADD/ADHD which is a diagnosis often seen in children growing up in traumatic homes; trauma may have contributed to Chris's learning disability). Chris, Daisy, Dwight, Maureen and Alvin Williams all have/had PTSD, at least by the record. IN addition to the daily violence Chris experienced at home, he was sexually abused on an ongoing basis from 1989-90 by his uncle, Bryant, and by his mother until he was 14 years old. Chris has/had Complex PTSD[37] but this mitigating factor was barely touched. The trauma Chris experienced affects brain development, attachment styles (which impacts relationships), cognitive ability, ability to respond appropriately in social settings, etc. Trauma was a central mitigating factor in this case but has never been properly assessed and explained by a trauma expert. According to Kathy Wayland, a nationally respected trauma expert, "…many barriers to developing trauma histories arise from limitations in the knowledge and skills of defense teams. In this area, problems may include lack of a comprehensive understanding of the dynamics and effects of trauma; failure to fully investigate and assess the wide range of experiences, responses, and symptoms that must be included in a comprehensive trauma history; and failure to integrate that history in the context of existing psychological literature in order to explain its significance for a particular client. Barriers also arise when the defense team is not fully educated about the

---

[37] "Complex PTSD is a condition that results from chronic or long-term exposure to emotional trauma over which a victim has little or no control and from which there is little or no hope of escape, such as in cases of: domestic emotional, physical or sexual abuse."

unique aspects of their client's cultural background and the implications that has for social history investigation and mental health evaluation."

132.    Vogelsang should have requested a Learning Disabilities (LD) expert. Chris took the driver's test 5 times and passed it on the 6th try. He failed 1st grade and dropped out in 9th grade at age 17 years. He received special education services as a child. Dr. Evans noted that he had "Atypical LD". This expert could have testified to the importance of staying in one school, and having good parent-teacher relationships. This person could have testified to the bullying Chris endured in school that may have been directly related to his learning disabilities.

133.    Vogelsang should have recommended an **Adult Children of Alcoholics expert**. Both of Chris's parents were alcoholics and alcoholism is recognized as a family disease. Chris Williams is the adult child of alcoholics. A qualified expert in this area would have been able to explain the following traits of adult children of alcoholics:

    a.  "Many of us [adult children of alcoholics] found that we had several characteristics in common as a result of being brought up in an alcoholic or dysfunctional household. We had come to feel isolated and uneasy with other people, especially authority figures. To protect ourselves, we became people-pleasers, even though we lost our own identities in the process. All the same we would mistake any personal criticism as a threat. We either became alcoholics (or practiced other addictive behavior) ourselves, or married them, or both. Failing that, we found other compulsive personalities, such as a workaholic, to fulfill our sick need for abandonment.

    b.  "We lived life from the standpoint of victims. Having an overdeveloped sense of responsibility, we preferred to be concerned with others rather than ourselves. We got guilt feelings when we stood up for ourselves rather than giving in to others. Thus, we became reactors, rather than actors, letting others take the initiative. We were dependent personalities, terrified of abandonment, willing to do almost anything to hold on to a relationship in order not to be abandoned emotionally. Yet we kept choosing insecure relationships because they matched our childhood relationship with alcoholic or dysfunctional parents.

    c.  "These symptoms of the family disease of alcoholism or other dysfunction made us "co-victims", those who take on the characteristics of the disease without necessarily ever taking a drink. We learned to keep our feelings down as children and kept them buried as adults. As a result of this conditioning, we confused love with pity, tending to love those we could rescue. Even more self-defeating, we became addicted to excitement in all our affairs, preferring constant upset to workable relationships." http://www.adultchildren.org/lit-Problem

134.    A competent mitigation specialist would have recommended a Fetal Alcohol Spectrum Disorders (FASD) expert. The jury needed to understand all the subtleties associated with FASD (see below). The neurologist (Dr. Richards) suggested autism like features in Chris that might relate to FASD. At the very least, FASD makes Chris much

less culpable and is a problem for which he bears no responsibility. His mother drank excessively while she was pregnant with him; this is one of those mitigating circumstances that is worth its weight in gold because jurors care about brain dysfunction that is outside the client's control.  A FASD expert would have been able to explain to the jury that:

a. "If the facial characteristics are not visible, the child may not get a diagnosis of FAS, but may have the same neurological symptoms and behavior challenges as children with full FAS. Only about 20% of affected children receive a diagnosis of FAS. The other 80% have partial FAS or Alcohol Related Neurological Disorder (ARND). Together FAS and ARND make up the broad category called Fetal Alcohol Spectrum Disorders (FASD)…

b. "Most infants with FASD are irritable, have trouble eating and sleeping, are sensitive to sensory stimulation, and have a strong startle reflex. They may hyperextend their heads or limbs with hypertonia (too much muscle tone) or hypotonia (too little muscle tone) or both.38 Some infants may have heart defects or suffer anomalies of the ears, eyes [Chris had eye abnormalities], liver, or joints.

