# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# GREENVILLE DIVISION

| | | |
|---|---|---|
| Charles Christopher Williams, | ) | |
| | ) | Civil Action No.: 6:16-cv-01655-JMC |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Bryan P. Stirling, Commissioner, | ) | |
| South Carolina Department of Corrections, | ) | |
| and Willie D. Davis, Warden of Kirkland | ) | |
| Correctional Institution, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

This matter is before the court pursuant to Magistrate Judge Kevin F. McDonald's Report and Recommendation. (ECF No. 146.) Petitioner Charles Christopher Williams, an inmate incarcerated in Kirkland Correctional Institution in the South Carolina Department of Corrections ("SCDC") under a sentence of death, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. (*Id.*) The petitioner filed fifteen grounds for relief. (ECF No. 74.) The Magistrate Judge recommends that (1) the petitioner's amended habeas petition pursuant to 28 U.S.C. § 2254 be granted as to Ground Six, thereby returning him to state court for resentencing; (2) Grounds Eleven through Fifteen be dismissed without prejudice; (3) the petitioner's Motion for Evidentiary Hearing and to Expand the Record be denied; and (4) the petitioner's Motion to Stay pending the decision in *Ayestas v. Davis*, 137 S. Ct. 1433, No. 16-6795, be denied. (ECF No. 146.)

The petitioner and respondents filed objections and replies to the Report and Recommendation. (ECF Nos. 155, 156, 163, 164.) The Report and Recommendation, filed on December 11, 2017, sets forth the relevant factual and procedural background, which this court incorporates herein without a recitation. (ECF No. 146.)

For the reasons set forth below, the court **ACCEPTS** the Magistrate Judge's Report and Recommendation as to Grounds One through Ten, and **REJECTS** the Report and Recommendation as to Grounds Eleven through Fifteen (ECF No. 146). Therefore, the court **GRANTS** the respondents' Motion for Summary Judgment as to Grounds One, Two, Three, Four, Five, Seven, Eight, Nine, and Ten and **DENIES** it as to Ground Six (ECF No. 101). Consequently, the court **GRANTS** petitioner's amended habeas petition as to Ground Six (ECF No. 74). Further, as to Grounds Eleven through Fifteen, the court **GRANTS** the petitioner a stay pending exhaustion of these claims in state court. Finally, the court **DENIES WITHOUT PREJUDICE** the petitioner's Motion to Expand the Record and for Evidentiary Hearing (ECF No. 109) and his Motion to Stay pending the decision in *Ayestas v. Davis* (ECF No. 121). Accordingly, the court **REJECTS** the Magistrate Judge's Report and Recommendation as to petitioner's Motion to Stay pending the decision in *Ayestas v. Davis* (ECF No. 139).

## I.     LEGAL STANDARD

### A.  The Magistrate Judge's Report and Recommendation

The Magistrate Judge's ReportI'm j and Recommendation is made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2)(c) for the District of South Carolina. The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with this court. *See Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the Magistrate Judge's recommendation or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

### B. Summary Judgment Standard

Summary judgment is appropriate when the materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam)(brackets omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, may not rest on the allegations averred in its pleadings. Rather, the nonmoving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *See id.* at 324.

### C. Section 2254 Standard

Because the petitioner filed the petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his claims are governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320 (1997). Section 2254 "sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). For instance, § 2254 authorizes review of only those applications asserting a prisoner is in custody in violation of the Constitution or federal law and only when, except in certain circumstances, the prisoner has exhausted remedies provided by the state. *Id.*

When a § 2254 petition includes a claim that has been adjudicated on the merits in a state court proceeding, § 2254 provides that the application shall not be granted with respect to that claim, unless the state court's adjudication of the claim:

a. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
b. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Pinholster*, 563 U.S. at 181 (internal citations omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

### D. Ineffective Assistance of Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has held that this right is violated when counsel retained by, or appointed to, a criminal defendant fails to provide adequate or effective legal assistance. *See Strickland* v. Washington, 466 U.S. 668, 686 (1984). *Strickland* established a two-prong test for a claim of ineffective assistance of counsel in violation of the Sixth Amendment, under which the criminal defendant must show deficient performance and resulting prejudice. *Id.* at 687.

"The performance prong of *Strickland* requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). "[C]ounsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,'" and courts should indulge in a "'strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.'" *Burt v.*

*Titlow*, 134 S. Ct. 10, 17 (2013) (quoting *Strickland*, 466 U.S. at 689-90). "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler*, 566 U.S. at 163 (quoting *Strickland*, 466 U.S. at 694).

The standard for an ineffective assistance claim under *Strickland* in the first instance is already "a most deferential one," and "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Richter*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Consequently, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult, as the standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* (internal citations omitted) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Lindh*, 521 U.S. at 333, n. 7 (1997); *Strickland*, 466 U.S. at 689. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable... [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 89.

### E. Procedural Default

A petitioner's failure to raise in state court a claim asserted in his § 2254 petition "implicates the requirements in habeas of exhaustion and procedural default." *Gray v. Netherland*, 518 U.S. 152, 161 (1996). "The habeas statute generally requires a state prisoner to exhaust state remedies before filing a habeas petition in federal court." *Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Thus, "[a] state prisoner is generally barred from obtaining federal habeas relief unless the prisoner has properly presented his or her claims through one 'complete round of the State's established appellate review process.'" *Id.* (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999)). In a similar vein, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims

in the first instance" and has procedurally defaulted those claims. *Coleman v. Thompson*, 501 722, 732 (1991).

Absent an exception, a federal court will not entertain a procedurally defaulted claim, so long as the state procedural requirement barring the state court's review is adequate to support the judgment and independent of federal law. *See Martinez v. Ryan*, 566 U.S. 1, 9-10 (2012); *Walker v. Martin*, 562 U.S. 307, 315-16 (2011). "Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford*, 548 U.S. at 93 (internal citation omitted) (citing *Gray*, 518 U.S. at 161-62; *Coleman*, 501 U.S. at 744-51).

However, "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S. at 10 (citing *Coleman*, 501 U.S. at 750). "In *Coleman*, . . . the Supreme Court held that . . . a federal habeas 'petitioner cannot claim constitutionally ineffective assistance of counsel in [state post-conviction] proceedings to establish cause.'" *Fowler v. Joyner*, 753 F.3d 446, 460 (4th Cir. 2014) (quoting *Coleman*, 501 U.S. at 752). Subsequently, in *Martinez*, the Supreme Court recognized a "narrow exception" to the rule stated in *Coleman* and held that, in certain situations, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9. The Fourth Circuit has summarized the exception recognized in *Martinez*:

> [A] federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the "cause" for default "consists of there being no counsel or only ineffective counsel during the state collateral review proceeding;" (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim;" and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding."

*Fowler*, 753 F.3d at 461 (internal brackets omitted) (quoting *Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013)).