c. "Most children with FASD have developmental delays and some have lower than normal intelligence. Only 15% of children with FASD have an IQ under 70. Most children with FASD have IQ in the normal or above normal range [this is true of Chris].

d. "The most serious characteristics of FASD are the invisible symptoms of neurological damage from prenatal exposure to alcohol. These symptoms persist into adulthood and include the following [bold type indicates present in Chris]:

- **Attention deficits**
- Memory deficits
- **Hyperactivity**
- **Difficulty with abstract concepts**
- Inability to manage money
- **Poor problem solving skills**
- **Difficulty learning from consequences**
- **Immature social behavior**
- Inappropriately friendly to strangers
- **Lack of control over emotions**
- **Poor impulse control**
- **Poor judgment**

e. "These symptoms are not just "behavior problems" but are "soft signs" - symptoms of permanent, unchanging damage to the brain (static encephalopathy) and are *not within the child's control*. Although *psychological factors such as abuse and neglect can add to the intensity of the problems*, the behaviors should be viewed first and foremost as a result of brain damage from alcohol.

f. "Adults with FASD have difficulty maintaining successful independence. **They have trouble staying in school, keeping jobs, or sustaining healthy relationships**. They require long-term support and some degree of supervision in order to succeed."

g. "Without appropriate support services, these individuals have a high risk of developing secondary disabilities such as **mental health issues**, **getting into**

---

38 Vogelsang failed to ask Chris's mother about any of these symptoms.

**trouble with the law**, abusing alcohol and other drugs, and unwanted pregnancies.

h. "Children and adults with FASD are also quite **vulnerable to physical, sexual, and emotional** abuse." http://www.come-over.to/FAS/faschar.htm

135.    A competent mitigation specialist would have recommended a neurologist to perform a neurological examination specifically in light of a history of fetal alcohol exposure. While a neurologist, Dr. Richards, was recruited pre-trial to test Chris, the neurologist was never informed that Chris was exposed to excessive amounts of alcohol in utero. Additionally, when Dr. Richards showed enthusiasm for testing Mr. Williams using brain scan technology, Vogelsang made an improper decision to discourage Dr. Richards from doing an MRI. Vogelsang indicates in an email to attorney John Mauldin that she spoke with Dr. Richards who wanted to perform an MRI of the client in this case. She tells counsel that she discouraged Dr. Richards by "cooling his jets". In so doing, Vogelsang overstepped the boundaries of the mitigation specialist. Counsel, not the mitigation specialist, is the gatekeeper of information and decides what to disclose to experts, what tests to request, what referral questions to pose to experts, etc. While the mitigation specialist may identify several types of experts, it is counsel's job to interview experts and decide which experts to use. In their article, "Getting It Right," Dr. Richard Dudley and Pamela Blume Leonard write, "It remains the role of the core defense team, *in the person of counsel* [emphasis added], to integrate all of the facts and circumstances of the defendant's life and the crime and present a persuasive narrative of the events that encourages values of accountability over retribution, grace over vengeance, and life over death." Counsel must decide what tests each expert should perform and when, not the mitigation specialist. Counsel should speak directly with each expert in making these determinations. If Dr. Richards had been allowed to perform an MRI sooner, he would have been able to request relevant socially historical records (such as school records, for instance) but since the MRI was done after the trial began, he was never privy to the educational records and other mitigating evidence that might have informed his observations and diagnosis.

Mitigation specialists and mental health experts share information under the supervision of counsel in order to coordinate evidence. "Mitigation specialists remain in frequent contact with defense counsel, use good judgment and initiative in independently following investigative leads, and work closely with other members of the defense team in thoroughly exploring the client's life history. The defense team—particularly the mitigation specialist—anticipates that *mental health experts, once they have begun the assessment process, will identify further records and interviews for mitigation specialists to pursue and suggest additional methods of organizing the accumulating life history data*. [emphasis added]"[39]

Throughout this case, there was a communication failure that resulted in each expert not having any idea what other experts had done or were doing. It is ironic that in a case where the client's brain is damaged in the area of the corpus callosum, there would

---

[39] Dudley, Richard G. Jr. and Leonard, Pamela Blume (2008) "Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment," *Hofstra Law Review*: Vol. 36 : Iss. 3 , Article 12.