In the alternative to showing cause and prejudice, a petitioner may attempt to demonstrate a miscarriage of justice, *e.g.*, actual innocence, *Bousley v. United States*, 523 U.S. 614, 623 (1998); *see also Schlup v. Delo*, 513 U.S. 298, 327-28 (1995), or abandonment by counsel. *See Maples v. Thomas*, 565 U.S. 266, 283 (2012) (inquiring "whether [the petitioner] ha[d] shown that his attorneys of record abandoned him, thereby supplying the extraordinary circumstances beyond his control, necessary to lift the state procedural bar to his federal petition" (internal quotation marks and citations omitted)).

## II.    ANALYSIS

The parties were advised of their right to file objections to the Report and Recommendation. (ECF No. 146 at 101.) On January 12, 2018, the petitioner and respondents filed objections to the Report and Recommendation. (ECF Nos. 155, 156.) On February 4, 2018, the petitioner filed a reply to respondents' objection (ECF No. 163), and on the following day, respondents filed a reply to the petitioner's objection (ECF No. 164).

After reading the petitioner's objections to Grounds One, Two, Three, Four, Five, Seven, Eight, Nine, and Ten (which the court will grant in favor of respondents), the court does not find that the petitioner has made arguments sufficient to allege any error in the Magistrate Judge's

thoroughly reasoned Report and Recommendation.[1] Therefore, because the court will grant the petitioner's amended habeas petition as to Ground Six and order the petitioner to return to state court for resentencing, the court finds it only necessary to discuss Ground Six and the grounds that will be pertinent to the state court's resentencing (*i.e.*, Grounds 11-15).

**A. Ground Six**

In Ground Six, the petitioner contends that he was denied the effective assistance of counsel because his trial counsel failed to investigate and present evidence in mitigation of punishment that he suffers from Fetal Alcohol Syndrome ("FAS"). (ECF No. 108 at 22.)[2] The petitioner asserts that his condition is compelling evidence of his mental state and could have led one jury member to make a different decision at sentencing. (*Id.* at 53.)

Ground Six was essentially presented to the post-conviction relief ("PCR") court as Ground (n) in attachment II of the PCR petition (ECF No. 20-9 at 156) and was rejected on the merits by the PCR court (ECF No. 20-12 at 207-19). This claim was then rephrased and presented as Ground One in the petitioner's writ of certiorari to the South Carolina Supreme Court (ECF No. 19-17). The South Carolina Supreme Court granted certiorari (ECF No. 19-20 at 1), but later dismissed it as improvidently granted (ECF No. 19-24). As such, this claim is procedurally exhausted and ripe for habeas review by this court. *See In Re Exhaustion of State Remedies*, 471 S.E.2d 454 (S.C. 1990) ("[W]hen the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have exhausted all available state remedies."). The respondents do not dispute that Ground Six is procedurally exhausted and is ripe for review by this

---

[1] The court hereby accepts the Magistrate Judge's Report and Recommendation as to Grounds One, Two, Three, Four, Five, Seven, Eight, Nine, and Ten (*see* ECF No. 146).

[2] The court construes the petitioner's request as seeking relief from the sentencing phase of trial.

court.[3] (ECF No. 100 at 167.)

### 1. Background

The petitioner claims that his trial counsel were ineffective for failing to investigate, develop, and present evidence in mitigation of punishment that he suffers from FAS. (ECF No. 74 at 16-18.) The petitioner argues that trial counsel were deficient because they failed to recognize evidence that the petitioner suffered from organic brain damage and FAS, and therefore, conducted no investigation into those issues. (*Id.*) The petitioner argues that if presented with this additional evidence, "there is a reasonable possibility that at least one juror might have struck a different balance" at sentencing (ECF No. 108 at 26 (citing *Wiggins v. Smith*, 539 U.S. 510, 537 (2003))).

Under *Strickland*, a trial counsel's failure to conduct an "adequate investigation in preparing for the sentencing phase of a capital trial" may amount to ineffective assistance of counsel. *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). "Counsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

Counsel is not required to "investigate every conceivable line of mitigating evidence." *Wiggins*, 539 U.S. at 523. In considering the reasonableness of counsel's investigation the court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. Trial counsel's failure to make a reasonable investigation and to present this information as mitigating evidence as to whether the petitioner suffered from FAS can constitute ineffective assistance of counsel. *See, e.g. Sears v. Upton*, 561 U.S. 945, 946 (2010) (holding that evidence of brain damage was "significant

---

[3] On September 9, 2016, the petitioner filed a petition for a writ of certiorari to the United States Supreme Court that was denied on April 24, 2017. *See Charles Christopher Williams v. State of South Carolina*, 137 S. Ct. 1812 (2017).

mitigating evidence that a constitutionally adequate investigation would have uncovered.").

Counsel's decision not to investigate in a particular area "must be assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments," *Strickland*, 466 U.S. at 691. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

### a. Trial

At the outset, the court notes that trial counsel John Mauldin and William Nettles are both experienced attorneys who had worked previously on death penalty matters. (ECF No. 20-9 at 283, 341.) The record reflects that trial counsel's mitigation strategy was to present evidence of the petitioner's troubled childhood and that he suffered from mental illness. Trial counsel coordinated a defense team that included the following experts: Jan Vogelsang ("Vogelsang"), Dr. James Evans ("Dr. Evans"), Dr. Robert Richards ("Dr. Richards"), and Dr. David A. Griesemer ("Dr. Griesemer") to assist in preparation for trial and in preparing mitigation evidence for the sentencing hearing.[4] Vogelsang, a social worker, was retained to investigate mitigation evidence in preparation for sentencing. (ECF No. 74 at 16.) The petitioner maintains that, through Vogelsang's investigation, trial counsel were aware that the petitioner's mother was an alcoholic and that she drank during her pregnancy with the petitioner.[5] (*Id.* at 16). Further, the petitioner

---

[4] The record reflects that trial counsel also retained Dr. Seymour Halleck, a forensic psychiatrist who met with the petitioner for four hours and diagnosed him with Major Depressive Episode and Obsessive Compulsive Disorder. (ECF No. 20-6 at 322, 325, 328.) Additionally, the record reflects that Marjorie Hammock, a clinical social worker, prepared a bio-psycho social assessment of the petitioner in preparation of trial. (*Id.* at 262.)