be a similar dysfunction amongst members of his capital defense team. The role of the corpus callosum is, in brief, to coordinate and share information from one hemisphere of the brain to the other hemisphere. Chris Williams' brain functions poorly in this regard, and so did his defense team. The jury was never presented with the very important mitigating factor that Chris Williams has organic brain damage due to FASD and head trauma. "Evidence of organic brain damage has become incredibly important in capital cases. There are two general explanations for why that is the case. First, the emphasis on aggravating and mitigating evidence has created a system of incentives that encourages capital defendants—both at trial and in habeas proceedings—to seek evidence that they have brain abnormalities that contributed to their crime. Second, the two leading Supreme Court cases to reverse death sentences based on ineffective assistance of counsel have emphasized counsel's failure to find and present evidence in the mitigation phase that the defendant had diminished mental functioning. As a result, habeas petitioners are increasingly presenting evidence that they suffer from organic brain damage."[40]

136.　　　A competent mitigation specialist would have recommended a sociologist. As previously state, there was no development of cultural mitigation in this case despite the fact that the defendant is a biracial, German national raised in SC. It might have been necessary to hire two sociologists in this case, one to address the mitigating factors arising from the defendant's German heritage and the other to address the challenges of being biracial in SC. As German witnesses have affirmed, Chris's mother, Daisy, endured racism in Germany as the only biracial child in an all-white neighborhood in a very racist city, post WWII Nuremburg. Her first husband was a white man who beat her while shouting racist slurs. Years later, when Daisy was drunk, she shouted similar racial slurs at Chris. Her second husband, Chris' father, is a Black American who didn't believe Chris, the defendant, was his child because he was "too white" and had blond curly hair as an infant and toddler. For the first 6 years of Chris's life, he appeared more Caucasian than African American. Chris's paternal grandmother, Mary Snipes, rejected Daisy because she was biracial. The victim's family rejected Chris (or so he believed) because he was biracial. Children in an elementary school in Greenville County SC bullied Chris and called him a "he/she" because he was biracial. In addition to developing all the relevant (and plentiful) cultural mitigation in this case, a sociologist would have been able to challenge some of Daisy's claims that excessive alcohol consumption is virtually compulsive for pregnant women in Germany. Yet, the defense team was completely silent on this important mitigating factor and appears to have been oblivious to the glaring cultural mitigation in this case.

137.　　　The opinions and statements contained in this affidavit are to a reasonable degree of sociological certainty.

138.　　　The information and sources identified in this affidavit are those normally and customarily relied upon by experts in the field of Forensic Social Work.

---

[40] Aleksandra Matuszewski, THE MISTAKEN EMPHASIS ON ORGANIC BRAIN DAMAGE IN CAPITAL HABEAS LITIGATION. AL L. Review Vol. 67:4:1217

139.      The standards applied to the facts in this affidavit are standards established and published by the profession of Forensic Social Work.


Sworn to before me this 10th
Day of February, 2017.

_____
Sara Baldwin Flynn, LCSW


_____
Notary Public for Florida

My Commission Expires: _____

arising from the defendant's German heritage and the other to address the challenges of being biracial in SC. As German witnesses have affirmed, Chris's mother, Daisy, endured racism in Germany as the only biracial child in an all-white neighborhood in a very racist city, post WWII Nuremburg. Her first husband was a white man who beat her while shouting racist slurs. Years later, when Daisy was drunk, she shouted similar racial slurs at Chris. Her second husband, Chris' father, is a Black American who didn't believe Chris, the defendant, was his child because he was "too white" and had blond curly hair as an infant and toddler. For the first 6 years of Chris's life, he appeared more Caucasian than African American. Chris's paternal grandmother, Mary Snipes, rejected Daisy because she was biracial. The victim's family rejected Chris (or so he believed) because he was biracial. Children in an elementary school in Greenville County SC bullied Chris and called him a "he/she" because he was biracial. In addition to developing all the relevant (and plentiful) cultural mitigation in this case, a sociologist would have been able to challenge some of Daisy's claims that excessive alcohol consumption is virtually compulsive for pregnant women in Germany. Yet, the defense team was completely silent on this important mitigating factor and appears to have been oblivious to the glaring cultural mitigation in this case.

139.    The opinions and statements contained in this affidavit are to a reasonable degree of certainty for practitioners in the field of Forensic Social Work

140.    The information and sources identified in this affidavit are those normally and customarily relied upon by experts in the field of Forensic Social Work.

141.    The standards applied to the facts in this affidavit are standards established and published by the profession of Forensic Social Work.

Sworn to before me this 10th
Day of February, 2017.

*Sara Baldwin Flynn, LCSW*

Sara Baldwin Flynn, LCSW
Mitigation Specialist
Forensic Social Worker

LaTonya Adams
State of Florida
My Commission Expires 10/05/2019
Commission No. FF 924537

Notary Public for Florida

My Commission Expires: 10/05/2019

49