[5] Notably, Vogelsang indicated that the petitioner's mother denied drinking while pregnant with the petitioner. (ECF No. 20-9 at 253.) However, the petitioner's sister and father advised Vogelsang that the petitioner's mother drank while pregnant. (*Id.* at 246.)

asserts that Dr. Evans, a neuropsychologist, who was retained to conduct testing on the petitioner, determined that the petitioner had learning disabilities and showed neurological impairments, specifically frontal lobe damage. As such, trial counsel were aware of the petitioner's possible brain damage. Dr. Richards, a general psychiatrist, examined the petitioner and diagnosed him with Bipolar Disorder and with Obsessive Compulsive Disorder. (*Id*.) Dr. Richards testified during the guilt phase of the trial about his diagnoses. (ECF No. 20-5 at 475.) The record reflects that Dr. Griesemer, a neurologist, performed an MRI and a neurological examination of the petitioner the weekend prior to the petitioner's trial (ECF No. 74 at 16-17). The record indicates that Dr. Griesemer was not provided with background information on the petitioner when he examined him. *(Id.)* The MRI of the petitioner's brain reflected a normal brain. (ECF No. 20-15 at 71.)

During the sentencing phase of the trial, the petitioner's counsel presented testimony in support of their mitigation strategy through testimony from the petitioner's father and sister, the petitioner's first grade teacher Ann Wilson, a co-worker of the petitioner's mother, and from other experts. (ECF No. 20-6 at 226, 238, 252.) Attorney Nettles also developed mitigation testimony as to the petitioner's troubled childhood through his cross examination of the state psychiatrist, Dr. Crawford, who testified, *inter alia*, that the petitioner had trouble with his parents' divorce; that his mother was an alcoholic; that he had difficulty in school; and that he had Attention Deficit Disorder but was never medicated. (*Id*. at 196-200.) As such, this is not a case where counsel completely ignored their duty to investigate background information or conducted a belated investigation.

### b. PCR hearing

The petitioner filed an application for PCR relief on November 30, 2010. The PCR court held an evidentiary hearing from January 28 to January 31, 2013. (ECF No. 20-12 at 172.) At the

PCR hearing, the petitioner's primary presentation of evidence regarding FAS was provided by three mental health experts who specialize in Fetal Alcohol Syndrome Disorders ("FASD"): Dr. Paul Connor, a neuropsychologist; Dr. Richard Adler, a forensic psychiatrist; and Dr. Natalie Novick Brown, a forensic psychologist. (ECF No. 74 at 17.) All three were members of the organization FASD Experts, which was formed in 2007 to provide a multi-disciplinary approach to evaluate individuals for FASD. (ECF No. 20-9 at 468.) The petitioner's trial counsel, William Nettles and John Mauldin, also testified at the hearing as to the issue of FAS.

**(1) Dr. Connor**

Dr. Connor testified that he specializes in clinical neuropsychology and also specializes in FASD. (ECF No. 20-9 at 463-64.) He indicated that he had been involved with the study of FASD since 1995. (*Id.* at 463.) Dr. Connor provided an overview of the history of FASD. As early as 1973, practitioners were seeing children of alcoholic women who had specific facial features, and those were the facial features that were later used for the diagnosis of FAS. (*Id.* at 470.) The three primary facial features that are usually identified with children suffering from FAS are small eyes, a very thin upper lip, and a smooth philtrum (the ridges between the nose and lip) (*Id.* at 470.) Dr. Connor testified that facial features of a fetus usually develop during the sixth to eighth week of pregnancy (*Id.* at 485, ECF No. 20-10 at 1-2.) Dr. Connor observed that in 1996 there were two main diagnoses: FAS, where all facial features existed, and Fetal Alcohol Effects ("FAE"), where there were some or no facial features (ECF No. 20-9 at 474.) According to Dr. Connor, in an effort to narrow these diagnoses into different groups the Institute of Medicine ("IOM") created five diagnoses: (1) full FAS with confirmed exposure; (2) FAS without confirmed exposure; (3) Partial Fetal Alcohol Syndrome ("PFAS") (some physical features, but not the full gambit of facial features and not growth deficiencies); (4) Alcohol Related Neurodevelopmental Disorder ("ARND") (no physical features with normal facial and normal growth); and (5)

Alcohol Related Birth Defects ("ARBD").[6] (*Id.* at 453.) Dr. Connor stated that there is really no difference between FAS, PFAS, and ARND when it comes to cognitive impacts. (*Id.* at 475.)

Dr. Connor also provided comprehensive testimony concerning alcohol's effect on a fetus. (*Id.*; ECF No. 20-10 at 1-2.) He stated that alcohol is a poison that affects all parts of the brain and all the synapses. (ECF No. 20-9 at 477-78.) Dr. Connor also indicated that FASD by definition is "brain damage." (ECF No. 20-10 at 27.) Dr. Connor explained that with fetal alcohol exposure, damage to the brain "is occurring at time of development" such that "the brain is never working properly when alcohol is damaging it." (*Id.* at 29.) Dr. Connor compared FASD to Alzheimers in that it affects the entire brain as compared to a stroke, which only affects a localized part of the brain. (*Id.* at 22-23, 30.)

Dr. Connor explained that FASD affects executive functioning that is most commonly associated with the frontal lobe but that it also affects connections with the frontal lobe to all parts of the brain. (*Id.* at 30.) He described executive functioning as "planning, problem solving, learning from your mistakes. Being given something that you have to figure out how to make it work. How to do it in such a way that you can get the job done and do it as well as possible. And so that's kind of - it's this large process of being able to take in information, see what you've done wrong, try and rework it, adapt and cope in order to solve things." (*Id.*)

Dr. Connor also indicated that IQ is impacted by prenatal alcohol exposure. (*Id.* at 6.) He noted that about 20 percent of individuals with FASD have IQs in the mentally retarded range. (*Id.*) However, Dr. Connor stated that you cannot look at IQs as a predictor of whether or not an individual has been impacted by fetal alcohol exposure. (*Id.* at 7.) Dr. Connor observed that with

---

[6] Dr. Connor stated that ARBD is the category where you look for things such as physical anomalies, skeletal anomalies, heart defects, and liver anomalies that are often associated with FASD. (ECF No. 20-9 at 475.)

fetal alcohol exposure he sees splits in IQ. (*Id.*) Dr. Connor indicated that the petitioner had a large split between his verbal and nonverbal IQ score and that his variability was consistent with what he expects with FASD. (*Id.* at 45, 47.)

Dr. Connor conducted a neuropsychological assessment of the petitioner in May 2012. (*Id.* at 25.) Dr. Connor stated that he spent approximately six hours with the petitioner while conducting the assessment. (*Id.*) He indicated that the neuropsychological assessment is "not designed to measure damage to the brain, *per se.*" (*Id.*) Instead, Dr. Connor looks at the functioning and comments on the function or dysfunction of the brain. (*Id.*) Dr. Connor indicated that he uses a series of tests that are broken down into domains or areas of functioning to assess for FASD. (*Id.* at 35.) Dr. Connor explained that the petitioner was deficient in eight out of eleven cognitive ability domains, including visuospatial construction organization, visuospatial memory, attention, executive functions, suggestibility, communication, daily living skills, and social functioning. (*Id.* at 85.) Dr. Connor opined that the functional impairment was severe as the petitioner had deficits in all but three of the domains tested. (*Id.* at 86.)

Dr. Connor's testing also showed the petitioner had poor adaptive functioning skills. (*Id.* at 10, 76-82.) He explained that adaptive functioning is how a person can manage his life day-to-day in the world with no structure around him. (*Id.*) In addition, Dr. Connor's testing found that the petitioner's information could not pass easily from one side of his brain to the other, indicating a damaged corpus callosum, a symptom of FASD. (ECF No. 20-9 at 234.) Dr. Connor indicated that he evaluates people for mental retardation with the same testing used to evaluate the petitioner. (ECF No. 20-10 at 74.)

Dr. Connor also testified that his testing was consistent with testing performed by Dr. Richard Evans, who was a part of the petitioner's trial counsel's defense team. (*Id.* at 87-89.) Dr. Connor

stated that he could not diagnose the petitioner with FAS or any other spectrum disorder as these are medical diagnoses. (*Id*.) However, he found nothing inconsistent with FASD in assessing the petitioner. (*Id*.)

### (2) Dr. Adler

Dr. Adler, a psychiatrist, is also a member of FASD Experts. (ECF No. 20-11 at 73.) He was qualified at the PCR hearing as an expert in clinical and forensic psychiatry and an expert in FASD. (*Id*.) He explained that his sole role in FASD Experts is to forensically examine the person and to render a diagnosis, if a diagnosis is appropriate. (*Id*.)

Dr. Adler diagnosed the petitioner with PFAS and cognitive disorder not otherwise specific (*Id*. at 80.) Dr. Adler indicated that PFAS is a medical diagnosis. (*Id*.) To be diagnosed with PFAS, an individual must have (1) confirmed exposure to alcohol; (2) two of the three facial feature deformities; (3) growth retardation; (4) central nervous system ("CNS") abnormalities; or (5) cognitive abnormalities. (ECF No. 20-11 at 83.) Dr. Adler indicated that you only have to have elements 1 and 2 and any one of elements 3, 4, or 5 to be diagnosed with PFAS, and the petitioner had all five elements. (*Id*. at 181-82.) Dr. Adler indicated that these cognitive abnormalities were severe. Dr. Adler explained that PFAS is more serious than FAS. (*Id*.) He explained that because people with FAS have the full abnormal face and their IQ is lower, it appears they get services more readily. (*Id*. at 173.) Conversely, individuals with PFAS have more difficult lives and more negative things happen to them. Dr. Adler explained that, because individuals with PFAS do not outwardly appear different and because they tend to have higher IQs, individuals with PFAS are able to mask problems they have functioning such that their problems are not readily identified. (*Id*. at 174.) For example, Dr. Adler indicated that the petitioner has good verbal skills, and his verbal skills mask that he has troubles being able to understand and react appropriately to his environment. (*Id*. at 60.)

Dr. Adler explained that Bipolar Disorder is not a symptom of FASD because you can have co-occurring disorders. (*Id*. at 182.) He opined that if you have FASD, then you are at an increased risk of having other disorders. (*Id*.) When asked whether having FASD or being bipolar was worse, Dr. Adler responded that FASD was worse. He stated that the impairment from FASD is markedly greater than a Bipolar Disorder or having Obsessive Compulsive Disorder. (*Id*. at 182-183.)

Both Dr. Adler and Dr. Connor indicated that the petitioner's trial counsel were provided the cognitive deficit information through Dr. Evans' testing. (*Id*. at 259.) When questioned about the petitioner's 2005 and 2011 MRIs, Dr. Adler conceded that the reports indicated a normal brain, although he disagreed with the reporters' conclusion as to each. (*Id*. at 258.)

### (3) Dr. Brown

Psychologist Dr. Natalie Novick Brown also testified at the PCR hearing. Dr. Brown specializes in the evaluation and treatment of individuals with FASD and began her work in this field in 1995. (*Id*. at 267.) She is a member of FASD Experts and stated that her role is to review all of the records to find evidence that might indicate an individual does not have FASD. (*Id*. at 283.)

Dr. Brown explained that FASD affects executive functioning, including self-regulation, behavior control, and thought and emotion control. (*Id*. at 283-84.) Dr. Brown opined that the petitioner's executive functions were significantly impaired due to PFAS. (*Id*.) She also explained that the frontal lobe controls the processing of information from the brain and uses it to make decisions, resist urges, and reduce the intensity of emotions. (*Id*.) Dr. Brown indicated that when the executive functions are impaired it leads to "problematic behavioral difficulties." (*Id*.) Dr. Brown stated that individuals with FASD have impulse control problems – difficulty controlling strong feelings and stopping urges. (*Id*. at 287.) Dr. Brown also noted that individuals have urges

all the time and that they rely on executive functioning to "hit the brakes." (*Id*. at 285.)

Dr. Brown explained that self-monitoring is an important aspect of executive functioning and that individuals with FASD have problems self-monitoring – being aware of what you are doing, the significance and implications of what you are doing, the acts you are engaging in, and the impact of that act or those acts on someone else, or others around you, are important aspects of executive functioning. (*Id*. at 287.) She stated that the petitioner's brain is damaged, thus he does not have the ability to determine what is the worst thing that can happen and resist the urges. (*Id*. at 289.) She indicated that stress makes the problem worse. (*Id*.) Dr. Brown also explained that executive functioning deteriorates in low structure situations, leading to impairments in adaptive functioning. (*Id*. at 317.) Adaptive functioning is how well a person handles day-to-day life. (*Id*. at 294.) Dr. Brown suggested the petitioner cannot function in a non-structured environment and that the environment in day-to-day life is not really very structured. (*Id*. at 315-19.) Dr. Brown suggested that the petitioner would not have problems in the prison environment because it is a structured environment. (*Id*. at 319.)

Dr. Brown stated that individuals with FASD have childlike coping skills and opined that testing suggested the petitioner had the coping skill level of a nine year old. (*Id*. at 303.) Dr. Brown also explained that due to FASD the petitioner had a childlike approach to the world. (*Id*. at 342.) She stated that the petitioner's childlike behaviors led to his inability to handle the breakup with the victim. (*Id*. at 342-43.) Dr. Brown also discussed how the petitioner was suggestible and easily manipulated. (*Id*. at 358.) Dr. Brown indicated that she used the Gudjonsson test standard for suggestibility and found that the petitioner's score rated him more suggestible than the general population. (*Id*. at 360-361.) Dr. Brown explained that state psychiatrist Dr. Crawford's interview of the petitioner immediately after the incident was damaging because Dr.

Crawford's questioning led him away from what he originally said about the crime following his arrest. (*Id*. at 358.) Dr. Brown opined that the petitioner met the definition of Guilty but Mentally Ill and that he lacked sufficient capacity to conform his conduct to the requirements of the law. (*Id*. at 367.) Dr. Brown also reiterated Dr. Connor's observation that adaptive functions are more reliable in measuring an intellectual deficiency than IQ, because IQ is measured in a structured environment. (*Id*. at 294-95.)

Dr. Connor, Dr. Adler, and Dr. Brown acknowledged that, prior to 2007, there was not a protocolized approach to FASD assessment such as their group uses. (*Id*. at 36, 276-77.) However, they each indicated that there were individual practitioners addressing FASD prior to 2007. (*Id*. at 36, 276-77.) On cross examination, Dr. Brown indicated that there were some practioners testifying prior to 2007 who were not qualified to do so. (*Id*. at 276-77.)

**(4) PCR Court's Order**

Following an evidentiary hearing, the PCR court denied the petitioner relief on his claim of ineffective assistance of counsel. (ECF No. 20-11 at 213.) In making this determination, the PCR court indicated that *Strickland* was the applicable standard of review of the petitioner's claims of ineffective assistance of counsel. (*Id*.) In finding that trial counsel were not deficient, the PCR court found:

> The record shows that trial counsel did not present evidence to the jury that Petitioner suffered from Fetal Alcohol Syndrome or that he had organic brain damage. At Petitioner's PCR hearing, Petitioner's trial counsel and defense mitigation investigator testified that they had evidence that Petitioner's mother, Daisy, drank alcohol during pregnancy and that they were aware of Fetal Alcohol Syndrome and the effects of prenatal exposure to alcohol. However, both Attorney Mauldin and Attorney Nettles stated that they could not identify a reason why they did not develop a mitigation strategy based on Fetal Alcohol Syndrome. PCR Transcript of Record at 93-97, 119, 186-88. Nevertheless, this Court finds that Petitioner has not shown trial counsel was ineffective.

(*Id*.)

The PCR court observed that counsel has a duty to undertake reasonable investigations to discover all reasonably available mitigation evidence (ECF No. 20-12 at 208 (citing *McKnight v. State*, 66 S.E.2d 354, 360 (S.C. 2008)). As to trial counsel's investigation, the PCR court found:

> Trial counsel's investigation, preparation, and presentation of defense evidence and mitigation at Petitioner's trial were not deficient. Trial counsel put together a highly qualified defense team, which included experienced capital defense attorneys, mitigation investigators, social workers, and mental health experts. Trial counsel carefully investigated the social, educational, familial, and mental health background of the Petitioner. Trial counsel developed a cogent mitigation defense, offered an array of compelling evidence, and presented the poignant testimony of a number of lay and expert witnesses.

(ECF No. 20-12 at 213.) The PCR court also addressed the petitioner's claim that trial counsel were ineffective for failing to present evidence of FAS, finding as follows:

> Based on all the foregoing, this Court finds that trial counsel had evidence that Petitioner's mother drank during pregnancy, and that trial counsel was aware of the resulting complications, including brain damage. Trial counsel also had evidence that Petitioner possibly suffered brain damage, based on Dr. Evan's reports. Trial counsel presented this information along with other mitigation evidence, to the defense experts. Considering all of the information it had available and in consultation with its experts, trial counsel developed a cogent strategy to present mitigation evidence—including evidence of the mother's alcohol addiction—but also made a strategic decision to not present to the jury evidence of brain damage or a diagnosis of Fetal Alcohol Syndrome (though trial counsel was unable to articulate the reasons for that strategic decision). Instead, trial counsel's strategy was to present mitigation evidence regarding Petitioner's troubled childhood and his mental illness, as diagnosed by defense experts.

(*Id.* at 215.)

The PCR court also found that the petitioner had not shown prejudice. (*Id.* at 217.) In making this determination, the PCR court explained:

> [T]rial counsel presented a well-reasoned mitigation defense, including "compelling evidence of Petitioner's troubled childhood and evidence of Petitioner's mental illness based on multiple expert opinions. The PCR court determined that Petitioner's PCR argument would have "merely resulted in a 'fancier' mitigation case, having no effect on the outcome of the trial." *Jones v. State*, 332 S.C. 329, 504 S.E.2d 822 (1998).

(ECF No. 20-12 at 217.) The PCR court pointed to a survey of jury verdicts in sister jurisdictions where defendants had been sentenced to death "in spite of evidence offered in mitigation that the defendant had fetal alcohol syndrome or organic brain damage." (*Id.* at 218-19.)

### 2. Analysis

#### a. The Parties' Objections and Replies

The petitioner agrees with the Magistrate Judge's recommendation to grant sentencing relief based on Ground Six because the petitioner's trial counsel were ineffective for failing to develop and present evidence that the petitioner suffers from FAS. (ECF No. 155.) The respondents object to this recommendation on both substantive and procedural grounds. (ECF No. 156.) Substantively, the respondents argue that the Magistrate Judge erred in two respects: first, by finding that the PCR Court's determination that trial counsel made a "strategic decision" not to present FAS evidence at sentencing was unreasonable and, second, by finding that the petitioner was prejudiced by that failure. (*Id.*) Procedurally, the respondents argue that, even if the PCR Court made an unreasonable determination of the facts, this court cannot grant summary judgment but instead must hold an evidentiary hearing. (*Id.*)

The petitioner replies to the respondents' objections by stating: (1) the PCR court's finding that trial counsel made a "strategic decision" not to present evidence of fetal alcohol syndrome was an unreasonable determination of the facts; (2) the Magistrate Judge was correct in finding that the petitioner was prejudiced by trial counsel's failure to develop and present evidence of fetal alcohol syndrome; and (3) the court may grant the petitioner relief from the PCR court's finding regardless of whether the petitioner filed a Motion for Summary Judgment. (ECF No. 163.) As discussed below, the court is in agreement with the petitioner's arguments.

#### b. The Court's Review

The court finds that the PCR court's determination that the petitioner failed to prove that trial counsel were deficient for failing to investigate, develop, and present fetal alcohol as a mitigation factor was both contrary to and an unreasonable application of clearly established federal law to the facts in the record. Specifically, the PCR court's finding that trial counsel "made

a strategic decision not to present to the jury evidence of brain damage or a diagnosis of Fetal Alcohol Syndrome (though trial counsel was unable to articulate the reason for that strategic decision)" (ECF No. 20-12 at 215) was a violation of clearly established law because it was based on a less than adequate investigation and unreasonable determination of the facts in evidence and is not supported by the evidence as presented by trial counsel's testimony.

Attorney Nettles testified that he did not recall any discussion concerning FAS. (ECF No. 20-9 at 291.) Attorney Nettles acknowledged that the mitigation specialist, Vogelsang, prepared a risk assessment for the defense team and included on that list was "mother drank and smoked throughout pregnancy." (*Id*. at 285.) However, attorney Nettles indicated that they never discussed FAS in relation to the checklist. (*Id*. at 291.) Attorney Nettles also acknowledged that there were indicators that the petitioner may have had brain damage and that he knew that drinking by a birth mother could cause brain damage, but he never connected the dots. (*Id*.at 293-94.) Attorney Nettles indicated his awareness of the American Bar Association's Guidelines for Performance of Defense Counsel in Death Penalty Cases, which states that counsel needs to conduct an in-depth investigation as well as explore all avenues of mitigation, and mentions FAS three times. (*Id*. at 288-89.)

When asked about his investigation into FAS, attorney Nettles stated that FAS "wasn't ever brought up," that "[i]t wasn't discussed," and "[i]t wasn't ruled in, it wasn't ruled out." (*Id*. at 295.) Attorney Nettles also indicated that there was never an intent to put up evidence of FAS. (*Id*. at 289.)

In response to being asked what comes to mind when you think of drinking during pregnancy, attorney Nettles responded, "[w]ell, now, Fetal Alcohol Syndrome." (*Id*. at 286.) When asked if drinking by the petitioner's mother during pregnancy "rang any bell," attorney

Nettles testified that he made no correlation between the mother's drinking and FAS (*Id.* at 290.) He explained that the bell that rang for him was to show a correlation between the mother's drinking and that the petitioner had a less than ideal childhood. (*Id.* at 290.) Attorney Nettles acknowledged during questioning that he would liked to have had evidence to support a diagnosis of "guilty but mentally ill." (*Id.* at 331.)

Attorney Mauldin also testified at the PCR hearing as to whether they conducted any investigation into whether the petitioner suffered from FAS. (*Id.* at 369.) Attorney Mauldin agreed with attorney Nettles that FAS was not brought up, was not discussed, and was not a part of their trial strategy. (*Id.*) According to attorney Mauldin, if FAS had been discussed, it would have been noted on the checklist, and it was not. (*Id.* at 368.)

Attorney Mauldin explained that FAS has become a much more common inquiry than at the time the petitioner was tried, and he now knows more about the concept than he did eight or nine years ago. (*Id.* at 352-53.) He explained that if he were to see a risk factor on a list referencing drinking during pregnancy now, a red flag of FAS would pop up. (*Id.*) Attorney Mauldin indicated that he was aware that the circumference of the head at birth had a correlation with FAS and that one of the experts on their defense team had requested birth records that would have contained this information, suggesting the expert may have suspected FAS. (*Id.* at 380.) Attorney Mauldin acknowledged that he did not make such a connection. (*Id.* at 381.) Attorney Mauldin also acknowledged that an MRI was not done until a week prior to trial and that he had no explanation as to why it was not done earlier given that he was on notice that the petitioner's mother drank during pregnancy. (*Id.* at 365.)

Attorney Mauldin testified that, after being shown PCR evidence and exhibits, he was "dumbfounded" as to why a certain course of action did not occur – that a natural course would

be to bring in a neurologist and tell him they had evidentiary information to suspect FAS and they

needed whatever testing needed to be done to determine whether it existed. (*Id.* at 387.) Attorney

Mauldin acknowledged that the risk factor of a mother drinking during pregnancy was a red flag

regarding the potential for organic brain damage. (*Id.* at 354.) Attorney Maudlin concurred with

attorney Nettles that he would have wanted evidence that the petitioner suffers from brain damage

before the jury such that he could present a defense of guilty but mentally ill. (*Id.* at 354-55, 393.)

When asked if he ever went to any experts about the problem of the mother drinking, he

responded, "And what could possibly have led me to not conduct some sort of follow-up is just

beyond my – I don't have an explanation for it." (*Id.* at 402.)

### 1. Deficient Performance

On the question of deficient performance, the evidence was that organic brain damage and

FAS were not recognized by trial counsel, thus no investigation into those conditions was pursued

or undertaken. (ECF No. 108 at 22.) In order to establish deficient performance, a "defendant must

show that counsel's representation fell below an objective standard of reasonableness."

*Strickland*, 466 U.S. at 688. Under *Strickland*, "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary."

*Id.* at 691. Concerning counsel's duty to investigate, the United States Supreme Court explained:

> [S]trategic choices made after thorough investigation of law and facts relevant to
> plausible options are virtually unchallengeable; and strategic choices made after less
> than complete investigation are reasonable precisely to the extent that reasonable
> professional judgments support the limitations on investigation. In other words,
> counsel has the duty to make reasonable investigations or to make a reasonable
> decision that makes particular investigations unnecessary. In any ineffectiveness
> case, a particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Id.* at 690–91. Further, the Supreme Court indicated that a court's inquiry "is not whether counsel

should have presented a mitigation case. Rather we focus on whether the investigation supporting

counsel's decision not to introduce mitigating evidence was itself reasonable." *Wiggins*, 539 U.S.

at 523.

Counsel is not required to "investigate every conceivable line of mitigating evidence." *Id.* In considering the reasonableness of counsel's investigation, the court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690. Trial counsel's failure to make a reasonable investigation of whether the petitioner suffered from FAS and to present this as mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel. *See, e.g. Sears v. Upton*, 560 U.S. 945, 946 (2010) (holding that evidence of brain damage was "significant mitigation evidence a constitutionally adequate investigation would have uncovered.").

Additionally, the performance of counsel is measured in terms of "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. "Prevailing professional norms of practice as reflected in the American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides." *Id.* The performance inquiry in this case concerns the nature of trial counsel's duty to investigate mitigating evidence in a capital case. In a capital case, the professional norms require counsel to conduct a thorough investigation into "all reasonably available mitigating evidence." *Wiggin*s, 539 U.S. at 524.

Turning to the PCR court's decision that the petitioner failed to meet his burden of establishing that trial counsel were deficient, the PCR court found that trial counsel "developed a cogent strategy to present mitigation evidence—including evidence of the mother's alcohol addiction — but also made a strategic decision to not present to the jury evidence of brain damage or a diagnosis of Fetal Alcohol Syndrome (though trial counsel was unable to articulate the reasons for that strategic decision)." (ECF No. 20-12 at 217.) The PCR court also determined that

the petitioner had not shown prejudice. (*Id*. at 217-19.) Thus, the AEDPA standard applies to both prongs of the *Strickland* test.

The court is mindful that it must give deference to the PCR court's merits determination. 28 U.S.C. § 2254(d), (e). Additionally, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

The court finds that the PCR court's determination that trial counsel made a "strategic decision" not to investigate and not present evidence of FAS or brain damage during the sentencing phase of trial was unreasonable. First, this finding of the PCR court is directly contradicted by the testimony of both attorney Nettles and attorney Mauldin. *See* 28 U.S.C. § 2254(d)(1). As fully set forth above, both of the petitioner's trial counsel testified at the PCR hearing that FAS was never discussed, it was never considered, and it was never ruled in or out. (ECF No. 20-9 at 295, 369.) Second, trial counsel acknowledged that they were aware that the petitioner's mother drank when she was pregnant with the petitioner and that Dr. Evan's report indicated the petitioner had frontal lobe damage. (ECF No. 20-9 at 293-94, 354.) However, it appears that trial counsel either overlooked or ignored these indicators and failed to investigate for evidence of FAS. *See Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008) (counsel ignored red flags and failed to investigate for mental health evidence) (citing *Rompilla*, 545 U.S. at 392); *Wiggins*, 539 U.S. at 516-18, 522 (counsel was ineffective for failing to pursue leads and investigate further into defendant's background despite knowing that defendant's mother was an alcoholic and that defendant had emotional and academic difficulties as a child). Trial counsel's decision not to present evidence of organic brain damage or FAS cannot be described as strategic,

since trial counsel were not aware of the evidence that might have been available. *See, e.g., Sears v. Upton*, 561 U.S. 945, 951 (2010) (failure of trial counsel to present mitigating evidence that they do not know about cannot be a strategic decision). Third, any decision of trial counsel not to investigate was erroneously based on counsel's failure to inquire about and appreciate the potential value of evidence of brain damage and FAS as a mitigating circumstance, as outlined by Drs. Connor, Adler, and Brown at the PCR hearing.

As such, in viewing the record as a whole, including the evidence introduced at the sentencing and at the PCR hearing, and applying deference to the PCR court's decision, the court concludes that there is no reasonable argument to sustain the PCR court's finding that trial counsel made a "strategic decision" to not present evidence of FAS. Further, there could be no disagreement between "fairminded jurists" that the PCR court's decision was incorrect. *Harrington*, 562 U.S. at 102. As such, the state court decision involved an unreasonable determination of the facts in light of the petitioner's clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(d)(1).

### 2. Prejudice

Having found that the PCR court's decision as to Ground Six was based upon an unreasonable determination of the facts, the court must now determine whether the failure of the petitioner's trial counsel to investigate and present evidence of organic brain damage and FAS at the sentencing proceeding resulted in prejudice. The PCR court addressed the prejudice prong of *Strickland* and found that, even if trial counsel were deficient, the petitioner had failed to establish prejudice. (ECF No. 20-12 at 217-19.) The PCR court noted that trial counsel had put together a highly qualified defense team, which included experienced capital defense attorneys, mitigation investigators, social workers, and mental health experts. The PCR court also noted that trial counsel had presented a "well-reasoned mitigation defense, which included evidence of the

26

petitioner's troubled childhood and evidence of the petitioner's mental illness based on multiple expert opinions." (*Id*. at 217.)[7]   The PCR court explained that the petitioner's fetal alcohol syndrome argument would have only produced a "'fancier mitigation case.'" (*Id*. at 217 (quoting *Jones v. State*, 504 S.E.2d 822 (S.C. 1998) (trial counsel not ineffective for failing to thoroughly investigate and present mitigating evidence regarding defendant's mental impairments, including organic brain damage, where trial counsel focused its mitigation on the mental condition of the defendant)). The PCR court also set forth a survey of jury verdicts in sister jurisdictions wherein evidence of FAS had been presented in mitigation and the defendants were still found guilty. (*Id*. at 218- 19.)

If the trial counsel had presented evidence of the petitioner's organic brain damage and FAS, it is reasonable that at least one juror would have been persuaded to give a life sentence rather than the death penalty. To establish prejudice, a petitioner must show a "reasonable probability" that counsel's deficient performance prejudiced the outcome of the case. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.* at 696.  As to the penalty phase, "[i]n assessing prejudice, we reweigh  the evidence in aggravation against the totality of the available mitigating evidence." *Wiggins*, 539 U.S. at 534.  *See Williams v. Taylor*, 529 U.S. 362, 397–98 (2000) (the court must "evaluate the totality of  the available mitigation evidence—both that adduced at trial, and the evidence  adduced  in  the  habeas  proceeding—in  re-weighing  it  against  the  evidence  in

---

[7] At the sentencing phase of the trial, the petitioner's father and sister provided testimony regarding the petitioner's difficult childhood.

aggravation.").

In the present action, the prosecutor put forward only one aggravating factor, and the jury was split after several hours of deliberation. As previously set forth, the mitigating evidence relates to the petitioner's exposure to alcohol *in utero*. Presented with the additional mitigating evidence regarding the petitioner's organic brain damage and diagnosis of PFAS, there is a reasonable probability that the jury would not have sentenced him to death. Testimony regarding the petitioner's brain damage would have been compelling mitigating evidence and is the type of evidence that the Supreme Court has recognized as relevant in assessing a defendant's moral culpability. *Porter v. McCollum*, 558 U.S. 30, 41 (2009). The testimony of Dr. Brown that the petitioner at the time of the crime was not able to conform his conduct to the requirements of the law was important mitigation testimony that should have been presented to the jury. Further, the evidence presented at the PCR hearing by the petitioner's experts was that the petitioner is emotionally on the level of a nine-year-old and was functioning as a child on the days leading up to the murder. Further, the state has not contradicted the petitioner's diagnosis of PFAS. As shown in the publications submitted to the PCR court and through the experts' testimony, FASD can cause a person to make poor decisions, including criminal behavior. (ECF No. 146 at 85.) The evidence of brain damage caused by *in utero* ingestion of alcohol was compelling evidence that could have led one juror to making a different decision at the sentencing phase.

Because of trial counsel's omissions in this case, the jury was deprived of powerful evidence - that the petitioner suffered from organic brain damage and that FAS had impaired his judgment and his ability to control his behavior. The petitioner has presented a compelling case that he suffers from FAS, a dysfunction that affected his cognitive ability and his ability to conform his actions. This evidence should have been presented to the sentencing jury. If this evidence had been

presented, there is a reasonable probability that the jury would have returned a sentence of life in prison rather than a death sentence. Because trial counsel unreasonably failed to investigate and present compelling mitigation evidence, this court's confidence in the outcome reached at sentencing is undermined. The petitioner has established prejudice resulting from trial counsel's ineffectiveness, and the petitioner is entitled to a new sentencing hearing.

Based upon the foregoing, the respondents' Motion for Summary Judgment as to Ground Six is denied, thereby granting the petitioner's amended habeas petition as to Ground Six.

## B. Grounds Eleven, Twelve, Thirteen, Fourteen, and Fifteen

### 1. Background

In Grounds Eleven through Fifteen, the petitioner alleges that his trial counsel were ineffective in presenting certain evidence and in failing to investigate, develop, and present certain other evidence, and that these failures prejudiced the mitigation phase of the trial. (ECF No. 74 at 23-77.) The petitioner further alleges that PCR counsel were ineffective in failing to present these claims in PCR, thus providing cause to excuse the procedural bar of these grounds under *Martinez.* (*Id.*) The petitioner notes that extra-record evidence has been provided in support of these grounds (*id.* at 23), and several affidavits and other documentary evidence were included as exhibits to the amended petition (*see* ECF Nos. 74-1 through 74-26). On September 8, 2017, the petitioner filed a Motion to Expand the Record and for an Evidentiary Hearing on all *Martinez* claims. (ECF No. 109.) The respondents filed a response in opposition on October 6, 2017 (ECF No. 115), and the petitioner filed a reply on October 26, 2017 (ECF No. 124).

On October 16, 2017, the petitioner filed a Motion to Stay further proceedings pending the decision by the Supreme Court of the United States in *Ayestas v. Davis*, a case which is likely to address issues relating to whether a petitioner may present evidence developed during his

federal habeas investigation in an evidentiary hearing for consideration of his *Martinez* claims. (ECF No. 121.) The respondents filed a response to that Motion on October 27, 2017 (ECF No. 126), and the petitioner filed a reply on November 1, 2017 (ECF No. 126). On November 3, 2017, the Magistrate Judge filed his first Report and Recommendation, recommending that the district court grant the Motion to Stay. (ECF No. 139 at 3). However, after further review of the parties' filings, the Magistrate Judge stated his intention to withdraw his first Report and Recommendation that this case be stayed pending the decision in *Ayestas v. Davis* because of his recommendation to resentence the petitioner, rendering an evidentiary hearing before this court unnecessary.[8] (ECF No. 146 at 99-100.)

In the Magistrate Judge's second and most recent Report and Recommendation, he recommended that the petitioner be allowed to present the evidence at issue in Grounds Eleven through Fifteen, along with other relevant evidence, to the state court for its consideration. (ECF 146 at 100.) Therefore, the Magistrate Judge recommended that Grounds Eleven through Fifteen be dismissed without prejudice and the petitioner's Motion for Evidentiary Hearing and to Expand the Record (ECF No. 109) be denied as the evidence at issue may be presented to the state court. (*Id.*)

### 2. The Parties' Objections and Replies

The petitioner objects to the recommendation that the court dismiss the five *Martinez* claims without prejudice because to do so "violates his Fifth Amendment right to due process of law." (ECF No. 155 at 18.) The statute of limitations for the filing of a habeas petition under 28 U.S.C. § 2254 tolled in February of 2017. If the petitioner's *Martinez* claims are dismissed,

---

[8] The court notes that this Report and Recommendation has not been withdrawn on the docket. (*See* ECF No. 139.) Therefore, the court will still rule on this Report and Recommendation.

even without prejudice, and it becomes necessary to refile his claims, tolling provisions will apply. The dismissal "without prejudice" will shelter the claims from principles of *res judicata* but not from the statute of limitations. Although the statute of limitations is not jurisdictional,[9] an untimely filing is subject to the rigors of equitable tolling. Moreover, the petitioner maintains that he has made a prima facie showing entitling him to an evidentiary hearing to establish "cause" for the default, and as such the petitioner believes that the *Martinez* claims are ripe for disposition. (ECF No. 155 at 20.) Accordingly, the petitioner asserts that he is entitled to a ruling on the merits or a stay pending a final order on the exhausted claims. (*Id*. at 19.)

The respondents object to the recommendation that Grounds Eleven through Fifteen be dismissed without prejudice. (ECF No. 164 at 1.) The respondents believe a stay of these five grounds pending a final determination on the remaining claims is not warranted. (*Id*.) In light of the respondents' position that the Report's recommendation on Ground Six should be rejected, the respondents submit the claims presented in Grounds Eleven through Fifteen should be remanded to the Magistrate Judge for resolution. (*Id*.) Further, the respondents espouse that the petitioner's claims in Grounds Eleven through Fifteen were procedurally defaulted in state court, and as a result, are barred from federal habeas review. (ECF No. 164 at 2.) The respondents posit that the petitioner has not shown that procedural default should be excused under *Martinez* and furthermore, based upon the state court record, the claims are "without merit." (*Id*.)

### 3. The Court's Review

The court acknowledges the petitioner's concern regarding the statute of limitations issue if he were to refile his habeas petition at a later time. *See Rhines v. Weber*, 544 U.S. 269, 269 (2005) (holding that a district court has discretion to stay a mixed petition to allow a petitioner to present his

---

[9] *Holland v. Florida*, 560 U.S. 631 (2010).

unexhausted claims to the state court in the first instance and then to return to federal court for review of his perfected petition). "It likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id*. at 278. Because the court does not believe that (1) the petitioner's allegations of ineffective assistance of counsel are frivolous (explaining his failure to exhaust), (2) his unexhausted claims are without merit, or (3) he has engaged in intentionally dilatory litigation tactics, the court finds that a stay pending exhaustion of the potentially meritorious claims is warranted.

In *Rhines*, the Supreme Court referenced approvingly a 30-day time period. *See Rhines*, 544 U.S. at 278 (*citing Zarvela v. Artuz*, 254 F.3d 374, 381 (2d Cir. 2001) ("[District courts] should explicitly condition the stay on the prisoner's [pursuit of] state court remedies within a brief interval, normally 30 days, after the stay is entered and returning to federal court within a similarly brief interval, normally 30 days after state court exhaustion is completed."). As a result, the court will suggest a 30-day time period for the petitioner to be resentenced in state court, and thereafter within 30 days of the petitioner's resentencing, for the petitioner to return to this court for the court's ruling on any related issues.

The petitioner's Motion for Evidentiary Hearing and to Expand the Record (ECF No. 109) are hereby denied without prejudice as the evidence at issue may be presented to the state court. Lastly, the petitioner's Motion to Stay pending the decision in *Ayestas v. Davis* is denied without prejudice, as an evidentiary hearing before the court at this time is unnecessary.

### III.    CONCLUSION

The court hereby **ACCEPTS** the Magistrate Judge's Report and Recommendation as to Grounds One through Ten, and **REJECTS** the Report and Recommendation as to Grounds

Eleven through Fifteen. (ECF No. 146). Therefore, the court **GRANTS** the respondents' Motion for Summary Judgment as to Grounds One, Two, Three, Four, Five, Seven, Eight, Nine, and Ten and **DENIES** it as to Ground Six (ECF No. 101). Consequently, the court **GRANTS** petitioner's amended habeas petition as to Ground Six (ECF No. 74), and **VACATES** his death sentence. Based on the Supreme Court's decision in *Rhines*, the court suggests that a resentencing trial in state court occur within 30 days or as soon as practical thereafter.

Further, as to Grounds Eleven through Fifteen, the court **GRANTS** the petitioner a stay pending exhaustion of these claims in state court. Finally, the court **DENIES WITHOUT PREJUDICE** the petitioner's Motion to Expand the Record and for Evidentiary Hearing (ECF No. 109) and his Motion to Stay pending the decision in *Ayestas v. Davis* (ECF No. 121). Accordingly, the court **REJECTS** the Magistrate Judge's Report and Recommendation as to petitioner's Motion to Stay pending the decision in *Ayestas v. Davis* (ECF No. 139).

**IT IS SO ORDERED.**

J. Michelle Childs
United States District Judge

March 8, 2018
Columbia, South Carolina